## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on 16-3, November 3, 2016**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | **GRAND JURY ORIGINAL** |
| | : | |
| **JAMES A. BENJAMIN,** | : | **VIOLATIONS:** |
| | : | |
| **a/k/a "Jay Benjamin,"** | : | **18 U.S.C. § 1341** |
| | : | **(Mail Fraud)** |
| **Defendant.** | : | |
| | : | **18 U.S.C. § 1343** |
| | : | **(Wire Fraud)** |
| | : | |
| | : | **22 D.C. Code § 3221(a)** |
| | : | **(First Degree Fraud)** |
| | : | |
| | : | **18 U.S.C. § 1001** |
| | : | **(False Statement)** |
| | : | |
| | : | **FORFEITURE:** |
| | : | **18 U.S.C. § 982(a)(1)(C);** |
| | : | **28 U.S.C. § 2461(c); and** |
| | : | **21 U.S.C. § 853(p)** |

## INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

At times material to this indictment:

1.     Defendant JAMES A. BENJAMIN ("BENJAMIN"), also known as "Jay Benjamin," was a resident of Maryland.

2.     Ventricle Advisory Consultants, LLC ("VENTRICLE") was a limited liability company that was organized under the laws of Maryland.

1

3.     DMPG, LLC ("DPMG"), was a limited liability company that was organized under the laws of Maryland.   The Maryland Department of Assessments and Taxation listed DPMG as "forfeited" as of October 3, 2011.

4.     BENJAMIN organized and controlled VENTRICLE and DPMG.

5.     J.G. was a resident of Maryland.   J.G. was both a beneficiary and trustee of GFT, a family trust derived from the estate of J.G.'s father.

6.     D.L. was a resident of North Carolina.

7.     K.B. was a resident of the District of Columbia.   T.B. was a resident of Maryland. K.B. and T.B. were business partners who operated Company LE.

8.     L.G. was a resident of Maryland and the pastor of a church in Maryland.   L.G. owned Company GGI.

### The Scheme

#### Overview

9.     Between about March 2015 and about March 2017, BENJAMIN conducted a financial fraud scheme using VENTRICLE and DPMG.   BENJAMIN used VENTRICLE to fraudulently solicit and receive investments and fees from investors and borrowers.   BENJAMIN used VENTRICLE and DPMG to obtain and launder the proceeds of the scheme, and to create the appearance that he conducted a legitimate financial services business.

10.    BENJAMIN told prospective investors and borrowers that he and VENTRICLE had access to, and expertise in, investments and loans involving "bank instruments," especially international "bank instruments" and "Standby Letters of Credit," or "SBLCs."

11.     BENJAMIN typically told prospective investors and borrowers that, through VENTRICLE, he would serve as a "broker," "consultant," or other type of intermediary, and that he and VENTRICLE would work with third parties that would help issue or obtain SBLCs.

12.     BENJAMIN claimed that, by making up-front cash payments from about $16,000 to about $250,000, investors and borrowers could obtain millions of dollars through SBLCs, even if, to obtain the SBLCs and proceeds therefrom, they intended to rely on collateral that was worth a fraction of the SBLC amount.

13.     BENJAMIN structured the transactions and tailored his fraudulent representations to ensure that, even without the knowledge or authorization of the relevant investors and borrowers, he would be able to obtain unauthorized fees, misappropriate investor funds, or both.

14.     In some cases, BENJAMIN told investors that the proposed SBLC transactions would result in significant "non-recourse" SBLC loans that investors would never need to repay. In other cases, BENJAMIN told investors that they would never need to repay SBLC loans because a portion of the loan proceeds would be invested; the profits from those investments would be used to repay the SBLC loans.  In other cases, BENJAMIN told prospective borrowers that SBLC financing would essentially work the same way that traditional mortgages and bank loans worked, that is, the prospective borrowers would obtain money from the SBLC while they, in turn, provided collateral purportedly securing the moneys received.

15.     In this manner, by making a series of false and fraudulent representations, pretenses, and promises concerning material facts, and by making fraudulent omissions that concealed material facts, BENJAMIN intentionally misled prospective investors and borrowers into believing that he would honestly and properly handle their investment and loan transactions.  Through those

3

representations, BENJAMIN caused prospective investors and borrowers to wire hundreds of thousands of dollars to VENTRICLE bank accounts, and to bank accounts owned by third-party companies that would then transfer money to VENTRICLE and DPMG.

16.     BENJAMIN subsequently used the proceeds in VENTRICLE and DPMG bank accounts to pay for his electric bills, satellite television bills, trips to casinos, and luxury vehicles. In one case, BENJAMIN used newly-obtained investor funds from D.L. to refund $25,000 to J.G.

### Investment by J.G. and GFT

17.     In or about April and May 2015, BENJAMIN solicited a $250,000 investment from J.G. and GFT. BENJAMIN falsely represented that all $250,000 would serve as collateral for a $5,000,000 SBLC that VENTRICLE would obtain. BENJAMIN also falsely represented that VENTRICLE's fees would be drawn from "net profits" that would result from the transaction.

18.     BENJAMIN knew that the aforementioned representations were false when he made them. BENJAMIN knew that he planned to keep $50,000 of the J.G./GFT investment for himself, and that only $200,000 of the J.G./GFT investment would be available to serve as the "SBLC Collateral."

19.     By making a series of these and other false and fraudulent representations, pretenses, and promises concerning material facts, and by making fraudulent omissions that concealed material facts, BENJAMIN intentionally misled J.G. into believing that he and VENTRICLE would honestly and properly J.G.'s investment money in the manner that BENJAMIN represented.

20.     On or about May 4, 2015, as a result of BENJAMIN's representations, J.G. caused GFT to wire $250,000 into a VENTRICLE bank account.  BENJAMIN wired $200,000 of that $250,000 into a bank account controlled by T.G., an individual who had been working with BENJAMIN.  BENJAMIN kept $50,000 of the J.G./GFT investment for his own personal enrichment.

21.     T.G. did not invest the funds as represented.  However, by December 2015, T.G. had agreed to refund the entire $200,000 that VENTRICLE had invested with T.G.  Accordingly, through two $100,000 wire transfers in December 2015 and January 2016, T.G. paid VENTRICLE refunds totaling $200,000.

22.     In January 2016, BENJAMIN falsely and fraudulently told J.G. that VENTRICLE had received only $100,000 from T.G.  BENJAMIN then wired $98,250 from VENTRICLE to GFT.  BENJAMIN falsely and fraudulently claimed that bank fees consumed the missing $1,750.

23.     BENJAMIN intentionally concealed the existence of T.G.'s other $100,000 refund payment.  Through misrepresentations and intentional omissions, BENJAMIN intentionally misled J.G. and GFT to believe that VENTRICLE had only received $100,000 from T.G.  BENJAMIN kept the other $100,000 in a VENTRICLE bank account, which allowed BENJAMIN to use that money for unauthorized transactions, including his own personal enrichment.

First Investment by D.L.

24.     In or about April 2016, BENJAMIN begin soliciting investments from D.L. BENJAMIN told D.L. that he had expertise in "trading and leveraging in banking instruments" and "commercial real property trades."

25.     Through a series of false and fraudulent representations, pretenses, and promises concerning material facts, and by making fraudulent omissions that concealed material facts, BENJAMIN intentionally misled D.L. into believing that VENTRICLE would properly and honestly handle D.L.'s investment funds in the manner BENJAMIN represented; that VENTRICLE would use D.L.'s investment funds for high-yield investments that involved "trading and leveraging in banking instruments" and "commercial real property trades"; and that VENTRICLE would obtain only agreed-upon fees from D.L.   BENJAMIN made various oral representations about his fees, including representations that created the false appearance that he would obtain only industry-standard fees.

26.     BENJAMIN falsely told D.L. that her investment would be "leveraged" through a VENTRICLE "investment" account that regularly conducted international banking business. BENJAMIN claimed that this special bank account would function similar to a hedge fund, such that the funds therein would earn significant returns.   BENJAMIN further represented that the account would include investments from other investors, but that a third party would manage and/or monitor the account to track each investor's funds.

27.     In fact, as BENJAMIN knew, neither BENJAMIN nor VENTRICLE held a special investment account that regularly conducted international banking business, functioned similar to a hedge fund, or otherwise earned significant returns.   In fact, as BENJAMIN knew, the VENTRICLE account that received D.L.'s money was a business checking account that BENJAMIN controlled at M&T Bank.

28.     In fact, as BENJAMIN knew, the VENTRICLE account that received D.L.'s investment would not be monitored by an any third party, nor by anyone else, except BENJAMIN. In fact, as BENJAMIN knew, D.L.'s investment would be commingled in a VENTRICLE account that BENJAMIN frequently used for personal spending, including cash withdrawals at casinos.

29.     On or about July 29, 2016, based on BENJAMIN's representations about the proposed investment, D.L. wired $563,805.84 to a bank account controlled by an attorney, R.H.

30.     Based on BENJAMIN's instructions, R.H. wired $60,000 of D.L.'s money to a bank account for the benefit of D.L.   R.H. then wired $497,958 to VENTRICLE.   R.H. kept the remaining funds, approximately $5,847, as a fee for receiving and redistributing funds.

31.     VENTRICLE received the $497,958 wire on or about August 8, 2016.   During the months that followed, BENJAMIN had sole control over D.L.'s investment funds.   BENJAMIN did not invest those funds in the manner that he had described to D.L.   Instead, BENJAMIN used hundreds of thousands of dollars of D.L.'s investment funds for unauthorized purposes, including thousands of dollars for transfers among other bank accounts controlled by BENJAMIN, including transfers to DPMG, as well as thousands of dollars for electric bills, satellite television bills, trips to casinos, and payments on luxury vehicles.

32.     In January 2016, BENJAMIN sent D.L. a one-page report containing a fraudulent summary of D.L.'s investment.  The summary appeared to show that VENTRICLE had invested D.L.'s money as promised, reflecting "committed funds for banking securities/SBLCs" involving several corporate entities.  However, as BENJAMIN knew, the summary and the representations therein were materially false and fraudulent.  Neither BENJAMIN nor VENTRICLE had made any of the listed investments involving "banking securities/SBLCs."  In fact, although BENJAMIN had already used nearly $200,000 of D.L.'s investment by January 2016, approximately $300,000 remained in the VENTRICLE checking account.

### SBLC Application For Company LE

33.     In September 2016, K.B. and T.B. were seeking a business loan to expand their business, Company LE.

34.     Through a series of false and fraudulent representations, pretenses, and promises concerning material facts, and by making fraudulent omissions that concealed material facts, BENJAMIN persuaded K.B. and T.B. to apply for an SBLC from MTF, which BENJAMIN described as a third-party company that would help Company LE obtain non-bank financing, including SBLCs.  BENJAMIN told K.B. and T.B. that Company LE could obtain $2,000,000 through an SBLC that would issue based on an upfront payment of $96,000 and the use of certain collateral owned by Company LE.

35.     In September 2016, BENJAMIN falsely represented to K.B. and T.B. that Company LE had been approved for the SBLC, and that the SBLC would issue in the near future, so long as K.B. and T.B. paid the $96,000 upfront guaranty fee to MTF.

36.     Through a series of false and fraudulent representations, pretenses, and promises concerning material facts, and by making fraudulent omissions that concealed material facts, BENJAMIN intentionally misled K.B. and T.B. into believing that their $96,000 upfront payment was fully refundable and that it did not include any broker fees to BENJAMIN.   In fact, BENJAMIN knew that he would take $30,000 of that upfront payment as his nonrefundable fee.

37.     On or about September 24, 2016, based on BENJAMIN's representations, K.B. and T.B. paid the MTF invoice on behalf of Company LE, including by a $50,000 cashier's check that T.B. mailed from a U.S. Post Office in the District of Columbia.   Shortly after MTF received Company LE's payment, BENJAMIN submitted an invoice to MTF for $30,000.   MTF paid BENJAMIN the $30,000 fee through a wire transfer to a DPMG bank account controlled by BENJAMIN.

## SBLC Application by D.L.

38.     In or about October 2016, BENJAMIN persuaded D.L. to obtain an SBLC. BENJAMIN told D.L. that, based on an initial payment of $48,500, plus the use of two residential properties as collateral, D.L. could obtain $2,000,000 through an SBLC.   BENJAMIN claimed that, even though D.L.'s residential properties were valued at less than $1,000,000, D.L. could obtain a $2,000,000 SBLC by using those properties as collateral.   BENJAMIN claimed that $1,500,000 of the SBLC proceeds would immediately be available to D.L., and that BENJAMIN would use the remaining $500,000 to make investments that would repay the SBLC.

39.    Through false and fraudulent representations, pretenses, and promises that BENJAMIN made and caused to be made, BENJAMIN intentionally created the false impression that D.L.'s $48,500 payment was required for, and would be used for, "Guaranty Charges" for the SBLC.   BENJAMIN also intentionally created the false impression that none of the $48,500 would be paid to BENJAMIN.

40.    Based on BENJAMIN's false and fraudulent representations, pretenses, and promises, on or about October 10, 2016, D.L. wired $48,500 to MTF.   Shortly after MTF received D.L.'s payment, BENJAMIN submitted an invoice to MTF for $22,500.   MTF paid BENJAMIN the $22,500 fee through a wire transfer to a DPMG bank account controlled by BENJAMIN, where it was used for various purposes, including payments on luxury vehicles.

### SBLC Application For Company GGI

41.    In November 2016, L.G. was the pastor of a church in Maryland.   L.G.'s church was seeking financing to purchase its church building.

42.    Through a series of false and fraudulent representations, pretenses, and promises concerning material facts, and by making fraudulent omissions that concealed material facts, BENJAMIN persuaded L.G. and his church to apply for an SBLC from MTF.   BENJAMIN told L.G., as well as other members of the church, that the church could obtain $6,000,000 through an SBLC that would issue based on an upfront payment of $120,000.

43.    BENJAMIN told L.G. and the church, although the church could be the beneficiary in fact, an SBLC could only be issued to a for-profit entity.   L.G. and the church agreed that Company GGI, which was owned and operated by L.G., could be the formal applicant for the loan.

10

44.    In November 2016, BENJAMIN falsely represented to L.G. and the church that Company GGI had been approved for the SBLC, and that the SBLC would issue in the near future, so long L.G., the church, or Company GGI paid a $120,000 upfront guaranty fee to MTF.

45.    Through a series of false and fraudulent representations, pretenses, and promises concerning material facts, and by making fraudulent omissions that concealed material facts, BENJAMIN intentionally misled L.G. and the church into believing that their $120,000 upfront payment was fully refundable and that it did not include any broker fees to BENJAMIN.   In fact, BENJAMIN knew that he would take $54,000 of that upfront payment as his nonrefundable fee.

46.    In about November 2016, based on BENJAMIN's representations, the church paid the $120,000 on behalf of GGI.   Shortly after MTF received Company GGI's payment, BENJAMIN submitted an invoice to MTF for $54,000.   MTF paid BENJAMIN the $54,000 fee through a wire transfer to a DPMG bank account controlled by BENJAMIN.

### Final Investment by D.L.

47.    In or about September 2016 through November 2016, BENJAMIN persuaded D.L. to make an additional investment with VENTRICLE.   BENJAMIN told D.L. that VENTRICLE was involved with "real estate ventures" and that VENTRICLE owned a "portfolio of properties" that was then valued at $3,600,000.

48.    BENJAMIN told D.L. that, if she invested in these "real estate ventures," her "return will equate to 16% annually," which BENJAMIN later adjusted to 17.5% annually.   BENJAMIN told D.L. that VENTRICLE would "secure" her investment "with the entire 3,600,000."   BENJAMIN told D.L. that, because VENTRICLE would "be securing [D.L.'s] contributions with the entire portfolio," and the investment would be "SECURE with no worries."

11

49.     In fact, as BENJAMIN knew, VENTRICLE did not own any "portfolio" of properties worth $3,600,000 and D.L.'s investment would not be "secured" with any such assets. Moreover, as BENJAMIN knew, neither BENJAMIN nor VENTRICLE could truthfully make the unqualified claim that D.L.'s investment would earn 17.5% annual returns.

50.     On or about November 8, 2016, based on BENJAMIN's materially false and fraudulent representations, pretenses, and promises, D.L. wired $225,000 to VENTRICLE.

51.     D.L.'s investment was never "secured" with a $3,600,000 real estate portfolio, or with any similar assets.   Instead, her investment was deposited into VENTRICLE's business checking account at M&T Bank.   BENJAMIN had sole control over that account.

52.     BENJAMIN used D.L.'s $225,000 investment in a variety of unauthorized ways. He paid $25,000 to GFT, as a refund of its investment; he repaid a $19,000 debt to a relative; he withdrew over $9,000 from ATMs at casinos; and he lent $9,000 to an associate, E.M., so that E.M. could meet payroll obligations for his private security company.

## COUNT ONE
### (Mail Fraud)

53.     Paragraphs 1 through 52 are re-alleged here.

54.     Between about April 2015 and about February 2017, in the District of Columbia and elsewhere, JAMES A. BENJAMIN knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

55.     On or about September 24, 2016, in the District of Columbia and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud, and attempting to do so, JAMES A. BENJAMIN caused the United States Postal Service to deliver mail matter, that is, an envelope containing a check for $50,000, from a U.S. Post Office in the District of Columbia to MTF in Miami, Florida,.

(**Mail Fraud,** in violation of Title 18, United States Code, Section 1341)

### COUNT TWO
### (Wire Fraud)

56.     Paragraphs 1 through 52 are re-alleged here.

57.     Between about April 2015 and about February 2017, in the District of Columbia and elsewhere, JAMES A. BENJAMIN knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

58.     On or about February 13, 2017, in the District of Columbia and elsewhere, for the purpose of executing the scheme and artifice to defraud, and attempting to do so, JAMES A. BENJAMIN did transmit and cause to be transmitted, by means of wire communications in interstate commerce between Maryland and the District of Columbia, writings, signs, and signals which comprised text messages to D.L., at a time when D.L. was in the District of Columbia.

(**Wire Fraud,** in violation of Title 18, United States Code, Section 1343)

13

## COUNT THREE
### (First Degree Fraud)

59.    Paragraphs 1 through 52 are re-alleged here.

60.    Between about April 2015 and about February 2017, in the District of Columbia and elsewhere, JAMES A. BENJAMIN engaged in a scheme and systematic source of conduct with intent to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and thereby obtained money and property that had a value of $1,000 or more, consisting of money which was obtained from J.G., GFT, D.L., Company LE, and Company GGI, and then transferred to VENTRICLE and DMPG bank accounts.

(**First Degree Fraud,** in violation of Title 22, D.C. Code, Sections 3221(a), 3222(a))

## COUNT FOUR
### (False Statement)

61.    Paragraphs 1 through 52 are re-alleged here.

62.    On or about April 17, 2017, in the District of Columbia and elsewhere, JAMES A. BENJAMIN, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by falsely claiming that certain funds derived from D.L. had been "held in trust for the benefit of [D.L.]."   The statement and representation was false because, as JAMES A. BENJAMIN then and there knew, the funds had never been held in trust for the benefit of D.L.

(**False Statement,** in violation of Title 18, United States Code, Section 1001)

14

## FORFEITURE ALLEGATION

1.      Upon conviction of either of the offenses alleged in Count One and/or Count Two, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).   The property subject to forfeiture includes:

      a.      $302,032.43 in funds from the M&T Bank account number ending in 6629 held in the name of "Ventricle Advisory Consultants Escrow Account;"

      b.      $147,001.20 in funds from the M&T Bank account number ending in 1852 held in the name of "Ventricle Advisory Consultants;" and

      c.      One 2006 Bentley Continental with a VIN of SCBBR53W06C037443.

The United States will also seek a forfeiture money judgment against the defendant equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

2.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value

of the property described above, pursuant to Title 21, United States Code, Section 853(p)).

(**Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p))


A TRUE BILL


_____
Foreperson


_____
JESSIE K. LIU,
UNITED STATES ATTORNEY