**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 18-CR-121** |
| **v.** | **Honorable Paul L. Friedman** |
| **JAMES BENJAMIN,** | <u>**Filed Under Seal**</u> |
| *Defendant.* | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits the following Sentencing Memorandum.  The United States submits that, for more than two years, the defendant engaged in a systematic course of conduct whereby he defrauded victims into entrusting him with nearly one million dollars, either as investments, loan guaranty fees, or undisclosed broker fees.  Subsequently, when the Federal Bureau of Investigation ("FBI") seized hundreds of thousands of dollars from the defendant's bank accounts, the defendant falsely claimed that the money had been "held in trust" for the benefit of victim Diane Leege – when, in fact, the defendant had simply taken her money and deposited it into one of his checking accounts.  In light of the harm, the seriousness of the offense, and the need to deter similar criminal conduct, the government submits that the defendant should be sentenced to twelve months in prison (the high end of the range recommended by the D.C. Voluntary Sentencing Guidelines ("D.C.V.S.G.")) for Count Three, and to sixteen months (the high end of the agreed-upon range recommended by the U.S. Sentencing Guidelines ("U.S.S.G.")) for Count Four, and that these sentences should be concurrent with one another.  Finally, the government submits that the sentence should require the defendant to pay restitution as set forth below.

## **INTRODUCTION**

The defendant has pleaded guilty to Count Three of the Indictment, which charged that he "engaged in a scheme and systemic course of conduct with intent to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and thereby obtained money and property that had a value of $1,000 or more, consisting of money which was obtained from" John Green (and a family trust, "GFT"), Diana Leege, Laser Essentials ("Company LE"), and Gideon Global Investments ("Company GGI"), "and then transferred to . . . bank accounts" that were controlled by the defendant. The defendant's scheme inflicted hundreds of thousands of dollars of harm to the victims in Count Three, including, as of the date of his guilty plea, approximately $748,025 for Ms. Leege, $126,000 for Mr. Green, $54,000 for Gideon Global Investments, which was actually a vehicle for a local church, through its Pastor Lawrence Garrison, and $30,000 for Laser Essentials (owned by Keith Bouchelion and Dr. Therese Thomas).[1]

The defendant has also pleaded guilty to Count Four of the Indictment, which charged the defendant with making a false statement to the Federal Bureau of Investigation ("FBI") by "falsely claiming," in a claim that the defendant submitted seeking to regain seized funds, "that certain funds derived from [Ms. Leege] had been 'held in trust for the benefit of [Ms. Leege].'" Thus, while the defendant has now accepted responsibility in the form of his guilty plea, when he was confronted by law enforcement, and even after proceeds of the offense were seized, the defendant continued to make false claims about his actions. As the defendant well knew, the money he obtained from Ms. Leege and others was never "held in trust" – he simply deposited their money into checking accounts that he controlled, and that were not subject to any restrictions or oversight.

---

[1] As discussed further below, some of these losses may be offset through remissions of proceeds that have been seized from the defendant's bank accounts by the FBI.

## THE STATEMENT OF OFFENSE IN CONTEXT

The Statement of Offense contains a limited set of facts that support the defendant's guilty plea. The governments submits that, in determining the appropriate sentence in this case, the Court should consider the entirety of the defendant's conduct, including the conduct described below.

### Defrauding Mr. Green

In the Statement of Offense, the defendant agreed that, during April and May 2015, he solicited a $250,000 investment from Mr. Green (and a trust that benefitted Mr. Green, referred to in the Indictment as "GFT"); that the defendant would handle Mr. Green's investment money in a particular manner on behalf of Mr. Green; that Mr. Green wired $250,000 into a bank account controlled by the defendant; and that the defendant immediately wired $200,000 of that $250,000 into a bank account controlled by Tyrone Grandberry, an individual who, the defendant believed, would make an investment with Mr. Green's money.[2]  The defendant further agreed, in the Statement of Offense, that Mr. Grandberry refunded $200,000 of Mr. Green's money after the "investment" did not work out, but the defendant led J.G. to believe that Mr. Grandberry had only refunded $100,000. The defendant was thus able to fraudulently retain the remaining $100,000.

The context for this conduct, which the government believes is relevant context for sentencing, is that the defendant had been defrauding Mr. Green from the start.  While the defendant did intend to invest $200,000 for Mr. Green, he misled Mr. Green into believing that he

---

[2] Although the defendant appears to have believed in it, the "investment" described by Mr. Grandberry was, in fact, patently fraudulent. It involved a claim that, by providing $200,000 as collateral for a $5 million "Standby Letter of Credit," or "SBLC" from TD Bank, Mr. Green and the defendant would receive a $2.5 million dollar "loan," which they would never need to repay. In fact, Mr. Grandberry's pitch was fraudulent, Mr. Grandberry never had the means to turn a $250,000 deposit into a $5 million, and Mr. Grandberry did not attempt to do so; rather, Mr. Grandberry spent the money for his own benefit. Later, when Mr. Grandberry repaid the $200,00 investment, he funded that payment with proceeds obtained by another fraud victim.   Mr. Grandberry has since pleaded guilty in U.S. v. Tyrone Grandberry, 18-CR-372.  See Exhibit 1.

would invest all $250,000 on Mr. Green's behalf, and that his fees would come from future profits. Instead, the defendant would invest $200,000, and would take $50,000 as an undisclosed "fee."

The defendant provided documents Mr. Green which specified that Mr. Green's $250,000 would serve as a "cash account" and that his "client funds will be used to secure SBLC for the trade account" and described the investment as involving "SBLC Collateral: Cash Account $250,000." See Exhibit 2.  The documents further provided that any fees for "representatives and consultants" would be 2% of some unspecified "net profits" and not from the initial $250,000 investment from Mr. Green.  Id.  Based on the defendant's representations, Mr. Green believed that the defendant would obtain a fee or commission, although after the investment had "performed," see Exhibit 24 (Form 302 Report for Mr. Green).  Mr. Green did not believe the defendant was entitled to a fee before the investment had performed.  Id.

Notwithstanding these representations to Mr. Green – and unbeknownst to Mr. Green – the defendant e-mailed Mr. Grandberry that he would use "200k for the securing of the SBLC" (see Exhibit 3).  In other words, while the defendant was telling Mr. Green that the he needed $250,000 for the investment, he was simultaneously telling Mr. Grandberry that only $200,000 would be used in this manner, while the remainder would be "held in escrow for the fees of all intermediaries" (see Exhibit 3).  What's more, the $50,000 was not "held in escrow."  The defendant simply spent it.  See Exhibit 4 (copies of the defendant's relevant bank statements).[3]

---

[3] The FBI initially contacted Mr. Green as a suspected victim in the investigation of Mr. Grandberry.  Mr. Green brought the defendant to the meeting with the FBI.  During the interview that followed, the defendant claimed that the $50,000 was to have been used in other joint ventures between the defendant and Mr. Green.  Mr. Green did not object at that time.  (See Exhibit 5).  Later, during a final pre-arrest interview with the FBI, the defendant claimed that the $50,000 was a "fee" that was to be split with Mr. Grandberry (see Exhibit 6), a claim which contradicted, among other things, the defendant's earlier interview with the FBI.

In response to a defense inquiry, the FBI and the undersigned contacted Mr. Green on September 23, 2019.  Mr. Green was asked about his initial 2016 interview with the FBI, and in particular,

**Defrauding Ms. Leege**

In March 2017, based on a complaint from Ms. Leege and other information, the FBI obtained a warrant that permitted the seizure of approximately $450,000 from checking accounts controlled by the defendant (which the defendant used for his personal expenses).  The defendant responded to the seizure by filing a claim to the funds, asserting to the FBI that the money had been "held in trust for the benefit of" Ms. Leege.  In fact, as the defendant agreed in the Statement of Offense, the money was not placed into any trust for the benefit of Ms. Leege – the defendant directed it into checking accounts that he controlled without any oversight or restrictions.

The context for this conduct is that the defendant had been defrauding Ms. Leege from the start – beginning in about April 2016, when the defendant began making investment pitches to Ms. Leege.  The defendant – who knew that Ms. Leege had mental health issues and a difficult time understanding certain things – misrepresented himself, his capabilities, and how he would handle Ms. Leege's money.   He solicited three rounds of payments from Ms. Leege.  In each case, as set forth below, Ms. Leege made those payments based on the defendant's fraudulent representations.

**$500,000 Investment in August 2016**

The defendant solicited the Ms. Leege's first investment (about $500,000), based on representations that he would invest her money in an investment account; that the account would pool her money with other investor money for purposes of investments; and that the account would be subject to oversight by a separate corporation or by an attorney.  Instead, the defendant directed

---

the defendant's claim that the $50,000 used for a "joint venture" between Mr. Green and the defendant.  See Exhibit 24.  Mr. Green pointed out that the interview took place three years ago, said that he could not remember the defendant making that claim, and said that he could not remember why he would not have objected to such a claim.  Id.  Mr. Green further stated that, in fact, the $50,000 was not used for any joint venture between himself and the defendant; that he never received anything from that $50,000; and that he never believed the defendant was entitled to spend $50,000 of Mr. Green's investment money before the investment had performed.  Id.

Ms. Leege's into checking account which he controlled without oversight, and which he used for personal expenses.   The defendant never invested Ms. Leege's money in an investment account, it was never pooled with other money for purposes of investments, and to the extent that the defendant ever invested any of Ms. Leege's money, he used about $26,500 to make deposits on certain real estate properties at foreclosure auctions – "investments" that bore no resemblance to the investments that the defendant promised to Ms. Leege.

Specifically, according to Ms. Leege, the defendant led her to believe that, her $500,000 would be invested in an "account" that contained "multiple investments," that a "lawyer would keep track of who had what money," and that Ms. Leege's investment would quickly grow in the account. See Exhibit 7.  Ms. Leege's account is corroborated by the investment-related documents provided by the defendant, specifically, an "Irrevocable Master Fee Investment and Profit Sharing Agreement" (see Exhibit 8), which the defendant provided a few days after Ms. Leege transferred her $500,000 investment, and which purported to govern the relationship between the defendant and Ms. Leege.  The document described the defendant's expertise in "banking strategies in trading and leveraging in banking instruments, and commercial real property trades, for a consistent long term income stream."  The agreement also referred to, "gains from proceeds derived from banking instruments, and investment gains, commercial real estate swaps, and collateral funding, through our professional association with trading associates and Banking relationships to Ventricle[.]" (emphasis added).

R.L., a friend of the defendant's who was present during the investment pitch to Ms. Leege, similarly stated that the defendant represented (1) that Ms. Leege's money would be deposited into an investment account that handled international transactions with banks such as HSBC and Deutsche Bank; (2) that Ms. Leege's money would not be inactive in the account, but would be

"leveraged" and lent out in international transactions, similar to the way money is leveraged in hedge funds, so that the funds would rapidly grow; (3) that the defendant would monitor the account, but the account itself was controlled by a separate corporate entity; and (4) that the money would not simply be left in one of the defendant's personal accounts. See Exhibit 9.  Based on the defendant's representations, R.L. believed the defendant's relationship to the investment account was similar to R.L.'s relationships with accounts for R.L.'s own life insurance and annuity clients. R.L. could monitor and terminate those accounts, but he did not control funds in them – and he could not simply spend his client's money without their express permission.  Id.

 The evidence shows that, contrary to the defendant's representations to Ms. Leege, as understood by both Ms. Leege and R.L., the defendant directed Ms. Leege's $500,000 into checking account which he alone controlled, and which he used for his own personal expenses. The defendant never invested Ms. Leege's money in an investment account, never pooled it with other money for purposes of investments, and to the extent that the defendant ever invested any of Ms. Leege's money, even viewed in the light most favorable to the defendant, he used about $26,500 to make deposits on certain real estate properties at foreclosure auctions – "investments" that bore no resemblance to the investments that the defendant promised to Ms. Leege.  See Exhibit 10 (FBI-generated spreadsheet showing account activity of the relevant bank account).

Finally, when Ms. Leege asked for an accounting of her investment, the defendant provided a blatantly false account of what he had done with her $500,000.  See Exhibit 11.  He e-mailed Ms. Leege an annual report which began, "We have currently committed funds for banking securities/SBLCs of 480,000.00 on behalf of [Jasoral Consulting, Gideon Enterprises, Essential Laser Treatment, Black Wire, LLC, Matthews Protective Services, and SDS Networks]."  The report further stated, "Depending on the State of the process each deal is in, the funds are

transferred from Ventricle Advisory Consultants Escrow Account at M@T [sic] Bank to Millhouse Trade Finance to HG International Holding Accounts and then Back to Ventricle at Closing. . . . All unused or unissued funds are held in escrow of Ventricle Advisory M@T [sic] Banking. Currently it is requiring typically 6 months for the entire process to funds, these deals are all at various stages, but Gideon Enterprises and Essential laser could fund by the end of February, and thus those funds would be available to be reloaned in March 2017.  This would give us an increase in annual yield[.]"  This report created the false impression that the defendant had initiated – for the benefit of Ms. Leete – investments in "banking securities" or "SBLCs" involving Jasoral Consulting, Gideon Enterprises, Essential Laser Treatment, Black Wire, LLC, Matthews Protective Services, and SDS Networks.  This was simply not true – the defendant had not made any such investments.

Instead, during the months that followed Ms. Leege's investment, Ms. Leege's money was simply transferred to an M&T Bank account.  The funds remained largely inactive, except when the defendant (1) transferred it to other bank accounts in his name; (2) paid electrical, cable, insurance, and telephone bills; (3) made payments on car loans for two luxury vehicles; (4) withdrew at least $8,000 from ATMs at Maryland casinos; or (5) wrote checks to himself or his companies.  See Exhibit 10.  In significant part, much of the defendant's spending could theoretically have been within a 15% fee that to in the written agreement with Ms. Leege. However, any fee had been obtained by fraud in the first instance.  If the defendant had been truthful about his intended or actual use of the money – if he had told Ms. Leege that he simply planned to keep her money in a checking account, where he could spend it at will, and possibly make occasional investments at real estate foreclosure auctions – Ms. Leege never would have invested with him.

$225,000 Investment in November 2016

In November 2016, the defendant persuaded Ms. Leege to invest an additional $225,000 with Ventricle, based on representations that Ventricle would invest the money in "real estate ventures and joint ventures with real estate."  On November 6, 2016, he e-mailed the "format for [D.L.'s] Real Estate Participation," specifying that his "current portfolio of properties that underline the security of this portfolio is 3,600,000.00" (see Exhibit 12).   The defendant represented that Ms. Leege's "return will equate to 16%, annually broken into MONTHLY income starting January 12, 2017[.]"  He claimed that he would "secur[e] [Ms. Leege's] contributions with the entire portfolio to make sure [Ms. Leege was] SECURE with no worries."  Id.

Ms. Leege made her $225,000 investment based on the two essential representations that (1) her money would be invested in some manner that could generate 16% annual returns; and (2) her investment would be "secured" with a $3,600,000 real estate portfolio.   Both of these representations were false.   The defendant did not own any "$3,600,000 real estate portfolio"; he could not possibly "secure" Ms. Leege's investment with those assets; and the defendant had no means of investment that permitted him to claim that he could generate a 16% return.

Ms. Leege transferred her $225,000 investment into an M&T Bank account owned by the defendant's company, Ventricle.  There is evidence that the defendant attempted some investment activity with Ms. Leege's money, because shortly after Ms. Leege's $225,000 investment, the defendant used $5,000 from the M&T bank account to make a good faith deposit at an auction.  However, the defendant also used thousands of dollars from Ms. Leege's investment for other, plainly unauthorized purposes: he lent $9,000 to Matthews Protective Services, a company owned by E.M., so that E.M. (a friend of the defendant) could meet payroll obligations; he used $19,000 to repay a loan to an apparent family member; he used $25,000 to send an additional refund to Mr.

Green, and he withdrew over $9,000 cash from ATMs at casinos.  See Exhibit 13 (FBI-generated spreadsheet showing account activity of the relevant bank account).   All of those expenditures were funded by Ms. Leege's $225,000.[4]  While it is theoretically possible that some of the defendant's spending was part of a "fee," the e-mail describing Ms. Leege's investment did not identify his fees.  Moreover, any "fee" had been obtained by fraud in the first instance.  If the defendant had been truthful about his intended or actual use of the money – including the fact that Ms. Leege's investment was not secured by anything, and that fact that the defendant did not have a $3.6 million portfolio – Ms. Leege never would have invested another $225,000 with the defendant.

## Undisclosed "Fees" for Loan Applications

The defendant also persuaded Ms. Leege, as well as two additional groups, Laser Essentials (and its partners, Mr. Bouchelion and Dr. Thomas) and Gideon  (through Pastor Garrison, and on behalf of his congregation), to apply for purported "SBLC" loans.   Ms. Leege sought financing because she was having difficulty selling her former residence; Laser Essentials was seeking a loan to expand its business; and Pastor Garrison's church congregation was seeking financing to relocate and obtain a new church building.  The defendant persuaded them to seek "SBLC" loans with a third-party company, MTF.  The "loans" were unrealistic – essentially, the applicants were made to believe that, in exchange for a proportionately small guaranty fee, and using collateral

---

[4] As of August 8, 2016, the relevant account contained only $127.  Between August 10, 2016, and the end of January 2017, the only credits to the account were derived from Ms. Leege, either from her $500,000 investment (money that was transferred from another account controlled by the defendant), or from her $225,000 investment.  Thus, all of the above-listed expenditures were funded by Ms. Leege.

worth significantly less than the value of the loan, applicants who had been unable to obtain traditional financing means would be able to obtain an "SBLC" for significant sums of money.[5]

Whatever the merits of the proposed SBLC transactions, the defendant persuaded Ms. Leege, Mr. Bouchelion and Dr. Thomas, and Pastor Garrison that they could obtain SBLC loans, so long as they paid up-front guaranty fees to MTF: $48,500 in the case of Ms. Leege, $96,000 in the case of Laser Essentials, and $120,000 in the case of Pastor Garrison.  The defendant told each victim that the SBLC process required these fees – but he led the victims to believe that those fees would go to third parties, and he fraudulently concealed the fact that he was taking about half of the "guaranty fees," and that he considered his undisclosed fees to be non-refundable.

P.K., the principal of MTF, provided invoices for each victim.  However, the defendant ensured that those invoices did not identify his fees – even though he submitted very explicit invoices directing MTF to pay him a share of the victims' fees.  Thus, the September 16, 2016, MTF invoice for Laser Essentials identified $96,000 in "Guarantee Charges," but listed no payments to the defendant (see Exhibit 15).  Yet the defendant himself submitted an invoice to MTF seeking $30,000 "for services rendered" in connection with Laser Essential (see Exhibit 16), and those fees were to be derived exclusively from the money paid by Laser Essentials.[6]

_____

[5] For example, the defendant wrote Ms. Leege that MTF would "purchase through its bank a SBLC (Stand By Letter of Credit) in your company name," that "upon the execution of the SBLC, they will forward this instrument to a receiving bank that will issue a loan to [Ms. Leege] in the amount of 2 million, minus fees cost of instrument, financing, etc."  See Exhibit 14.

[6] On September 15, 2016, P.K. e-mailed an "invoice" for Mr. Bouchelion.  See Exhibit 17.  The invoice provided for a fully refundable "security fee" of $60,000, a refundable $6,000 payment for attorneys' fees, and an $11,500 payment for "intermediary broker's fees."  However, according to P.K., after P.K. sent that invoice, the defendant was upset, argued that P.K. should not have sent any emails to Mr. Bouchelion, and the P.K. certainly should not have broken out his fees.  See Exhibit 18.  According to P.K., he insisted on sending an invoice, but as a compromise, he would not break down the different fees.  Id.  The defendant insisted that he would communicate whatever he needed to communicate to the applicants, who were his clients, and P.K. relented.  Id.  The next day, P.K. e-mailed Mr. Bouchelion Exhibit 15, which increased Mr. Bouchelion's up-front

Similarly, the November 9, 2016, invoice for Gideon Global Investments and Pastor Garrison listed "$120,000" in "Guarantee Charges," but listed no payments to the defendant (see Exhibit 19). Yet the defendant himself submitted an invoice to MTF seeking $54,000 "for services rendered" in connection with Gideon Global Investments (see Exhibit 20). Finally, with respect to Ms. Leege, the defendant directed Ms. Leege to send MTF "$48,500 usd. (20,000, 1% of the face amount of the instrument and 3000.00 which is the account opening funds are fully refundable). See Exhibit 14. The balance of 25,000 is for professional services as well as Attorneys and broker fees," but nowhere did the defendant identify himself as a "broker" who would receive these fees. The defendant ultimately took a $22,500 fee, but he concealed his receipt of any fees – and thus Ms. Leege inferred that the "attorney and broker fees" noted in the defendant's e-mail were third party fees, not fees to the defendant. Ms. Leege would not have paid the defendant a non-refundable $22,500 up-front fee, prior to closing.

In each case, the defendant fraudulently concealed his involvement, and misled Ms. Leege, Mr. Bouchelion, and Pastor Garrison, such that all three victims were later surprised to discover that the defendant had taken any fees at all from their up-front payments on "loans" that never closed, and that the defendant viewed such fees as non-refundable. See Exhibits 21, 22. In contrast, when each of the victims asked MTF for a refund, MTF refunded them in full.

## Additional Background

The FBI's initial contact with the defendant was as a potential victim of Mr. Grandberry, and at that time (2016) the FBI treated the defendant as a potential victim and witness.

---

payment from $77,500 to $96,000 – and the defendant submitted Exhibit 16 to MTF, and thereby obtained a $30,000 "fee."

## ARGUMENT

### I.      Introduction

The government respectfully submits that a significant sentence is warranted under all of the circumstances of the case, and that a sentence at the high end of the recommended guidelines ranges is appropriate.   The defendant's crimes were willful, deceitful, and sustained over a long period of time; his fraudulent transactions caused hundreds of thousands of dollars in losses to Ms. Leege, Mr. Green, Mr. Bouchelion, Dr. Thomas, and Pastor Garrison; and his acceptance of responsibility is amply reflected by the charge bargaining incorporated into the Plea Agreement, together with the 2-level reduction that he received under the U.S.S.G. for Count Four.

### II.      Application Of The Sentencing Guidelines

#### A.   Framework for the D.C.V.S.G. (Count  Three)

While the United States Code and the U.S.S.G. are applicable to the defendant's sentence for Count Four, as discussed below, the defendant's sentence for Count Three must be determined according to the District of Columbia Code. See United States v. Cutchins, 956 F.2d 1216, 1219 (D.C. Cir. 1992) (explaining that "the [U.S.S.G.] apply only to federal crimes under 18 U.S.C. § 3551(a)" and that "violations of the D.C. Code can only be sentenced under the D.C. Code.").

The District of Columbia Courts typically sentence felony violations of the D.C. Code with reference to the D.C.V.S.G.  Pursuant to an Administrative Order of the D.C. Superior Court, D.C. Superior Court judges are expected either to follow the D.C.V.S.G. or, if they choose not to follow

the D.C.V.S.G., to explain why they chose not to do so. However, the D.C.V.S.G. are entirely voluntary, and an otherwise lawful sentence may not be appealed on the theory that the court misapplied the D.C.V.S.G. Speaks v. United States, 959 A.2d 712, 717-20 (D.C. 2008).

### B.  Framework for the U.S.S.G. (Count Four)

The Guidelines provide advisory recommendations which the courts "must consult . . . and take . . . into account when sentencing," United States v. Booker, 543 U.S. 220, 264 (2005), defendants for violations of the United States Code.  As the Supreme Court has explained, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" in for determining the appropriate sentence.  Gall v. United States, 552 U.S. 38, 49 (2007).

### C.  The Applicable Sentencing Guidelines Range

#### 1.     Count Three: First Degree Fraud

The government agrees with the Presentence Report's application of the D.C. Voluntary Sentencing Guidelines, and that the sentencing guidelines range for that charge is 1 to 12 months.

#### 2.     Count Four: First Degree Fraud

The government believes that the ranges reflected in the Plea Agreement are the correct ranges under the U.S.S.G., and that the overall offense level for Count Four is 12, resulting in a recommended sentencing range of 10 to 16 months for Count Four.

The government disagrees with the Presentence Report's application of the enhancement for the use of "special skills."  The defendant certainly held himself out as having special skills in the area of financial and investment management.  However, based on the evidence available to the government, the defendant did not actually possess any special skills, or have any real expertise in those areas.  Rather, the evidence available to the government shows that the defendant did not

- 14 -

have any expertise in professional financial or investment management, and that the defendant's claims to the contrary were, rather than evidence of a special skill, merely part of the fraud.[7]

### 3.      The U.S.S.G. and Concurrent Sentences

U.S.S.G. § 5G1.3 provides that, "If . . . a state term of imprisonment is anticipated to result from another offense that is relevant conduct to the instant offense of conviction . . . , the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment." U.S.S.G. § 5G1.3(c).   The government believes that the Court should apply U.S.S.G. § 5G1.3 in this case, and that, therefore, the sentences for Count Three and Four should be concurrent with one another.

### D.  The Requested Departure Under U.S.S.G. § 5H1.4

The defense has requested a departure under U.S.S.G. § 5H1.4.  The available evidence does show that the defendant suffers from certain significant medical issues, but the government does not believe that the evidence to date warrants a departure under U.S.S.G. § 5H1.4.  The defense has not demonstrated that the Bureau of Prisons would be unable to meet the defendant's particular health needs, or that his health needs are greater than those in "typical cases."  The government is open to consideration of additional evidence concerning the defendant's medical needs, if the defense provides additional evidence at sentencing.

## III.    The Statutory Factors for Sentencing

The U.S. Code and the D.C. Code both require courts to consider their respective sentencing guidelines as an initial step, but also require the courts to consider additional sentencing

---

[7] In the event that the Court applies U.S.S.G. § 3B1.3, and as noted in the defendant's Sentencing Memorandum, at 13 at note 6, the government agrees that the Court should apply an additional one-level credit under U.S.S.G. § 3E1.1(b), such that the defendant receives an overall three-level credit for pleading guilty.

factors.  Specifically, the U.S. Code requires the court to consider the factors set forth in 18 U.S.C. § 3553(a).  See, e.g., United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005).  These include (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, protects the public, and provides the defendant with needed educational or vocational training and medical care; and (4) the need to avoid unwarranted sentence disparities among defendants with similar records and offenses.

The D.C. Code requires the consideration of similar factors. D.C. courts must impose a sentence that (1) reflects the seriousness of the offense and the criminal history of the offender; (2) provides for just punishment and affords adequate deterrence to potential criminal conduct of the offender and others; and (3) provides the offender with needed educational or vocational training, medical care, and other correctional treatment." D.C. Code § 24-403.01(a).

## IV.     The Government's Recommended Sentence

### A.     Overview

The government believes that the Court should sentence the defendant to the high end of the recommended sentencing range for each count, resulting in a sixteen months of incarceration, because neither the U.S.S.G. nor the D.C.V.S.G. analysis otherwise captures the severity of the defendant's conduct, the nature of the harm imposed by the defendant's offenses, or the sustained and deliberate nature of his crimes.  In addition, the government submits that the defendant should be ordered to pay restitution, including $748,025 for Ms. Leege, $126,000 for Mr. Green, $54,000 for Gideon Global Investments, and $30,000 for Laser Essentials, with credit given for amounts remitted to each victim by the FBI.

B.      **Impact of the Statutory Sentencing Factors**

1.   **Nature and Circumstances of the Offenses**

The government submits that this factor weighs in favor of a significant sentence.   The defendant's fraud was sustained over an extended period of time, across different victims and particular transactions, with the sole commonality the defendant's fraudulent claims to access unusually lucrative returns or extravagant financing.   These were not crimes committed on an impulse, nor were they the product of a failure to think.   The defendant plainly considered his actions and then continued down a determined path, all in pursuit of self-enrichment.

2.   **History and Characteristics of the Offender**

The government submits that this factor has no significant bearing on the appropriate sentence.   The defendant appears to be an intelligent and capable adult, having had some past professional success, and some general business acumen.   The defendant does not have a criminal history of prior convictions, and a review of the PSR shows that there are no particularly mitigating circumstances in the defendant's character or background.

The defense has provided letters of support as well as information about the defendant's good conduct as a family member, father, and friend.   The government credits that the defendant has the history described in the letters attached as Exhibit A to the defendant's Sentencing Memorandum.   However, the government does not believe that those letters excuse the defendant's history of fraudulent behavior directed at the victims in this case, and the government does not believe that a sentence of probation will accomplish the goals of sentencing.

In addition, the defendant's letters of support appear to have been written by persons without any knowledge of the facts of the case – or any appreciation for the nature of his conduct.

For example, the defense submits a letter from Edward Matthews, who wrote that the defendant "tried to assist [his] business with a credit line."  Mr. Matthews appears to have been unaware that his "credit line" was funded the defendant's fraudulent conduct.  For example, in December 2016, using money obtained from Ms. Leege, the defendant lent $9,000 to Mr. Matthews's company, Matthews Protective Services.  See Exhibit 13 (FBI-provided spreadsheet showing flow of funds; Entry for December 22, 2016).  Finally, in January 2017, when Ms. Leege asked for an accounting of her investment, the defendant fraudulently used the name of Matthews Protective Services. Specifically, the defendant claimed that, in connection with Ms. Leege's investment, the defendant had "currently committed funds for banking securities / SBLCs . . . on behalf of the following companies: . . . Mathews Protective Services . . . $55,000."  See Exhibit 11.   When asked by the FBI, Mr. Matthews confirmed that "he never received $55,000 from" the defendant, and never received anything from the defendant "related to banking securities or SBLCs."  See Exhibit 23 (Form 302 Report for Mr. Matthews).

### 3. The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, to Protect the Public

The government submits that the circumstances of this case demand a significant sentence, in order to promote respect for the law, provide adequate deterrence to the defendant and others, and to justly punish the defendant for his conduct, for the harm that he imposed on others, and for the impact of his actions on the victims in this case.   The defendant carried out a million-dollar fraud scheme over the course of nearly two years – a scheme that cries out for significant punishment, in order to deter similar conduct in the future.

### 4. The Need to Provide the Defendant with Educational or Vocational Training or Medical Care

The defendant would no doubt benefit from additional education and counseling, but nothing in the PSR shows that he has any unusual or particular need for education, training, or

medical care that would impact the appropriate sentence.  The government does not believe that the appropriate sentence is impacted by this statutory factor.

### 5.   The Need to Avoid Unwarranted Sentence Disparities

The government believes its recommended sentence will avoid any unwarranted sentence disparities by complying with both the D.C.V.S.G. and U.S.S.G. recommended ranges.

### <u>CONCLUSION</u>

For all of the foregoing reasons, the government respectfully requests that the Court sentence the defendant to twelve months in prison for Count Three, sixteen months in prison for Count Four, and to impose these sentences concurrent with one another.  The government further requests that the Court order the defendant to pay restitution including $748,025 for Ms. Leege, $126,000 for Mr. Green, $54,000 for Gideon Global Investments, and $30,000 for Laser Essentials.  The government further requests that the Court sentence the defendant to three years of supervised release, and to pay the required assessments for Counts Three and Four.  Finally, the government requests that the terms of the defendant's supervise release include a requirement that he stay away, and refrain from contacting, any of the victims or their family members.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845


By: ____/s/_____
       DEMIAN AHN
       Assistant United States Attorney
       DC Bar Number 490111
       United States Attorney's Office
       555 Fourth Street, N.W.
       Washington, D.C.  20530
       Telephone: 202-252-7106
       Email: demian.ahn@usdoj.gov

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.                                    Case No.   18-CR-372 (PLF)

TYRONE GRANDBERRY,
a/k/a Tyrone Staindl,

Defendant.

## STATEMENT OF OFFENSE IN SUPPORT OF GUILTY PLEA

### *Summary of the Plea Agreement*

Defendant Tyrone Grandberry, a/k/a Tyrone Staindl, agrees to admit guilt and enter a plea

of guilty to the Information.   The Information charges the defendant with three counts of wire

fraud, in violation of Title 18, U.S. Code, Section 1343, and one count of possessing a fraudulent

immigration document, in violation of Title 18, U.S. Code, Section 1546(a).

I.     **Elements of the Offenses**

A.  **Count One (Wire Fraud)**

In order to prove wire fraud in violation of 18 U.S.C. § 1343, the government must prove
the following elements:

- First, that the defendant devised or intended to devise a scheme to defraud or for
  obtaining money or property by means of false or fraudulent pretenses,
  representations, or promises that were material;
- Second, that the defendant did so with the intent to defraud; and
- Third, that, for the purpose of executing the scheme, the defendant transmitted or
  caused to be transmitted by means of wire, radio, or television communication in
  interstate or foreign commerce any writings, signs, signals, pictures, or sounds.

B.  **Count Thirteen (Fraudulent Immigration Document)**

In order to prove possession of a fraudulent immigration document, in violation of 18
U.S.C. § 1546(a), the government must prove the following elements:

- First, the defendant knowingly possessed a document prescribed by statute or regulation for entry into . . . the United States;
- Second, the document was forged or procured by fraud; and
- The defendant knew the document was forged or procured by fraud.

## II.   Brief Statement of Facts

The following statement of facts does not purport to include all of the government's evidence against the defendant.   It is intended to represent sufficient information for the Court to find a factual basis for accepting the defendant's guilty plea.   Had this case gone to trial, the government would have proven, beyond a reasonable doubt, the following facts:

### A.   Immigration Documents

The defendant was born in Chicago, Illinois, on July 29, 1960.   However, in 2003, and again on or about March 4, 2013, the defendant traveled to the Austrian embassy in Washington, D.C., and obtained an Austrian passport under the assumed name "Tyrone Staindl."   The defendant fraudulently obtained this passport using a forged birth certificate, purportedly issued by Virginia, which falsely asserted that Mr. Grandberry was born to an Austrian mother in 1972. When the defendant obtained and subsequently possessed the Austrian passport, he knew he had procured it by means of a fraudulent application that contained materially false representations.

### B.   Wire Fraud

As set forth further below, between about June 2012 and about November 2016, the defendant engaged in a continuing course of conduct whereby he used multiple corporate entities, including Challenger Capital Limited, G Group International, LLC, JAG Holdings Trust, LLC, Ocean 27 International, LLC, and Ocean 27 Holdings, LLC, to obtain money, including by unlawful means as described below.

2

## Investment by S.G.

In May 2012, the defendant and M.N. discussed with S.G., a resident of the United Kingdom, an investment of $125,000 in a program that would be conducted through the E*TRADE investment platform with the assistance of a "trader," H.L.   The defendant represented that all $125,000 of S.G.'s money would be invested in this program through the defendant and H.L.; that S.G. would recover his principal within ten "banking days" of the investment; that the defendant would take his fee from profits generated by the investment.   On June 1, 2012, based on those and other material representations, S.G. wired $125,000 to a bank account owned by JAG Holdings Trust, LLC, corporate entity operated by the defendant.

Upon receipt of S.G.'s $125,000, the defendant immediately diverted $25,000 for his own personal gain.   The defendant did transfer $100,000 to an E*TRADE account – and somebody used that account to make trades on margin.   Defendant also temporarily put $25,000 from a separate account into the E*TRADE account prior to S.G.'s arrival in Miami to review the H.L. account.   However, S.G.'s $100,000 investment – the cash that supported the trades – was diverted by H.L., including at the request of the defendant.   For example, on July 9, 2012, $50,000 of S.G.'s investment was wired from the E*TRADE account to one of the defendant's accounts. The defendant then used that $50,000 for his own purposes, and later sent $30,000 to S.G.

The defendant concealed his use of S.G.'s funds by forging and sending fraudulent "statements" that purported to describe the status of S.G.'s investment.   For example, on or about July 20, 2012, the defendant sent S.G. a statement claiming that S.G.'s investment had grown to $421,562.   When S.G. responded by asking to cash out his investment, the defendant convinced S.G. to allow the investment to continue growing.   S.G. agreed to allow the investment to

3

continue, but asked for some money as an initial payment.   On July 27, 2012, the defendant wired S.G. $30,000, as that initial payment.   The defendant did not disclose that the $30,000 was actually funded by investment money that the defendant obtained from C.F.

The defendant continued providing fraudulent "statements" in August 2012, including one that showed that S.G.'s investment had grown to $749,915.   However, by that point, S.G. had begun demanding the return of his investment and profits.   The defendant admitted that he had sent fake account statements to S.G. and claimed that H.L. had absconded with some of the money left in the account.   According to the government, S.G. strongly suspected fraud by September 2012, and was aware that someone had defrauded him no later than October 2012   S.G. continued contacting the defendant in 2013, 2014, and 2015.   Finally, the defendant resolved the civil dispute through W.J., a Washington, D.C., attorney, who obtained a liability release from S.G. over e-mail, and who then sent S.G. $52,000 in December 2015 which was funded by investment money from Octafin.   S.G.'s actual loss, as of the date of the plea agreement, and accounting for all payments from the defendant, is $43,000.

### Investment by C.F.

In July 2012, the defendant and another person persuaded C.F. to invest $150,000 in a program that H.L. would conduct through the E*TRADE investment platform.   The defendant and the other individual told C.F. that all of C.F.'s $150,000 would be invested in the program; that they would generate a 15-20% return; and that at least one similar investment had been successfully completed.   On July 26, 2012, based on those and other material representations, C.F. wired $150,000 to a Jag Holdings Trust, LLC, account.   T.G. and C.F. later met in Miami so C.F. could view the account personally.

The defendant may have intended to "invest" some of C.F.'s money in some manner. However, he took tens of thousands of dollars of C.F.'s money up front.   Upon receipt of C.F.'s $150,000, the defendant immediately used $30,000 of that money to pay S.G.   The defendant also immediately used $40,000 of C.F.'s investment money to fund a down payment for the purchase of real estate in Woodbridge, Virginia, and the defendant transferred another $35,000 to corporate entities with no relation to the investment that the defendant described to C.F.

By August 30, 2012, the defendant had spent all but $122 of C.F.'s investment.   Later, when C.F. demanded the promised investment return, the defendant made various excuses and blamed other people, but told him that he would work to get his money back.   In September and October 2012, in order to appease C.F., the defendant wired $25,000 to C.F, which had been funded by investment money the defendant obtained from E.E.   Finally, after C.F. sued the defendant and E*TRADE for fraud, the defendant later paid C.F. an additional $30,000, including $25,000 in December 2015, which was funded by investment money from Octafin.   According to the government, E*TRADE also paid $5,000 to C.F.   C.F.'s actual loss, as of the date of the plea agreement, is approximately $90,000.

<u>Investment by E.E.</u>

In September 2012, based on discussions with the defendant, the defendant and E.E. verbally agreed that E.E. would invest $100,000 and that the defendant would use the funds to make investments.   The defendant and E.E. signed a contract, which was provided by the defendant, that guaranteed return of E.E.'s principal in 30 days, and 20% per week, "paid to the client for 16 weeks".   The contract, signed after E.E. wired the money, represented that all of E.E.'s investment would be placed into the program, and the contract specified that the defendant's

5

fee was to be 30% of the "net return" on the investment.   On September 20, 2012, based on those

and other material representations, E.E. wired $100,000 to Jag Holdings Trust, LLC.

At the time that he obtained E.E.'s money, the defendant did not plan not plan on carrying

out the investment in the manner described in the contract with E.E.   The defendant did not plan

on investing all $100,000 of E.E.'s money.   Indeed, as noted above, the defendant wired $25,000

of E.E.'s money to C.F.   The defendant also spent $30,000 of E.E.'s money to make rent payments

for JAG Holdings Trust, LLC.   By November 13, 2012, all but $1,118.25 of E.E.'s investment

was gone, and, at most, $1,000 had been invested in the promised E*TRADE platform.   On

November 26, 2014, the defendant paid $5,000 to E.E.   Later, in December 2015, the defendant

paid $25,000 to E.E. which was funded by investment money from Octafin.   As of the date of the

plea agreement, E.E.'s actual loss is approximately $70,000.

Investment by A.M.

During 2013 and 2014, A.M. was persuaded to invest $150,000, in a transaction that

involved the defendant and another person, A.R.   On March 31, 2014, A.M. wired his $150,000

investment to Ocean 27 International, LLC.   The defendant did not invest the $150,000 in the

manner set forth in the contract, and spent a material amount of money for the defendant's own

purposes.   The contract was in the name of A.M. and A.R.

Nevertheless, approximately two weeks after receiving the $150,000, the defendant told

A.M. that the investment was going well.   Around that same timeframe, the defendant also paid

A.M. $5,000.   However, after the thirty-day period ended (and A.M.'s return was due), the

defendant became less responsive to A.M.   A.M. next spoke with the defendant months later, at

which point the defendant said that he would repay A.M.   However, the defendant never made

6

defendant confirmed by e-mail that he would get pre-approval from SunTrust Bank and be ready to re-transmit the proceeds within 24 hours of receiving the funds.   The transfer was successful, but the bank identified the fraud before the defendant could re-transmit the funds.   According to the government, when a bank investigator promptly asked the defendant about the wire transfer, the defendant falsely told the investigator that he (the defendant) had nothing to do with the wire transfer and that he knew nothing about it.   The bank provided the defendant a document noting the "fraud" involved in that transaction.   The defendant agreed that the bank should return the funds and forwarded that document to R.H. and C.A.   On November 2, 2014, the defendant also sent an e-mail to R.H., telling R.H. that "The banks situated in Panama are today some of the best for total anonymity . . . especially if its numbered accounts its a great way to move money through it and of to another offshore location to make the money trail completely invisible."

The defendant successfully completed two wire transfers on behalf of C.A.   According to the government, on November 19, 2014, C.A. fraudulently obtained a wire transfer of $400,000 that C.A. directed to a Bank of America account held by Ocean 27 Holdings, LLC.[2]   The defendant knew about the wire transfer before he received it, and had agreed to divide up the proceeds with R.H. and C.A.   Less than one day after receiving the $400,000, the defendant re-transmitted over $382,000 of that money, including over $55,000 to an Ocean 27 Holdings, LLC, account at TD Bank.   Shortly after the defendant completed those transactions, the relevant banks told the defendant that they had identified the fraud and recaptured the remaining funds in the defendant's Bank of America account.   According to the government, on January 23, 2015, C.A.

---

that was to be wired into his accounts.

[2] The defendant did not know the particular manner by which C.A. and R.H. obtained the money that was to be wired into his accounts.

8

fraudulently obtained a wire transfer of $131,234 that C.A. directed to a Jag Holdings, LLC, account at Capitol One Bank.[3]  By January 29, 2015, the date that the relevant banks identified the fraud, the defendant had re-transmitted and spent all but $23 of the $131,234 proceeds, including through a $110,000 wire to the Ocean 27 Holdings, LLC, account at TD Bank, a $35,000 wire to a South African bank, a $63,000 wire to a Turkish bank, and a $4,000 wire to a bank in the United Kingdom.

Bank investigators asked the defendant about both the November 2014 and January 2015 wire transfers.  In each case, bank investigators told the defendant that the bank had identified fraud in the transactions.

Between January 2015 and June 2015, the defendant continued working with C.A. and R.H. to receive and re-transmit the proceeds of C.A.'s activities.  In one case, the defendant spent $1,600 before the bank identified the fraud and froze his account.  In four subsequent cases, the proceeds were flagged and frozen in the defendant's accounts before the defendant could redirect the money.  In at least one case, in May 2015, the defendant confirmed with R.H. that he was ready to receive $500,000 from C.A., but the wire was never transmitted.  The defendant sent a "cease and desist letter" to C.A. on August 5, 2015.  The defendant e-mailed the letter and copied R.H. on the e-mail.

<u>Investment of J.B.</u>

During the spring of 2015, the defendant and another person, M.P., persuaded J.B. to invest through Ocean 27 Holdings, LLC, in a purported investment that, according to the defendant,

---

[3] The defendant did not know the particular manner by which C.A. and R.H. obtained the money that was to be wired into his accounts.

would involve obtaining a "Standby Letter of Credit" or "SBLC" which would be "leveraged" and "monetized" through a Dubai-based company called MPS Gulf International ("MPS"), whose principal was M.P.

Under the terms of the contract, which was provided to J.B. by the defendant, J.B. would invest the $200,000 by transferring the investment money into a TD Bank account. The defendant told J.B. that, based on those funds, TD Bank would issue an SBLC for $5,000,000, for which J.B. would be a signatory. The defendant and M.P. told J.B. that the SBLC would then be "signed over" to MPS Gulf International, which would make trades that would "monetize" the transaction. On May 4, 2015, based on the defendant's representations, together with representations by M.P. which were facilitated and e-mailed to J.B. by the defendant, J.B. wired $200,000 to the Ocean 27 Holdings, LLC, account at TD Bank.

The $200,000 was not invested according to the contract. The defendant used it investment for other purposes. In fact, before the $200,000 wire, the Ocean 27 Holdings, LLC, account at TD Bank had a negative balance – and immediately after the wire, the defendant used the proceeds to send $25,000 to MPS Gulf International, pursuant to an arrangement between the defendant and that company; to pay $40,000 in overdue rent for the defendant; to wire $10,000 to a Panamanian bank account held by N.G.; to process several thousand dollars in other payments to I.G.; and for other personal purposes.

The defendant attempted to conceal the fraud by forging and sending J.B. "screenshots" that purported to show that J.B.'s $200,000 was blocked in the TD Bank account, and that purported to show that related TD Bank accounts contained over $1,000,000. In fact, as noted above, the $200,000 was never blocked; the defendant spent the $200,000 as outlined above; and

on the dates of the statements the defendant did not have any TD Bank account that contained over $1,000,000.

When the promised $2,500,000 failed to materialize, J.B. demanded answers from the defendant and M.P., but both of those individuals provided fraudulent excuses and failed promises. By the fall of 2015, J.B. told the defendant that, "if this goes into October, the proper authorities will be involved." In December 2015 and January 2016, the defendant made two $100,000 payments, totaling $200,000 to J.B. As a result, as of the date of the plea agreement, J.B. has not suffered any actual losses.

### Investment of Octafin

In November and December 2015, M.P., in part using documents and information provided by the defendant, persuaded Octafin AG (a Switzerland-based company) to invest €3,000,000 (which was valued at $3,274,185) to conduct an SBLC investment.[4] Octafin AG made its investment based on material representations that (1) the Octafin investment and SBLC would be handled by M.P. directly (2) M.P. and Ocean 27 Holdings had already made arrangements with TD Bank to begin the process of obtaining an SBLC from TD Bank; and (3) at least $3,000,000 of Octafin's money would be "blocked" in an account at TD Bank.

The defendant knew that he had exclusive control over the relevant accounts at TD Bank, and M.P. never had access to those accounts. In fact, between November 27, 2015, and December 9, 2015, in response to requests from Octafin, which were related to the defendant by M.P., seeking documentation that M.P. controlled Ocean 27 Holdings, LLC, bank accounts, the defendant forged

---

4 The defendant did not have direct contact with Octafin. However, the defendant provided information and documents to M.P., knowing and intending that M.P. would provide the information and documents to Octafin.

11

and e-mailed documents falsely showing that M.P. controlled the company's TD Bank accounts. Second, the defendant knew that he had not made the promised arrangements with TD Bank to begin the SBLC process. On December 8, 2015, after beginning the process to wire the funds, an Octafin representative asked for confirmation that TD Bank had begun the process for issuing an SBLC. On December 8, 2015, M.P. contacted the defendant about that inquiry. The defendant then forged an e-mail which appeared to have been sent by a TD Bank employee. In this forged e-mail, which was written and sent by the defendant, the purported TD Bank employee confirmed that TD Bank was ready to process the SBLC. When the defendant obtained the $3,274,185, the defendant did not attempt to "block" $3,000,000 in the Ocean 27 Holdings, LLC, TD Bank account. Instead, the defendant used a material part of that $3,000,000 for other purposes.

In fact, in the first twenty-four hours after receiving the $3,274,185, M.P. instructed the defendant to wire $240,000 of the Octafin money to M.P., which the defendant did. The defendant also wired another $660,000 of the proceeds to an account at SunTrust Bank that was held by Ocean 27 International, LLC, one of the defendant's companies. Thus, within just twenty-four hours of receiving the Octafin money, the defendant had already diverted $900,000, leaving less than $2,374,185 in TD Bank accounts. The defendant continued diverting Octafin money until January 24, 2016, when TD Bank noticed irregularities and froze the Ocean 27 Holdings, LLC, account. By that time, the defendant had used $200,000 of Octafin money to make refund payments to J.B.; $50,000 to make refund payments to S.G.; $25,000 to make refund payments to E.E.; $25,000 to make refund payments to C.F.; and over $15,000 for the benefit of N.G. and I.G., including a $9,000 loan for plastic surgery for I.G.

The defendant concealed his use of the Octafin money by forging and e-mailing fraudulent documents asserting that Octafin's $3,000,000 remained "blocked" in the TD Bank account.

In August 2016, the defendant asked his attorney to send a letter about the TD Bank account. The attorney sent a letter that reflected the accurate balance in the TD Bank account.

The defendant caused the transmission of the interstate wires described in the attached Information in furtherance of the above-described scheme to defraud.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY

BY:

Demian S. Ahn
Assistant United States Attorney

13

### DEFENDANT'S ACKNOWLEDGMENT

I have read each of the 14 pages constituting this Statement of Offense and Acknowledgment, understand it, and agree that it is true and accurate.   While it is not a complete recitation of everything that I did or everything that I know, it accurately describes my conduct and my knowledge concerning my own involvement in the illegal activity that is the subject of this Statement of Offense.   No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this factual proffer fully.

Date: 7/30/19

Tyrone Grandberry
Defendant

### ATTORNEY'S ACKNOWLEDGMENT

I have read each of the 14 pages constituting this Statement of Offense and Acknowledgement, reviewed them with my client, and discussed it with my client.

Date: 6/30/19

Glenn Ivey, Esq.
Attorney for Defendant

14

# EXHIBIT 2



**MPS GULF INTERNATIONAL DMCC**
Dubai Office:
J&G, DMCC Dubai, United Arab Emirates
London Office: Bridge House, London Bridge, London SE1 9QR, UK

## SBLC AGREEMENT

### (Co-operation Agreement)

SBLC Loan Agreement with transaction Code: **POL/010515/257869** with
Bank Transfer Ref: 070229 – **AGREEMENT** entered into between the following Parties:

### MPS Gulf International (hereinafter referred to as Lender)

## Further utilizing Ventricle Capital Consultants LLC as US lending Representative

A company with its principle place of business at: Dubai Office:

Account : (Cash trade Account)
Bank Name: M&T Bank
Bank Address:
Account Name: Ventricle Advisory Consultants LLC for further credit to TD Bank, Dba as MPS
Trade Account :         5293
Routing Number

### (Hereinafter referred to as "Clients")

### John L. Green Family Trust C/O Ventricle Consultants

A company with its principle place of business at:

### SBLC Collateral: **Cash Account $250,000.00**

Collectively known as the "**Parties.**"

**WHEREAS** the parties are desirous to enter into an agreement to; The Lender to lend funds and invest any overages on behalf of the Lender, and the borrower to borrow funds scured by the co beneficial asset to address csah/cashflow requirements.

**WHEREAS** Clients has access to collateral assets (cash account) that it wishes to make available, on an agreement basis, to Lender for security against credit line facilities, SBLC and loan

**WHEREAS** Lender agrees to act on behalf of Client to cause the supply and delivery of cash funds drawn from credit line facilities and to provide a loan to client from SBLC.

**WHEREAS** Representatives and consultants agree to act on behalf of Clients in this transaction for a fee of (02%) Two percent of net Profit.

SCC/BIG

**WHEREAS**   MPS Gulf International agrees to provide client with weekly screen shot of funds until contract payments have been completed.

**WHEREAS**   Client will be given 50% loan against MPS/Client SBLC within 45 banking days from receipt of wire transfer to TD BANK trade account.

**NOW THEREFORE** the Parties agree as follows:

1      **Definitions**

    1.1      In this Agreement, words importing the singular shall include the plural, and vice versa, and words importing the masculine gender shall include the feminine and neuter genders, and vice versa, and words importing persons shall include partnerships, trusts and bodies corporate, and vice versa. The headings to the paragraphs to this Agreement are inserted for reference purposes only and shall not affect the interpretation of any of the provisions to which they relate.

    1.2      This Agreement shall be binding on and enforceable by the estates, executors, administrators, trustees, assigns or liquidators of the parties as fully and effectually as if they had signed this Agreement in the first instance and reference to any party shall be deemed to include such party's estate, executors, administrators, trustees, assigns or liquidators, as the case may be.

    1.3      This Agreement shall be governed by and construed in accordance with the laws of the USA.

2      **Co-operation**

    2.1      Clients have advised that they shall cause the collateral asset (cash funds) to be delivered by wire transfer to the credit line bank account nominated by lender for purposes of collateral security for a credit line against the SBLC.

    2.2      Lender shall receive the cash funds by way of wire into their nominated entity / credit line bank account and shall proceed to apply non recourse and forgivable loan account to the account of: as security for pre-existing credit line facilities. (Allow max 45 banking days from date of wire for funds to be credited to account. (30 banking days for payment). First payment due ____

    2.3      Lender hereby confirms that the credit line LTV shall be minimum (50%) percent of the SBLC account face value. The client will be co beneficiary of the SBLC for the term of the loan or payment of 50% of the face amount of the SBLC is paid on behalf of the client, at which time

MPS will be made 100% beneficiary and return cash payment to the bank for closure of the loan.

2.4     Lender shall deliver the agreed LTV value of minimum of 50 percent, within 45 banking days of cash account deposit wire; to the receiving paymaster bank account nominated by client, If funds are not paid at this time all funds must be return to clients account if funding does not happen in 45 banking days per the agreement.

3       Relationship between Parties

3.1     Nothing in this agreement shall constitute or be deemed to constitute a partnership between the parties hereto or constitute the one party as an agent or representative of the other for any purpose whatsoever.

3.2     Each party to this agreement will be responsible only for its pro-rata share of expenses as contained in this agreement and will furthermore be liable for its own taxation of profits and the parties reciprocally indemnity one another and hold each other harmless from any claims and/or obligation to be incurred by a party in respect of the other party's tax obligations.

3.3     The parties hereby irrevocably agree to indemnify and hold each other harmless from any actions, debts and/or liabilities caused and/or incurred by the other party, the parties reciprocally indemnifies one another against any claims against the other party which might originate from any perception by any third party that a general partnership exists or existed between the Parties beyond the objectives of the parties stipulated in this agreement.

3.4     The parties shall owe to each other a duty of good faith at all times. In dealings with each other in the implementation of this agreement, the parties undertake to observe the utmost good faith and to give full effect to the intents and purpose of this agreement and to neither do nor to refrain from doing anything which might prejudice or detract from the rights, property or interest of the other parties.

4       Termination

4.1     This agreement will be terminated in the following circumstances:

4.1.1   Upon mutual consent by the Parties;

MPS GULF INTERNATIONAL

Transaction Code: POL/010519/257869

4.1.2    Upon the instance where the anticipated business has come to its natural end and both parties have fulfilled all their commitments towards one another in respect of the business;

4.1.3    When a party commits a breach of any material term contained in this agreement and the breach is such that it could not or is neglected to be rectified by the party in breach within 45 (Forty-Five) banking days of receipt of a notice in respect of such breach, then the injured Party shall be entitled to forthwith cancel this agreement;

4.1.4    Upon the filing of insolvency proceedings against any one party, whether voluntary or involuntary, or when a party's assets are placed under administration in terms of an Administration Order issued by a competent Court.

4.2    Upon the termination of this agreement for whatever reason the parties' reciprocal duties in terms hereof shall lapse.

5    **Cession, Assignment and Delegation**

The parties will not be entitled to cede and/or assign any of their rights or delegate any of its obligations incurred in terms of this agreement without the written permission from the other party. The parties may however employ or nominate third parties to assist them in the execution of their duties provided that the party who employs such third party(ies) will ensure that such third party(ies) to be engaged will likewise comply with the terms of this agreement, the appointing party to take full responsibility for the actions of their appointees or nominees.

6    **Intellectual Property Rights, Confidentiality and Non-Circumvention**

6.1    The parties hereto acknowledge that the 3rd parties being introduced by either of the parties for the purposes of the execution of the objectives contained herein, will be regarded as the exclusive intellectual property of the introducing party although the party to which the 3rd party is introduced, might ultimately deal or have direct or indirect contact with the introduced 3rd party. The parties irrevocably and unconditionally undertake to respect their respective integrity of intellectual proprietary rights of one another at all times.

6.2    The parties shall not use, divulge or communicate to any person, unless on a 'need-to-know' basis or with the written permission from the other party, any of the trade secrets or other

confidential information, technical, commercial or otherwise obtained from or disclosed by the other party. This restriction shall apply and will continue to be of full force and/or effect even after termination of this agreement unless such information or knowledge becomes part of the public domain otherwise than to be disclosed by a non-authorized action of the infringing party.

6.3    The parties agree to adhere to the provisions contained in the International Chamber of Commerce, Paris France's publications relating to non-circumvention and non-disclosure and the parties acknowledge and agree that they have read and will understand the contents thereof. Any renewals or third party assignment will operate with full reciprocation for a period of 1 (one) years after date of execution of this agreement.

**7     Jurisdiction**

This agreement shall be governed by and construed in accordance with the Laws of the USA. Both parties will be subjected to any Court in the USA with competent jurisdiction for the resolution of any legal dispute between the parties which might emanate from or during the execution of this agreement.

**8     Full agreement and non-variation**

This document contains the entire agreement between the parties and no party shall be bound by any undertakings, representations, warranties, promises or the like not recorded herein. No alteration, cancellation, variation of or addition to this agreement or any part thereof, including this paragraph, shall be of any force or effect unless reduced to writing and signed by all parties to this agreement or their Boards of Director authorised representatives.

**9     Domicilium citandi et executandi**

The *domicilium citandi et executandi* address of a party stated on the first page of this agreement shall be the address where all notices and legal process in any matter relating to this Agreement may be served on the parties. Any notice must be in writing and may be delivered or sent by hand, registered post, recorded delivery service, telefax, electronic mail or telegraph.

PAYMENT OF $250.000.00 WITHIN 3 BANKING DAYS of signed agreement
PAYMENT OF   (50% Min. of five (5) Million USD SBLC), payment of $2,500.000.00
(AFTER PAYMENT TO CLIENT SBLC BECOMES SOLE PROPERTY OF MPS GULF INTERNATIONAL.)
CLIENT FUNDS WILL BE USED TO SECURE SBLC FOR THE TRADE ACCOUNT

MPS GULF INTERNATIONAL

Transaction Code: POLJ010516/257869

Signed this day, April 28, 2015, for and on behalf of

DIRECTOR:
JOHN L. GREEN FAMILY TRUST:

DIRECTOR:
VENTRICLE CONSULTANTS:

MARK PERSUAD
MPS GULF INTERNATIONAL

**Loan Payment Bank Account Information**

Bank Name: M&T Bank of Maryland

Bank Address:

Account Name: Ventricle Advisory llc Trust Account

Account Number:          6629

Routing Number:

Bank Officer: Patricia Livingston

Bank Phone:

Bank Fax:

MPS GULF INTERNATIONAL

Transaction Code: POL/010515/257869

# EXHIBIT 3



| From: | @aol.com |
|---|---|
| To: | @gmail.com |
| Date: | Wednesday, April 29, 2015 3:59:11 AM |
| Attachments: | 2015_04_28_22_01_50.pdf |

As promised you are receiving the POF and Proof of sale of assets to account for the 200k for the securing of the SBLC as well as the 45k(2%) that will be held in escrow for the fees of all intermediaries. Call me to confirm receipt as well as discuss the other 5m SBLC option
</font

# EXHIBIT 4

# ▲▲ M&T Bank

FOR INQUIRIES CALL:   ST. JOHN'S LANE

000000                                    P

**VENTRICLE ADVISORY CONSULTANTS
ESCROW ACCOUNT**

| ACCOUNT TYPE | |
|---|---|
| M&T SIMPLE CHECKING FOR BUSINESS | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| 6629 | 05/01/15 - 05/31/15 |

| BEGINNING BALANCE | ($30.30) |
|---|---|
| DEPOSITS & CREDITS | 250,000.00 |
| LESS CHECKS & DEBITS | 209,400.00 |
| LESS SERVICE CHARGES | 10.34 |
| ENDING BALANCE | $40,559.36 |

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 05/01/2015 | BEGINNING BALANCE | | | ($30.30) |
| 05/01/2015 | INCOMING FEDWIRE FUNDS TRANSFER | $250,000.00 | | |
| | | | | 249,969.70 |
| 05/04/2015 | OUTGOING FEDWIRE FUNDS TRANSFER OCEAN 27 HOLDINGS LLC DBA MPS | | $200,000.00 | |
| 05/04/2015 | In Branch Transfer/Withdrawal | | 5,000.00 | 44,969.70 |
| 05/08/2015 | SERVICE CHARGE FOR ACCOUNT      6629 | | 10.34 | 44,959.36 |
| 05/22/2015 | CHECK NUMBER 0055 | | 4,400.00 | 40,559.36 |
| | NUMBER OF DEPOSITS/CHECKS PAID | 1 | 1 | |

PAGE 1 OF 1

# M&T Bank

FOR INQUIRIES CALL:   ST. JOHN'S LANE

000000                                    P

**VENTRICLE ADVISORY CONSULTANTS**
**ESCROW ACCOUNT**

| ACCOUNT TYPE | |
|---|---|
| M&T SIMPLE CHECKING FOR BUSINESS | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| 6629 | 06/01/15 - 06/30/15 |

| | |
|---|---|
| BEGINNING BALANCE | $40,559.36 |
| DEPOSITS & CREDITS | 0.00 |
| LESS CHECKS & DEBITS | 20,441.10 |
| LESS SERVICE CHARGES | 43.50 |
| ENDING BALANCE | $20,074.76 |

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 06/01/2015 | BEGINNING BALANCE | | | $40,559.36 |
| 06/03/2015 | In Branch Transfer/Withdrawal | | $10,000.00 | 30,559.36 |
| 06/08/2015 | SERVICE CHARGE FOR ACCOUNT 6629 | | 43.50 | 30,515.86 |
| 06/09/2015 | OUTGOING FEDWIRE FUNDS TRANSFER TRAVEL KEYS | | 3,600.00 | 26,915.86 |
| 06/17/2015 | M&T ATM CASH WITHDRAWAL ON 06/17 ONE MALL N 1, 10025 GOV WARFIELD PK,COLUMBIA MD | | 860.00 | 26,055.86 |
| 06/22/2015 | IRENTTOOWN8888453306 | | 4.95 | 26,050.91 |
| 06/24/2015 | ASSOCIATED APPLIANCE S410-6686100 | | 176.15 | 25,874.76 |
| 06/26/2015 | CHECK NUMBER 0055 | | 5,800.00 | 20,074.76 |
| | NUMBER OF DEPOSITS/CHECKS PAID | 0 | 1 | |

MANUFACTURERS AND TRADERS TRUST COMPANY
25 S CHARLES ST BALTIMORE MD 21201

# ▲▲ M&T Bank

| FOR INQUIRIES CALL: | ST. JOHN'S LANE |
| --- | --- |

000000                                    P

**VENTRICLE ADVISORY CONSULTANTS**
**ESCROW ACCOUNT**

| ACCOUNT TYPE | |
| --- | --- |
| M&T SIMPLE CHECKING FOR BUSINESS | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
| --- | --- |
| 6629 | 07/01/15 - 07/31/15 |

| | |
| --- | --- |
| BEGINNING BALANCE | $20,074.76 |
| DEPOSITS & CREDITS | 0.00 |
| LESS CHECKS & DEBITS | 10,128.78 |
| LESS SERVICE CHARGES | 28.50 |
| ENDING BALANCE | $9,917.48 |

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
| --- | --- | --- | --- | --- |
| 07/01/2015 | BEGINNING BALANCE | | | $20,074.76 |
| 07/01/2015 | ATM CASH WITHDRAWAL ON 06/30<br>Ditronics    7002 ARUNDEL MILLSHANOVER    MD | | $1,004.99 | |
| 07/01/2015 | NON-M&T ATM FEE ON 06/30<br>Ditronics    7002 ARUNDEL MILLSHANOVER    MD | | 3.00 | 19,066.77 |
| 07/02/2015 | ATM CASH WITHDRAWAL ON 07/02<br>Ditronics    7002 ARUNDEL MILLSHANOVER    MD | | 1,004.99 | |
| 07/02/2015 | NON-M&T ATM FEE ON 07/02<br>Ditronics    7002 ARUNDEL MILLSHANOVER    MD | | 3.00 | 18,058.78 |
| 07/06/2015 | ATM CASH WITHDRAWAL ON 07/03<br>Ditronics    7002 ARUNDEL MILLSHANOVER    MD | | 1,004.99 | |
| 07/06/2015 | WENDYS #0152        NEW CARROLLTO | | 10.49 | |
| 07/06/2015 | M&T ATM CASH WITHDRAWAL ON 07/06<br>BETHNY LN/10100 BALT NAT PK, ELIOT CTY, MD | | 1,000.00 | |
| 07/06/2015 | NON-M&T ATM FEE ON 07/03<br>Ditronics    7002 ARUNDEL MILLSHANOVER    MD | | 3.00 | 16,040.30 |
| 07/08/2015 | WEST UNION BGE WUBGEPYMNT  3573850000 | | 1,002.00 | |
| 07/08/2015 | SERVICE CHARGE FOR ACCOUNT        6629 | | 28.50 | 15,009.80 |
| 07/10/2015 | SPRINT *WIRELESS | | 400.00 | 14,609.80 |
| 07/16/2015 | M&T ATM CASH WITHDRAWAL ON 07/16<br>BETHNY LN/10100 BALT NAT PK, ELIOT CTY, MD | | 600.00 | |
| 07/16/2015 | ATM MINI STATEMENT INQUIRY FEE ON 07/16<br>BETHNY LN/10100 BALT NAT PK, ELIOT CTY, MD | | 1.00 | |
| 07/16/2015 | ATM MINI STATEMENT INQUIRY FEE ON 07/16<br>BETHNY LN/10100 BALT NAT PK, ELIOT CTY, MD | | 1.00 | 14,007.80 |
| 07/17/2015 | PURCHASE WITH CASH BACK ON 07/16<br>Wal-Mart Store3490 WAL-SAMS    HANOVER    MD | | 165.80 | 13,842.00 |
| 07/20/2015 | EXIT 59 LOUNGE        BALTIMORE | | 32.22 | |
| 07/20/2015 | M&T ATM CASH WITHDRAWAL ON 07/19<br>ST JOHNS LANE 2, BALT NTL PK, ELLICOTT CITY, MD | | 800.00 | |
| 07/20/2015 | ATM CASH WITHDRAWAL ON 07/19<br>Ditronics    7002 ARUNDEL MILLSHANOVER    MD | | 204.99 | |
| 07/20/2015 | NON-M&T ATM FEE ON 07/19<br>Ditronics    7002 ARUNDEL MILLSHANOVER    MD | | 3.00 | 12,801.79 |

PAGE 1 OF 2

# M&T Bank

FOR INQUIRIES CALL:   ST. JOHN'S LANE

| ACCOUNT TYPE |
|---|
| M&T SIMPLE CHECKING FOR BUSINESS |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| 6629 | 07/01/15 - 07/31/15 |

**VENTRICLE ADVISORY CONSULTANTS**
**ESCROW ACCOUNT**

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 07/21/2015 | PURCHASE WITH CASH BACK ON 07/20 WM SUPERCENTERWal-Mart Super CenELLICOTT CITYMD | | 187.08 | 12,614.71 |
| 07/22/2015 | REDBOX *DVD RENTAL   OAKBROOK TER | | 3.77 | |
| 07/22/2015 | BALTIMORE GAS&ELECTRIC800-685-0123 | | 500.00 | |
| 07/22/2015 | BALTIMORE GAS&ELECTRIC800-685-0123 | | 125.00 | 11,985.94 |
| 07/23/2015 | IRENTTOOWN.COM    855-5806680 | | 4.95 | |
| 07/23/2015 | PIN SPORTS AUTHORITY 0BALTIMORE | | 54.03 | 11,926.96 |
| 07/27/2015 | LIBERTY FORD      RANDALLSTOWN | | 1,000.00 | |
| 07/27/2015 | PURCHASE ON 07/24 WAL-MART #3490Wal-Mart Store   HANOVER     MD | | 82.72 | |
| 07/27/2015 | LOGANS # 485     NASHVILLE | | 75.00 | |
| 07/27/2015 | SPEEDWAY 07158 189   CROSSVILLE | | 27.51 | 10,741.73 |
| 07/30/2015 | M&T ATM CASH WITHDRAWAL ON 07/30 ONE MALL N 2, 10025 GOV WARFIELD PK,COLUMBIA MD | | 740.00 | |
| 07/30/2015 | PURCHASE ON 07/30 Wal-Mart Super2412 WAL-SAMS    ELLICOTT CITYMD | | 84.25 | 9,917.48 |
| | NUMBER OF DEPOSITS/CHECKS PAID | 0 | 0 | |

MANUFACTURERS AND TRADERS TRUST COMPANY
25 S CHARLES ST BALTIMORE MD 21201

# M&T Bank

FOR INQUIRIES CALL:   ST. JOHN'S LANE

| ACCOUNT TYPE | |
|---|---|
| M&T SIMPLE CHECKING FOR BUSINESS | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| 6629 | 08/01/15 - 08/31/15 |

000000                          P

**VENTRICLE ADVISORY CONSULTANTS**
**ESCROW ACCOUNT**

| | |
|---|---|
| BEGINNING BALANCE | $9,917.48 |
| DEPOSITS & CREDITS | 0.00 |
| LESS CHECKS & DEBITS | 4,462.19 |
| LESS SERVICE CHARGES | 0.00 |
| ENDING BALANCE | $5,455.29 |

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 08/01/2015 | BEGINNING BALANCE | | | $9,917.48 |
| 08/03/2015 | REDBOX *DVD RENTAL   866-733-2693 | | $4.77 | 9,912.71 |
| 08/04/2015 | PURCHASE ON 08/03<br>WM SUPERCENTERWal-Mart Super CenELLICOTT CITYMD | | 54.19 | 9,858.52 |
| 08/07/2015 | CHOXI.COM 800-973-5990800-538-9798 | | 199.00 | 9,659.52 |
| 08/10/2015 | DISH NETWORK-ONE TIME 800-894-9351 | | 200.00 | |
| 08/10/2015 | M&T ATM CASH WITHDRAWAL ON 08/08<br>ST JOHNS LANE 1, BALT NTL PK, ELLICOTT CITY, MD | | 300.00 | |
| 08/10/2015 | M&T ATM CASH WITHDRAWAL ON 08/10<br>BETHNY LN/10100 BALT NAT PK, ELIOTT CTY, MD | | 700.00 | 8,459.52 |
| 08/11/2015 | PIN THE HOME DEPOT 256ELLICOTT CITY | | 51.32 | |
| 08/11/2015 | PIN SAFEWAY STORE 12ELLICOTT CITY | | 44.86 | |
| 08/11/2015 | ATM CASH WITHDRAWAL ON 08/10<br>Ditronics   7002 ARUNDEL MILLSHANOVER     MD | | 304.99 | |
| 08/11/2015 | PURCHASE WITH CASH BACK ON 08/11<br>WAL-MART #24123200 NORTH RIDGE RELLICOTT CITYMD | | 123.05 | |
| 08/11/2015 | NON-M&T ATM FEE ON 08/10<br>Ditronics   7002 ARUNDEL MILLSHANOVER     MD | | 3.00 | 7,932.30 |
| 08/13/2015 | PURCHASE ON 08/12<br>WAL-MART #24123200 NORTH RIDGE RELLICOTT CITYMD | | 53.60 | 7,878.70 |
| 08/14/2015 | M&T ATM CASH WITHDRAWAL ON 08/14<br>BETHNY LN/10100 BALT NAT PK, ELIOTT CTY, MD | | 200.00 | 7,678.70 |
| 08/17/2015 | SPRINT *WIRELESS     800-639-6111 | | 455.92 | |
| 08/17/2015 | PURCHASE ON 08/15<br>Wal-Mart Super2412 WAL-SAMS     ELLICOTT CITYMD | | 37.20 | |
| 08/17/2015 | M&T ATM CASH WITHDRAWAL ON 08/16<br>BETHNY LN/10100 BALT NAT PK, ELIOTT CTY, MD | | 400.00 | |
| 08/17/2015 | PIN WEGMANS 8855 MCGAWCOLUMBIA | | 64.70 | 6,720.88 |
| 08/19/2015 | COMPUTERS ETC     ELLICOTT CITY | | 284.80 | 6,436.08 |
| 08/20/2015 | WEGMANS COLUMBIA #47 COLUMBIA | | 9.51 | 6,426.57 |
| 08/24/2015 | ADVANCE AUTO PARTS #51BALTIMORE | | 157.31 | |
| 08/24/2015 | PIN SAFEWAY STORE 14ELLICOTT CITY | | 92.95 | |
| 08/24/2015 | CUBA DE AYER       BURTONSVILLE | | 90.00 | |

PAGE 1 OF 2

# M&T Bank

FOR INQUIRIES CALL:   ST. JOHN'S LANE

| ACCOUNT TYPE |
| --- |
| M&T SIMPLE CHECKING FOR BUSINESS |

| ACCOUNT NUMBER | STATEMENT PERIOD |
| --- | --- |
| 6629 | 08/01/15 - 08/31/15 |

VENTRICLE ADVISORY CONSULTANTS
ESCROW ACCOUNT

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
| --- | --- | --- | --- | --- |
| 08/24/2015 | RPD*IRENTTOOWN.COM   888-845-3306 | | 4.95 | |
| 08/24/2015 | PIN WEGMANS 8855 MCGAWCOLUMBIA | | 68.49 | |
| 08/24/2015 | M&T ATM CASH WITHDRAWAL ON 08/24 INGLESIDE/5642 BALT NATL PK, CATONSVILLE, MD | | 400.00 | 5,612.87 |
| 08/25/2015 | LONG REACH BEAUTY SUPPCOLUMBIA | | 10.90 | |
| 08/25/2015 | PIN 5660 BALTIMORE NATBALTIMORE | | 56.69 | 5,545.28 |
| 08/28/2015 | ADOBE *PDF PACK SUBS  800-833-6687 | | 89.99 | 5,455.29 |
| | NUMBER OF DEPOSITS/CHECKS PAID | 0 | 0 | |

MANUFACTURERS AND TRADERS TRUST COMPANY
25 S CHARLES ST BALTIMORE MD 21201

# M&T Bank

FOR INQUIRIES CALL:   ST. JOHN'S LANE

000000                                    P

**VENTRICLE ADVISORY CONSULTANTS**
**ESCROW ACCOUNT**

| ACCOUNT TYPE | |
|---|---|
| M&T SIMPLE CHECKING FOR BUSINESS | |
| **ACCOUNT NUMBER** | **STATEMENT PERIOD** |
| 6629 | 09/01/15 - 09/30/15 |

| BEGINNING BALANCE | $5,455.29 |
|---|---|
| DEPOSITS & CREDITS | 1,650.00 |
| LESS CHECKS & DEBITS | 2,622.89 |
| LESS SERVICE CHARGES | 0.00 |
| ENDING BALANCE | $4,482.40 |

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 09/01/2015 | BEGINNING BALANCE | | | $5,455.29 |
| 09/02/2015 | PURCHASE WITH CASH BACK ON 09/02 WM SUPERCENTERWal-Mart Super CenELLICOTT CITYMD | | $141.97 | 5,313.32 |
| 09/04/2015 | REDBOX *DVD RENTAL   OAKBROOK TER | | 3.18 | 5,310.14 |
| 09/08/2015 | DISH NETWORK-ONE TIME 800-894-9131 | | 187.85 | |
| 09/08/2015 | DRAFTKINGS 6175007995 617-500-7995 | | 100.00 | |
| 09/08/2015 | ATM CASH WITHDRAWAL ON 09/07 Ditronics    7002 ARUNDEL MILLSHANOVER    MD | | 1,004.99 | |
| 09/08/2015 | NON-M&T ATM FEE ON 09/07 Ditronics    7002 ARUNDEL MILLSHANOVER    MD | | 3.00 | 4,014.30 |
| 09/11/2015 | M&T ATM CASH DEPOSIT ON 09/11 BETHNY LN/10100 BALT NAT PK, ELIOTT CTY, MD | $1,000.00 | | |
| 09/11/2015 | M&T ATM CHECK DEPOSIT BETHNY LN/10100 BALT NAT PK, ELIOTT CTY, MD | 650.00 | | |
| 09/11/2015 | FANDUEL INC      800-475-2250 | | 200.00 | 5,464.30 |
| 09/21/2015 | BALTIMORE GAS&ELECTRIC800-685-0123 | | 902.00 | |
| 09/21/2015 | NORMANDY CROWN      ELLICOTT CITY | | 14.02 | 4,548.28 |
| 09/25/2015 | IRENTTOOWN.COM    855-5806680 | | 4.95 | 4,543.33 |
| 09/28/2015 | PURCHASE ON 09/26 WAL-MART #24123200 NORTH RIDGE RELLICOTT CITYMD | | 60.93 | 4,482.40 |
| | NUMBER OF DEPOSITS/CHECKS PAID | 2 | 0 | |

MANUFACTURERS AND TRADERS TRUST COMPANY
25 S CHARLES ST BALTIMORE MD 21201

# M&T Bank

| FOR INQUIRIES CALL: | ST. JOHN'S LANE | | ACCOUNT TYPE | |
|---|---|---|---|---|
| | | | M&T SIMPLE CHECKING FOR BUSINESS | |

| 000000 | P | ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|---|---|
| | | 6629 | 10/01/15 - 10/31/15 |

**VENTRICLE ADVISORY CONSULTANTS**
**ESCROW ACCOUNT**

| BEGINNING BALANCE | $4,482.40 |
|---|---|
| DEPOSITS & CREDITS | 700.00 |
| LESS CHECKS & DEBITS | 3,935.58 |
| LESS SERVICE CHARGES | 0.00 |
| ENDING BALANCE | $1,246.82 |

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 10/01/2015 | BEGINNING BALANCE | | | $4,482.40 |
| 10/02/2015 | PURCHASE WITH CASH BACK ON 10/01 Wal-Mart Super2412 WAL-SAMS   ELLICOTT CITYMD | | $180.27 | 4,302.13 |
| 10/06/2015 | PIN THE HOME DEPOT 256ELLICOTT CITY | | 74.17 | 4,227.96 |
| 10/07/2015 | MVA PHONE REG REN   999-9999999 | | 187.00 | |
| 10/07/2015 | MVA PHONE REG REN   999-9999999 | | 187.00 | |
| 10/07/2015 | PIN WEGMANS 8855 MCGAWCOLUMBIA | | 59.95 | |
| 10/07/2015 | PURCHASE WITH CASH BACK ON 10/06 WAL-MART #24123200 NORTH RIDGE RELLICOTT CITYMD | | 138.86 | 3,655.15 |
| 10/09/2015 | M&T ATM CASH WITHDRAWAL ON 10/09 BETHNY LN/10100 BALT NAT PK, ELIOTT CTY, MD | | 250.00 | 3,405.15 |
| 10/13/2015 | PURCHASE ON 10/09 WAL-MART #24123200 NORTH RIDGE RELLICOTT CITYMD | | 74.55 | |
| 10/13/2015 | PURCHASE ON 10/10 WM SUPERCENTERWal-Mart Super CenELLICOTT CITYMD | | 28.30 | |
| 10/13/2015 | PURCHASE WITH CASH BACK ON 10/13 Wal-Mart Super2412 WAL-SAMS   ELLICOTT CITYMD | | 126.83 | 3,175.47 |
| 10/16/2015 | ADVANCE AUTO PARTS #51BALTIMORE | | 95.99 | |
| 10/16/2015 | LAUREL CROWN      LAUREL | | 50.00 | |
| 10/16/2015 | M&T ATM CASH WITHDRAWAL ON 10/16 BETHNY LN/10100 BALT NAT PK, ELIOTT CTY, MD | | 100.00 | 2,929.48 |
| 10/19/2015 | PURCHASE WITH CASH BACK ON 10/19 WAL-MART #3490Wal-Mart Store   HANOVER    MD | | 109.95 | |
| 10/19/2015 | ATM CASH WITHDRAWAL ON 10/19 DItronics   7002 ARUNDEL MILLSHANOVER   MD | | 504.99 | |
| 10/19/2015 | NON-M&T ATM FEE ON 10/19 DItronics   7002 ARUNDEL MILLSHANOVER   MD | | 3.00 | 2,311.54 |
| 10/20/2015 | PURCHASE ON 10/19 Wal-Mart Super2412 WAL-SAMS   ELLICOTT CITYMD | | 21.62 | 2,289.92 |
| 10/22/2015 | M&T ATM CASH DEPOSIT ON 10/22 BETHNY LN/10100 BALT NAT PK, ELIOTT CTY, MD | $400.00 | | |
| 10/22/2015 | PIN RITE AID STORE - 0ELLICOTT CITY | | 254.75 | 2,435.17 |
| 10/23/2015 | M&T ATM CASH DEPOSIT ON 10/23 BETHNY LN/10100 BALT NAT PK, ELIOTT CTY, MD | 300.00 | | |

MANUFACTURERS AND TRADERS TRUST COMPANY
25 S CHARLES ST BALTIMORE MD 21201

# M&T Bank

FOR INQUIRIES CALL:   ST. JOHN'S LANE

| ACCOUNT TYPE | |
|---|---|
| M&T SIMPLE CHECKING FOR BUSINESS | |
| ACCOUNT NUMBER | STATEMENT PERIOD |
| 6629 | 10/01/15 - 10/31/15 |

VENTRICLE ADVISORY CONSULTANTS
ESCROW ACCOUNT

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 10/23/2015 | ATM CASH WITHDRAWAL ON 10/23<br>Ditronics    7002 ARUNDEL MILLSHANOVER      MD | | 504.99 | |
| 10/23/2015 | NON-M&T ATM FEE ON 10/23<br>Ditronics    7002 ARUNDEL MILLSHANOVER      MD | | 3.00 | 2,227.18 |
| 10/26/2015 | SPRINT *WIRELESS      800-639-6111 | 211.00 | | |
| 10/26/2015 | ATM CASH WITHDRAWAL ON 10/25<br>Ditronics    7002 ARUNDEL MILLSHANOVER      MD | | 204.99 | |
| 10/26/2015 | NON-M&T ATM FEE ON 10/25<br>Ditronics    7002 ARUNDEL MILLSHANOVER      MD | | 3.00 | 1,808.19 |
| 10/27/2015 | IRO*IRENTTOOWN      888-4351926 | | 4.95 | |
| 10/27/2015 | PURCHASE ON 10/26<br>Wal-Mart Super2412 WAL-SAMS    ELLICOTT CITYMD | | 41.28 | 1,761.96 |
| 10/28/2015 | ATM CASH WITHDRAWAL ON 10/27<br>Ditronics    7002 ARUNDEL MILLSHANOVER      MD | | 504.99 | |
| 10/28/2015 | NON-M&T ATM FEE ON 10/27<br>Ditronics    7002 ARUNDEL MILLSHANOVER      MD | | 3.00 | 1,253.97 |
| 10/29/2015 | CINEMARK THEATRES 1051HANOVER | | 7.15 | 1,246.82 |
| | NUMBER OF DEPOSITS/CHECKS PAID | 2 | 0 | |

MANUFACTURERS AND TRADERS TRUST COMPANY
25 S CHARLES ST BALTIMORE MD 21201

# EXHIBIT 5

29Q-WF-2127393 Serial 4

-1 of 5-

FD-302 (Rev. 5-8-10)

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    08/08/2016

    JAMES ALEXANDER BENJAMIN (BENJAMIN), date of birth ▮▮▮▮▮▮▮▮▮▮▮,
telephone number ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was
interviewed at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Also present
for the interview was BENJAMIN's business partner, JOHN LELAND GREEN III
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
Diplomatic Security Service Special Agent Kevin Hullihan assisted with the
interview. After being advised of the identity of the interviewing Agents
and the nature of the interview, BENJAMIN provided the following
information:

### INTRODUCTION

    BENJAMIN is the "Principal" and Director of Business Development at
VENTRICLE ADVISORY CONSULTANTS (VENTRICLE). VENTRICLE does business in
real estate and property investments. BENJAMIN and GREEN are business
partners and conduct their business ventures through VENTRICLE.

    TYRONE GRANDBERRY (GRANDBERRY) was first introduced to BENJAMIN and
GREEN as TYRONE "STAINDL" by a mutual acquaintance, LEONARD LNU, who was in
a fraternity with GRANDBERRY in college in North Carolina. LEONARD told
BENJAMIN and GREEN that GRANDBERRY worked in the banking industry in the
Washington D.C. area. BENJAMIN was interested in meeting GRANDBERRY to
"network" in the banking industry.

### STAND BY LETTER OF CREDIT INVESTMENT

    After BENJAMIN and GRANDBERRY were formally introduced, GRANDBERRY
approached BENJAMIN about a Stand By Letter of Credit (SBLC) investment
opportunity through TD BANK. BENJAMIN talked to GREEN about the investment
opportunity. GRANDBERRY sent BENJAMIN some SBLC documents to review and
claimed to have ways to "leverage" funding with loans. GRANDBERRY sent
BENJAMIN a "monetization" contract from an international trading company
located in Dubai called MPS. GRANDBERRY and BENJAMIN had a three-way call
with a female at TD BANK and the TD BANK employee explained the SBLC
process, with the exception of the "monetization" aspect.

    Through conversations with GRANDBERRY and the TD BANK employee, it was

Investigation on  07/22/2016  at  Pikesville, Maryland, United States (In Person)

File #  29Q-WF-6693698                                         Date drafted  07/25/2016

by  SA Tristan S. Hall

This document contains neither recommendations nor conclusi[...]d is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

29Q-WF-6693698

Continuation of FD-302 of  (U) Interview of JAMES BENJAMIN _____ , On  07/22/2016 , Page  2 of 5

understood that the investment funds would be "blocked" in a TD BANK
account.  TD BANK would provide an SBLC on which BENJAMIN and GREEN would
be "signatories".  The SBLC would be signed over to one of GRANDBERRY's
contacts, MARK PERSAUD (PERSAUD) from MPS to be "monetized".  GRANDBERRY
sent BENJAMIN a copy of the MPS trading license and claimed that PERSAUD
had contacts at a Chinese bank, "CTBC".  BENJAMIN and GREEN would receive
50 percent of the face value of the SBLC back as a "forgiveable loan".  The
other 50 percent would be "traded" by MPS to gain revenue to pay back the
full amount of the SBLC to TD BANK.  With GREEN's concurrence, BENJAMIN
agreed to move forward with the investment opportunity.

GREEN wired $250,000 from an account in the name of GREEN FAMILY TRUST
(GFT), a trust account GREEN controls, to an account belonging to
VENTRICLE.  BENJAMIN then wired $200,000 of that from the VENTRICLE account
to an account at TD BANK controlled by GRANDBERRY.  BENJAMIN and GREEN
agreed that the remaining $50,000 in the VENTRICLE account would be used in
joint business ventures between BENJAMIN and GREEN.

According to GRANDBERRY's explanation, the $200,000 would be "blocked"
in a TD BANK  and TD BANK would provide an SBLC for $5 million.  From this
$5 million, $2.5 million would be wired back to VENTRICLE as a "forgiveable
loan" within 7-10 banking days.  The other $2.5 million would be sent to
PERSAUD to be "leveraged" and "traded" through MPS to gain revenue.  The
revenue from the "trading" was supposed to be used to pay back the full $5
million to TD BANK, with a one year and one day deadline to repay.
BENJAMIN was told he and GREEN would not have to pay back the $2.5 million
"forgiveable loan".  BENJAMIN and GREEN planned to use the $2.5 million for
real estate investment dealings.

BENJAMIN never signed anything to "sign over" the SBLC to PERSAUD, even
though BENJAMIN was told that everything was moving forward with the SBLC.
BENJAMIN did receive an email from GRANDBERRY that appeared to be a
forwarded email from the TD BANK employee alleging that the SBLC was moving
forward.  BENJAMIN does not remember if he ever received an email directly
from the TD BANK employee.  Some of the three-way telephone calls with the
TD BANK employee were initiated by GRANDBERRY, but BENJAMIN called the TD
BANK branch in Woodbridge, Virginia directly at least once to discuss the
SBLC.  The number BENJAMIN called was from a TD BANK business card that
GRANDBERRY gave to BENJAMIN.  Conversations with the TD BANK employee
included both discussion on how SBLCs work in general and the specific SBLC
situation involving VENTRICLE.

On several occasions, GRANDBERRY sent BENJAMIN "screen shots" from the
TD BANK account holding the $200,000 to show that the money was there.
Both VENTRICLE and GFT were on the statements and there was a note

FD-302a (Rev. 05-08-10)

29Q-WF-6693698

Continuation of FD-302 of  (U) Interview of JAMES BENJAMIN _____ , On  07/22/2016 , Page  3 of 5

indicating that a $5 million SBLC was pending.  BENJAMIN noticed a lot of
money moving through one of the associated TD BANK accounts that also
showed up on the "screen shot".  GRANDBERRY sent BENJAMIN documents to make
it appear as if everything was moving along fine and that the deal was
going to close.  All bank related documents were received through
GRANDBERRY.

VENTRICLE did not receive the $2.5 million as promised.  GRANDBERRY
provided excuses as to why there was a delay and continued to claim that
the money would be sent to the VENTRICLE account.  GRANDBERRY blamed
PERSAUD for the delay.  BENJAMIN had several conference calls with
GRANDBERRY and PERSAUD.  PERSAUD also provided excuses such as bank delays
and tax issues.  Some of the contact BENJAMIN had with PERSAUD happened
through GRANDBERRY, but BENJAMIN called PERSAUD directly at least once.

At some point, GRANDBERRY claimed that a "test wire" of $50,000 would be
wired from a SunTrust Bank account to start the payment process.
GRANDBERRY and BENJAMIN spoke to two males at SunTrust Bank regarding the
wire, but nothing ever materialized.

At some point, GRANDBERRY claimed that there was no profit made in the
investment and that he would start the "refund process" to return the
$200,000.  GRANDBERRY eventually returned the full $200,000 to VENTRICLE
through several different wires.  A portion of that money has been returned
to the GFT account.  BENJAMIN and GREEN have agreed to use the remaining
portion in their joint business ventures through VENTRICLE.  BENJAMIN has a
payment contract agreement with GREEN for BENJAMIN to eventually repay the
full amount to the GFT account.

After refunding the original amount, GRANDBERRY said that he was going
to make things right and that he would pay $1.25 million to VENTRICLE once
some other business dealings of GRANDBERRY's finalized.  GRANDBERRY sent
BENJAMIN a "schedule of funds" for a settlement.  GRANDBERRY also mentioned
a $50 million property sale, a deal involving nickel wire, and the
"monetization" of a bank instrument.  This promised payment never
materialized and eventually GRANDBERRY stopped responding to BENJAMIN's
attempts to contact GRANDBERRY through telephone, email, and text message.
BENJAMIN believed his last contact with GRANDBERRY was possibly in
March/April 2016.

After the GFT deal went "bad", BENJAMIN Googled GRANDBERRY.  BENJAMIN
saw that GRANDBERRY used several aliases and was listed in a "ripoff
report" involving fraud.

TD BANK has never contacted BENJAMIN regarding the current status of the
SBLC.

29Q-WF-2127393 Serial 4

FD-302a (Rev. 05-08-10)

29Q-WF-6693698

Continuation of FD-302 of (U) Interview of JAMES BENJAMIN , On 07/22/2016 , Page 4 of 5

### RAYMOND HO

Before the GFT deal went "bad", BENJAMIN attempted to do other business with GRANDBERRY. GRANDBERRY introduced BENJAMIN to an attorney named RAYMOND HO (HO) that lives in Falls Church, Virginia. GRANDBERRY said that HO was an escrow attorney that could assist with transactions. BENJAMIN met with HO in person in Gaithersburg, Virginia and Tyson's Corner, Virginia. HO's association with GRANDBERRY gave the appearance of legitimacy.

About two months ago, BENJAMIN talked to HO about GRANDBERRY. BENJAMIN explained what happened with the GFT deal going "bad" and said that he could not continue to do business with HO if HO was still associated with GRANDBERRY. HO told BENJAMIN HO did not talk to GRANDBERRY anymore.

At some point, BENJAMIN met HO in Vienna, Virginia and introduced HO to an individual named PETER KECHIGIAS (phonetic)(PETER), who had a company in Florida called MILL HOUSE TRADE FINANCIAL (MILL HOUSE). MILL HOUSE is a company that issues SBLCs for businesses. HO was trying to obtain an SBLC on behalf of a client for a "humanitarian" investment project. PETER offered to assist. HO sent BENJAMIN some "bank checks" and asked BENJAMIN to send them to PETER. The checks were from a "custodial" bank in Argentina. Nothing materialized from this attempted deal. BENJAMIN and HO have attempted to do other business together, but nothing has ever materialized.

BENJAMIN and HO are in regular contact regarding potential business opportunities. BENJAMIN had contact with HO the day before being interviewed by the interviewing agents. BENJAMIN and HO discussed a client, GREEN HOUSE INDUSTRIES, that needed a credit line activation requiring a banking relationship with a "certain rated bank".

BENJAMIN has not used HO as an escrow attorney yet.

### MISCELLANEOUS

GREEN told BENJAMIN that GREEN's friend, HORACE WARD (WARD), is a fraud investigator with NAVY INTELLIGENCE. WARD works with the FBI. WARD tried calling GRANDBERRY on behalf of GREEN when the SBLC investment did not occur as promised. WARD tried calling several times, even from an FBI facility. GRANDBERRY did not answer or return WARD's calls. WARD considered going to Woodbridge, Virginia to confront GRANDBERRY, but decided against it.

GRANDBERRY claimed to have double residency in the United States and

FD-302a (Rev. 05-08-10)

29Q-WF-2127393 Serial 4

29Q-WF-6693698

Continuation of FD-302 of (U) Interview of JAMES BENJAMIN _____ , On 07/22/2016 , Page 5 of 5

Amsterdam.  GRANDBERRY used this fact to explain his multiple aliases.
Aside from GRANDBERRY and STAINDL, GRANDBERRY also uses the last name
GRANDERSON.  GRANDBERRY has multiple passports.  GRANDBERRY used to play
basketball overseas.

GRANDBERRY coaches girls basketball in Virginia.  BENJAMIN thinks that
GRANDBERRY's daughter plays on the team.  After contact between BENJAMIN
and GRANDBERRY stopped, BENJAMIN once received an invite to a girls
basketball game by mistake.  BENJAMIN considered going to the game to
confront GRANDBERRY, but decided against it.

GRANDBERRY used BENJAMIN's name to try to sell a bank guarantee.  JOHN
SCAFIDI (phonetic) sent AHIYA ISRAEL (phonetic) a "bank guarantee"
purportedly being sold by BENJAMIN.

# EXHIBIT 6

29Q-WF-2127393 Serial 31

-1 of 6-

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     03/13/2017

JAMES ALEXANDER BENJAMIN, previously identified, was interviewed at ███████████████████████. After being advised of the identity of the interviewing Agents and the nature of the interview, BENJAMIN provided the following information:

## TYRONE GRANDBERRY

BENJAMIN has not had any recent contact with TYRONE GRANDBERRY. BENJAMIN has not talked to GRANDBERRY since he met with GRANDBERRY in Washington, D.C. when cooperating with the FBI.

BENJAMIN is still working on paying money back to JOHN GREEN's (GREEN) trust. BENJAMIN is handling the real estate transactions previously alluded to in previous interviews with the FBI and reimbursing the trust account.

GRANDBERRY used the excuse of his mother being ill on one occassion when GRANDBERRY was explaining why he had not responded to BENJAMIN regarding GREEN investment.

## RAYMOND HO

RAYMOND HO (HO) is an attorney. BENJAMIN and HO have not communicated recently. The last time BENJAMIN spoke to HO, HO was focusing on his work as a patent attorney. HO has "washed his hands" of GRANDBERRY.

BENJAMIN and HO maintain a professional relationship, but BENJAMIN and HO do not have any joint ventures together.

HO has a firm named HG INTERNATIONAL that conducts "paymaster" transactions. HO and GRANDBERRY previously did a transaction in Germany involving nickel deals. HO's firm was used as a paymaster in the transaction. BENJAMIN described "paymaster" as the vehicle to move funds through an entity and further explained a paymaster attorney is similar to a title attorney in that they handle the disbursement of money. BENJAMIN used HO as a paymaster attorney for a deal with DIANA LEEGE (LEEGE) and on one other occasion. BENJAMIN has introduced HO to other people, but no business deals have transpired as a result.

UNCLASSIFIED//FOUO

---

Investigation on  02/17  at Ellicott City, Maryland, United States (In Person)

File #  29Q-WF-2127393     72017                                                    ted  02/28/2017

by  SA Tristan S. Hall, SA Heather Cayer Johnson

This document contains neither recommendations nor conclusions of the FBI. It is the prop███████████████ey; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

29Q-WF-2127393 Serial 31

UNCLASSIFIED//FOUO

29Q-WF-2127393

(U//FOUO) Interview of James Alexander
Continuation of FD-302 of Benjamin _____ , On 02/17/2017 , Page 2 of 6

## PETER KECHAGIAS/MILLHOUSE TRADE FINANCE

BENJAMIN introduced HO to PETER KECHAGIAS (KECHAGIAS), who is the principal of MILLHOUSE TRADE FINANCE (MILLHOUSE) in Florida.  KECHAGIAS is Russian/Greek and lives in Boca Raton, Florida.  MILLHOUSE arranges funding for business opportunities by assisting with and/or providing loans to clients.  MILLHOUSE has a website with more information and has been around for a few years.

BENJAMIN met KECHAGIAS on a conference call regarding real estate in Florida.  BENJAMIN was introduced to the conference call by a man named DAVID LAST NAME UNKNOWN (LNU).  MILLHOUSE was presented as an option to serve as a funding source.  After the call, BENJAMIN reached out to KECHAGIAS to learn how to obtain funding.  KECHAGIAS has done work with government contracts, factories, oil and gas.  BENJAMIN has met KECHAGIAS twice.  KECHAGIAS came to Washington D.C. to meet with BENJAMIN to create a networking relationship.

BENJAMIN is aware of a client of KECHAGIAS who was not satisfied and received a refund from KECHAGIAS.  The client was referred to KECHAGIAS by AHIYA ISRAEL.  The client was trying to secure a loan by using property as collateral.  It turned out the property the client was using as collateral did not legally belong to the client.  When KECHAGIAS became aware of this, he canceled the loan and refunded the client.

When BENJAMIN refers business to KECHAGIAS, BENJAMIN remains involved in the process to ensure the client makes it through the process.  Sometimes, BENJAMIN receives a referral fee, but it depends on the transaction.  BENJAMIN receives payment from the client.  BENJAMIN also receives payment from KECHAGIAS when a referral fee is involved.

HO tried to refer business directly to KECHAGIAS, but the deals did not work out.  BENJAMIN did not receive a referral fee from MILLHOUSE as a result of referring HO to him.

## EDWARD MATTHEWS

BENJAMIN has known EDWARD MATTHEWS (MATTHEWS) for a long time and considers him a friend.  MATTHEWS works in security and has no connection to GRANDBERRY.  BENJAMIN helps MATTHEWS from time to time and MATTHEWS helps BENJAMIN find property for investments.

## DPMG

FD-302a (Rev. 05-08-10)

29Q-WF-2127393 Serial 31

UNCLASSIFIED//FOUO

29Q-WF-2127393

Continuation of FD-302 of

(U//FOUO) Interview of James Alexander
Benjamin

,On

02/17
/2017

,Page   3 of 6

DPMG is a management company used in real estate and other business
opportunities.  HO is the registered agent for DPMG.  HO is not
significantly involved in the company.  BENJAMIN simply asked HO for
assistance in setting up the Florida company about 1.5 years ago.  Other
individuals involved with DPMG include: JAMES SMITH, ANNETTE PETERSON, and
MATTHEWS.

## ROBERT LEWIS

BENJAMIN has known ROBERT LEWIS (LEWIS) for a long time.  LEWIS lives
in North Carolina.  LEWIS is a financial adviser for MASS
MUTUAL.  BENJAMIN and LEWIS refer clients back and forth. .

LEWIS has no involvement with GRANDBERRY; however GRANDBERRY's mother
lives in North Carolina.  BENJAMIN does not know about other connections
GRANDBERRY has to North Carolina aside from the fraternity brother
associated with both GREEN and GRANDBERRY.

BENJAMIN previously referred LEWIS to HO, but the two have not
connected directly.

## DOCUMENTS SHOWN DURING THE INTERVIEW

### CLIENT FORM

BENJAMIN was shown a document titled "Name of the Client: Clients'
Identification."  BENJAMIN advised the interviewing Agents that LEEGE is a
client of BENJAMIN and LEWIS.  The document was used to create a
corporation for LEEGE's business.  The address on the document,
is where LEEGE resides.

### TRADE FINANCE APPLICATION

BENJAMIN was shown a document titled "Application For Trade Finance
Facility."  BENJAMIN advised the document was a loan application for
MILLHOUSE.  The loan is through MILLHOUSE's bank.  MILLHOUSE is working on
a Stand By Letter of Credit (SBLC) to get funding from a bank.  BENJAMIN
does not know what bank is being used for the deal.  MILLHOUSE uses
OCCIDENTE BANK, which BENJAMIN believes is located in Latin
America.  LEEGE has two properties she is trying to secure a loan
against.  LEEGE was trying to sell one of the properties and was having a
difficult time selling the property.  The plan is to use the properties as
collateral to obtain the loan, which will allow LEEGE to get her money up-
front.  The loan will be paid back through the liquidation of the
properties in 3-5 years.

FD-302a (Rev. 05-08-10)

29Q-WF-2127393 Serial 31

UNCLASSIFIED//FOUO

29Q-WF-2127393

|  | (U//FOUO) Interview of James Alexander | | 02/17 | | |
|---|---|---|---|---|---|
| Continuation of FD-302 of | Benjamin | , On | /2017 | , Page | 4 of 6 |

VENTRICLE ADVISORY CONSULTANT DOCUMENTS

BENJAMIN was shown a document on VENTRICLE ADVISORY CONSULTANTS (VENTRICLE) letterhead, dated January 17, 2017, titled "Diana Leege: End of year status report." BENJAMIN advised the document pertained to BENJAMIN's VENTRICLE business and included information provided to LEEGE regarding the itemization of the "deals" with MILLHOUSE and a description of how LEEGE would benefit from those deals.

LEEGE invested approximately $500,000 through BENJAMIN and MILLHOUSE. HG INTERNATIONAL was not involved in the transactions.

BENJAMIN was shown another document on VENTRICLE letterhead, dated January 24, 2017, titled "Diana Leege: Confirmation report." BENJAMIN advised the document is an explanation pertaining to an investment of approximately $225,000. LEEGE has been receiving monthly payments as a result of the investment.

The investment was initiated because LEEGE was in need of monthly income. The real estate investments are the basis for earning the income. LEEGE decided to enter into the real estate investments rather than getting an annuity because the real estate investments would purportedly result in an increase in funds going back to LEEGE. BENJAMIN offerred to provide the contracts to the interviewing Agents.

When asked if a review of VENTRICLE bank records would corroborate the "investments" detailed in the "End of year status report" and the "Confirmation report," BENJAMIN advised that he obtains certified checks from his account and attends wholesale property auctions to purchase property. BENJAMIN also pays work crews and other people working to get the real estate deals done. BENJAMIN does both short-term and long-term deals, depending on whether it makes more sense to liquidate a property right away or hold onto the property for a while. There are five properties BENJAMIN is working with right now, with the goal of meeting LEEGE's income needs, plus obtaining properties to fund future income.

**BENJAMIN'S FEES**

BENJAMIN has an "active" role in the real estate investments involving LEEGE. When BENJAMIN plays an "active" role in the deals, BENJAMIN does not take his "fee" until the income goals are met. In LEEGE's real estate investments, BENJAMIN will take a fee from profits earned from properties.

When BENJAMIN works with MILLHOUSE and BENJAMIN is not playing an "active" role, BENJAMIN receives a "face value" fee in the contract for actual services rendered and also benefits from the resulting profit

29Q-WF-2127393 Serial 31

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

29Q-WF-2127393

(U//FOUO) Interview of James Alexander
Continuation of FD-302 of Benjamin                                      02/17
margin.  For SBLCs, BENJAMIN gets his "fee" after a successful          /2017  , Page  5 of·6
outcome. BENJAMIN receives approximately 2-4 percent for the creation of
SBLCs, administration fees, and broker commission, which are paid from the
client's proceeds from the transaction.  BENJAMIN has not received any
payments or commissions from LEEGE's investments through MILLHOUSE
yet.  BENJAMIN will receive payment after a successful outcome.

## AMENDED STATEMENT

BENJAMIN was confronted by the interviewing Agents regarding the fact
that many of BENJAMIN's statements were not corroborated or supported by
conflicting documentary evidence collected in this
investigation.  Thereafter, BENJAMIN corrected and clarified some of the
information previously provided to interviewing Agents in the current
interview and previous interviews.

## JOHN GREEN

The transaction with GREEN did not go as planned.  GREEN sent BENJAMIN
$250,000.  BENJAMIN sent $200,000 of GREEN's funds to GRANDBERRY.  The
remaining $50,000 was a "fee" that was supposed to be split between
GRANDBERRY and BENJAMIN.  The $200,000 sent to GRANDBERRY was supposed to
be used to purchase a $5 million SBLC. BENJAMIN and GREEN never received
the SBLC.

GRANDBERRY eventually sent $200,000 back to BENJAMIN.  BENJAMIN used a
percentage of the $200,000 to buy a second SBLC.  This was done in the
form of a wire sent from one of the VENTRICLE accounts to
MILLHOUSE.  BENJAMIN also spent some of the funds on personal expenses,
including multiple cash withdrawals for gambling at casinos.  BENJAMIN did
not tell GREEN about the second SBLC beforehand and did not tell GREEN
about spending money on personal expenses.  GREEN did not authorize
BENJAMIN to spend money on personal expenses.

BENJAMIN has paid some of the money back to GREEN.  Additionally,
BENJAMIN lent GREEN his BMW vehicle since August 2016, which BENJAMIN pays
$380 per month for.

## DIANA LEEGE

LEEGE sent approximately $565,000 to HG INTERNATIONAL from the sale of
real property in Germany.  HG INTERNATIONAL sent $60,000 to LEEGE and
retained a fee.  Approximately $505,000 was sent to VENTRICLE.  BENJAMIN
subsequently spent some of the money on personal expenses, gambling at the
casino, and to purchase SBLCs.  Fifteen percent was VENTRICLE's fee, which

29Q-WF-2127393 Serial 31

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

29Q-WF-2127393

(U//FOUO) Interview of James Alexander     02/17
Continuation of FD-302 of Benjamin                        /2017    Page  6 of 6
was a portion of the total amount BENJAMIN spent. On BENJAMIN has a contract
detailing the fifteen percent fee agreement.

When the interviewing Agents confronted BENJAMIN about the fact that
bank records indicate BENJAMIN spent more than fifteen percent, BENJAMIN
admitted that he might have spent more than fifteen percent, not all the
"investment" funds from clients are isolated, and BENJAMIN has co-mingled
funds in his VENTRICLE bank accounts.  BENJAMIN used funds from LEEGE's
investment to purchase SBLCs for other businesses.

**MISCELLANEOUS**

BENJAMIN may close a deal in two days that will make LEEGE whole.

BENJAMIN is working on a deal with MATTHEWS through MATTHEWS PROTECTIVE
SERVICES.  BENJAMIN is trying to obtain a $1.5 million loan for MATTHEWS,
which may close in March 2017.  When the deal closes, $155,000 will be
credited to VENTRICLE.

In order to obtain an SBLC, one only pays eight percent of the face
value of the loan.

**SIGNED STATEMENT**

At the conclusion of the interview, BENJAMIN reviewed, amended, and
signed a written statement detailing some of the statements BENJAMIN
provided during the interview.  Before signing the statement, BENJAMIN
made reference to having a lawyer review the statement before
signing.  The interviewing Agents explained signing the statement was
completely voluntary and BENJAMIN did not have to sign if he did not want
to.  The interviewing Agents further advised BENJAMIN that he was free to
make additions and changes to the statement before signing it if he
disagreed with any of the information contained in the statement.  The
interviewing Agents asked that in the event BENJAMIN elected to make
changes, that BENJAMIN sign his initials next to those changes.  BENJAMIN
reviewed the statement and made changes.  BENJAMIN then signed his
initials next to all the revisions and initialed each page.  BENJAMIN
signed his name at the bottom of the last page of the written statement.

# EXHIBIT 7







# EXHIBIT 8

2016

# IRREVOCABLE MASTER FEE PROFIT SHARING INVESTMENT PROTECTION AGREEMENT

MARCH 16, 2015

## IRREVOCABLE
## MASTER FEE
### INVESTMENT
### AND
## PROFIT SHARING
## AGREEMENT

I, DIANA LEEGE,  Individually, professionally and with full legal  authority on behalf of myself, as well as related participating entities  with full responsibility, under penalty of perjury acting  on behalf of myself  hereby endorse this consultant's Profit Share/ Fee Protection Agreement and Pay Order (IMFPA/PO) for Consulting  work and proceeds management of funds derived from the sale of my business, and realty sales proceeds from an international account delivered to M@T Bank, submitted to Ventricle Advisory Consultants LLC..   and its professional partners.  With the understanding that according to the provisions of this agreement, we promise to pay 15% of the investment, principle, and a equal share gains from proceeds derived from banking instruments, and investment gains, commercial  real estate swaps, and collateral funding, through our professional association with trading associates and Banking relationships to  Ventricle Advisory Consultants LLC, and in the event of the use of Paymasters or Escrow Attorneys, Ventricle engages for business transactions, we will pay all from the proceeds collected as dictated by this agreement. I also acknowledge the payout will be accessed with each and every distribution.

I, DIANA LEEGE, agree to adhere to the designated distribution; payment of distributions of the proceeds received from the investment gains and profits daily, weekly, monthly or annually derived of this trading  relationship, to be credited directly to Ventricle Advisory Consultants LLC, or a Paymaster designated by the parties; HG International PLLC who will be recipient and also paymaster or designate for the other companies, or groups of the daily, weekly, monthly or annual payouts. This IFMPA/PO constitutes an Irrevocable and Unconditional Guarantee to pay fees in compliance with the terms hereof for such investments. I also adhere to the immediate release of these funds once the distribution I receive hits my account, I will not delay the automatic release of such funds provided my distribution has been received. Client Acknowledges this agreement is in force for a minimum of 36 months after the receipt of funds. Any early withdrawals will result in payment of commissions plus 10% penalty.

The transaction is hereby referenced as follows. These fees will be paid, without protest, prejudice, recourse or delay according to the following schedule: Daily, monthly, weekly, annually etc..

I DIANA LEEGE ACKNOWLEDGES: the objection of this professional association is for the

2

opportunity to participate in Investment Gains which can be produced from the relationship of Ventricle Advisoty Consultants LLC, and James A. Benjamin Principle, and his banking strategies in trading and leveraging in banking instruments, and commercial real property trades,for a consistent long term income stream. Our original Financial committment shall be a total sum of 515,000.00.

## GENERAL TERMS & CONDITIONS

- This agreement will become the standard for all future banking instruments of trading and investing between the parties unless it is mutually agreed upon to change the terms or percentages.

- This Fee Agreement becomes unconditional, assignable, and divisible upon the successful initiation of the transactions referenced above, and shall be registered with the Consultants bank and, and a copy shall be sent to each paymaster, and shall remain valid and enforceable for the full term of the contract and shall apply to any and all renewals, extensions or additions of any type.

- All Consultant and fee transfers are to be made by wire and transferred immediately upon closing of each transaction or transaction tranche or as soon thereafter as banking processes allow without liens or delays of any kind whatsoever.

- This Agreement is effective, and with the execution of the Transaction Contract referenced by the lender's Code and Borrower's Code set forth above and shall remain valid and enforceable for the full term of the contract and shall apply to any and all renewals, extensions.

- The applicable Non-Circumvention/Non-Disclosure conditions of the ICC 500/600 rules and regulations are binding upon all parties to this agreement or any other pending or future transactions. All signed copies of this agreement including fax transmissions thereof, shall be considered legally binding documents. This agreement and the rights and obligations hereof are binding and inure to the respective heirs, legal representatives, assignees and/or successors of the parties hereof.

- It is understood that all parties herein involved are considered to be bound by international standard of non- circumvention/non-disclosure as governed by the International Chamber of Commerce, and if subject to litigation, to the laws of the involved countries.

- Parties to this agreement are independent contractors and all contemplated payments and/or distributions hereunder are divided interests. All taxes, federal, state or other, are the independent responsibility of each of the parties hereto. Reporting of income and the payment of any related taxes is the sole responsibility of the Beneficiaries.

- All parties involved in this transaction herewith irrevocably agree that the above named Paymasters do not assume any responsibility for the above named transaction and they cannot be held liable for any reason associated with the above transaction, except for the Non-Circumvention and Non-Disclosure (N.C.N.D) violations.

- The receipt of this document constitutes acknowledgement on the part of recipients hereof that the transactions herein are not to be in violation of existing regulations and laws and all parties herein are bound to obey and be in compliance with all regulations and laws as related to the transactions herein.

3

- The Signatory hereof avers and confirms that he has the power and authority to execute this Irrevocable Fee Protection Agreement and Pay Order.

This agreement shall be binding, individually or collectively, upon and for the benefit of the parties, the beneficiaries and their respective successors and assigns for their mutual advantage or goodwill. In the event of death of any of the parties or beneficiaries, the surviving parties and beneficiaries agree that the beneficiaries of the deceased party shall receive any and all proceeds of this agreement that would have been earned by the deceased party under the same terms and conditions as if the party were not deceased.

## ACCEPTED AND AGREED THIS 06Th DAY OF MARCH, 2015 FOR AND ON BEHALF OF INVESTOR:

CONFIRMED AND APPROVED BY

RECIPIENT, DIANA LEEGE

08/13/ 2016

Mr. James Benjamin
CEO Ventricle Advisory Consultants LLC

4

# EXHIBIT 9



# EXHIBIT 10

| Bank | Account Number | Account Name | Posted Date | Description | Debits/Withdrawals | Credits/Deposits | Check # | Check Written To/Wire Paid To | Check Signed By/Wire From | Check Memo Line/Wire Description | Account Balance (Calculated) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/5/2016 | RPD_BRENTTOOWN_COM 888-845-3305 | $ (4.95) | | | | | | $ 5,049.87 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/5/2016 | NON-6621 ATM FEE UN 07/01 1525 RUSSEL -21525 RUSSEL STREET BALTIMORE MD | $ (3.00) | | | | | | $ 5,046.87 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/11/2016 | DISH NETWORK-ONE TIME 800 894-9131 | $ (182.99) | | | | | | $ 4,863.88 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/14/2016 | ALM CASH WITHDRAWAL UN 07/13 Dhroulos 7002 ARUNDEL MILLS HANOVER MD | $ (1,004.99) | | | | Maryland Live Casino ATM Withdrawal | | $ 3,858.89 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/14/2016 | NON-6621 ATM FEE UN 07/13 Dhroulos 7002 ARUNDEL MILLS HANOVER MD | $ (3.00) | | | | | | $ 3,855.89 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/19/2016 | ALM CASH WITHDRAWAL UN 07/18 1525 RUSSEL -21525 RUSSEL STREET BALTIMORE MD | $ (1,005.99) | | | | Horseshoe Casino - Baltimore MD | | $ 2,849.90 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/19/2016 | NON-6621 ATM FEE UN 07/18 1525 RUSSEL -21525 RUSSEL STREET BALTIMORE MD | $ (3.00) | | | | | | $ 2,846.90 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/21/2016 | RPD BRENTTOOWN_COM 888-845-3305 | $ (4.95) | | | | | | $ 2,841.95 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/28/2016 | ALM CASH DEPOSIT UN 07/28 BETHNY LN/0100 BALT NAT PK, ELIOTT CTY, MD | | $ 1,250.00 | | | | | $ 4,091.95 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/28/2016 | ALM CASH DEPOSIT UN 07/26 BETHNY LN/0100 BALT NAT PK, ELIOTT CTY, MD | | $ 300.00 | | | | | $ 4,391.95 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/28/2016 | ALM CASH WITHDRAWAL UN 07/27 Dhroulos 7002 ARUNDEL MILLS HANOVER MD | $ (1,004.99) | | | | Maryland Live Casino ATM Withdrawal | | $ 3,386.96 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 7/28/2016 | NON-6621 ATM FEE UN 07/27 Dhroulos 7002 ARUNDEL MILLS HANOVER MD | $ (3.00) | | | | | | $ 3,383.96 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 8/1/2016 | SPRINT WIRELESS 800-639-6111 | $ (420.06) | | | | | | $ 2,963.90 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 8/9/2016 | RPD BRENTTOOWN_COM 855-5806680 | $ (4.95) | | | | | | $ 2,958.95 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 8/9/2016 | INCOMING FEDVWIRE FUNDS TRANSFER | | $ 497,958.00 | | Ventricle Advisory Consultants LLC (M&T Bank *6629) | HG International PLLC (United Bank        5586) | | $ 500,916.95 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 8/9/2016 | HG INTERNATIONAL, PLLC DISH NETWORK-ONE TIME 800 894-9131 | $ (224.91) | | | | | | $ 500,692.04 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 8/9/2016 | ALM CASH WITHDRAWAL UN 08/08 Dhroulos 7000 ARUNDEL MILLS HANOVER MD | $ (1,004.99) | | | | Maryland Live Casino ATM Withdrawal | | $ 499,687.05 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 8/9/2016 | NON-6621 ATM FEE UN 08/08 Dhroulos 7000 ARUNDEL MILLS HANOVER MD | $ (3.00) | | | | | | $ 499,684.05 |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 8/10/2016 | In Branch Transfer Withdrawal | $ (22,000.00) | | | | | | $ 477,684.05 |

| Bank | Account Number | Account Name | Posted Date | Description | Debit/Withdrawal | Credit/Deposit | Check # | Check Written To/Wire Paid To | Check Signed By/Wire From | Check Memo 'Line'/Wire Description | Account Balance (Calculated) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&T Bank | 6629 | Venticle Advisory Consultants | 8/10/2016 | OUTGOING FED WIRE FUNDS TRANSFER DPMG LLC | $ (17,690.00) | | | DPMG LLC (Navy FCU *4974) | Venticle Advisory Consultants LLC (M&T Bank *6629) | | $ 459,994.05 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 8/10/2016 | ATM CASH WITHDRAWAL UN 08/10 1525 RUSSEL -21525 RUSSEL STREET BALTIMORE MD | $ (1,005.99) | | | Horseshoe Casino - Baltimore MD | | | $ 458,988.06 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 8/11/2016 | ATM CASH WITHDRAWAL UN 08/11 Dktronics 7002 ARUNDEL MILLS HANOVER MD | $ (1,004.99) | | | Maryland Live Casino ATM Withdrawal | | | $ 457,983.07 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 8/11/2016 | NON-M&T ATM FEE UN 08/10 1525 RUSSEL -21525 RUSSEL STREET BALTIMORE MD | $ (3.00) | | | | | | $ 457,980.07 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 8/11/2016 | NON-M&T ATM FEE UN 08/11 Dktronics 7002 ARUNDEL MILLS HANOVER MD | $ (3.00) | | | | | | $ 457,977.07 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 8/12/2016 | STAPLES 00112797 HANOVER | $ (5.83) | | | | | | $ 457,971.24 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 8/15/2016 | CHECK NUMBER 0055 | $ (31,000.00) | | 300761678-7 | James A Benjamin | Jay Benjamin - Venticle Advisory Consultants (Cashier's Check – M&T *6629) | #6216 - St Johns Lane | $ 426,971.24 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 8/15/2016 | PROGRESSIVE INSURANCE800-776-4737 | $ (3,573.00) | | | | | | $ 423,398.24 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 8/19/2016 | SAFEWAY FUEL 10014694BALTIMORE | $ (28.27) | | | | | | $ 423,369.97 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 8/22/2016 | IRORRENT100WN 888-4351925 | $ (4.95) | | | | | | $ 423,365.02 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 8/29/2016 | ADOBE PDF PACK SUBS 800-833-6687 | $ (89.99) | | | | | | $ 423,275.03 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 9/6/2016 | PIN KROGER LIMITED P SVASHVILLE | $ (51.86) | | | | | | $ 423,223.17 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 9/6/2016 | 1RENT100VVN88884535306 888-8453906 | $ (4.95) | | | | | | $ 423,218.22 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 9/8/2016 | M&T ATM CASH WITHDRAWAL ON 09/08 ST JOENS LANE 1, BALT NTL PK, ELLICOTT CITY, MD | $ (900.00) | | | | | | $ 422,318.22 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 9/8/2016 | DISH NETWORK-ONE TIME 800-894-9131 | $ (203.98) | | | | | | $ 422,114.24 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 9/9/2016 | SERVICE CHARGE FOR ACCOUNT 00000966495629 | $ (46.00) | | | | | | $ 422,068.34 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 9/12/2016 | M&T ATM CASH WITHDRAWAL ON 09/12 BETHNY LN/10100 BALT NAT PK, ELLOTT CITY, MD | $ (1,000.00) | | | | | | $ 421,068.24 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 9/15/2016 | SPRINT WIRELESS 800-639-6111 | $ (916.51) | | | | | | $ 420,151.73 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 9/16/2016 | DEPOSIT | | $ 42,000.00 | 300761761-5 | James Benjamin | Venticle Advisory Consultants (M&T Bank - Cashier's Check) | #6216 - St Johns Lane | $ 462,151.73 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 9/16/2016 | CHECK NUMBER 0055 | $ (2,000.00) | | 55 CASH | | Jay Benjamin - Venticle Advisory Consultants (Cashier's Check) | | $ 460,151.73 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 9/16/2016 | SEMINOLE HARD ROCK HOTT AMPA | $ (10.00) | | | | | | $ 460,141.73 |

5/10

| Bank | Account Number | Account Name | Posted Date | Description | Debits/ Withdrawal | Credits/ Deposits | Check # | Check Written To/ Wire Paid To | Check Signed By/ Wire From | Check Memo Line/ Wire Description | Account Balance (Calculated) |
|------|---|---|---|---|---|---|---|---|---|---|---|
| M&T Bank | 629 | Ventricle Advisory Consultants | 9/18/2016 | Adjustment Services Case 001- 01_6259000128 | $ (42,000.00) | | 3007617615 | James Benjamin | Ventricle Advisory Consultants (M&T Bank - Cashier's Check) | #6215 - St Johns Lane | $ 418,141.73 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 9/19/2016 | CHDXI_COM 600-973-9990NEW YORK- | | $ 6.03 | | | | | $ 418,147.76 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 9/21/2016 | CHDXI_COM 800-973-9990NEW YORK | | $ 10.06 | | | | | $ 418,157.82 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 9/21/2016 | CHDXI_COM 800-973_9990NEW YORK | | $ 4.51 | | | | | $ 418,162.33 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 9/27/2016 | M&T ALM CASH WITHDRAWAL ON 09/27 BETHNY LN70100 BALT NAT PK, ELIOTT CTY, MD | $ (160.00) | | | | | | $ 418,002.33 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 10/3/2016 | M&T ALM CASH WITHDRAWAL ON 09/30 Dfrom:s 7002 ARUNDEL MILLSHANOVER MD | $ (1,004.99) | | | Maryland Live Casino ATM Withdrawal | | | $ 416,997.34 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 10/3/2016 | M&T ALM CASH WITHDRAWAL ON 10/01 PATAPSCO VLG L3470 ANNAPLS RD, BALT MD 21227 | $ (800.00) | | | | | | $ 416,197.34 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 10/3/2016 | CUBA DE AYER BURTONSVILLE NON-M&T ATM FEE UN 09/30 Dfrom:s 7002 ARUNDEL MILLSHANOVER MD | $ (72.00) | | | | | | $ 416,125.34 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 10/4/2016 | DISH NETWORK-ONE TIME8 800-894-0131 | $ (3.00) | | | | | | $ 416,122.34 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 10/11/2016 | M&T ALM CASH WITHDRAWAL ON 10/17 1525 RUSSELL-21525 RUSSELL STREEBALTMORE MD | $ (256.97) | | | | | | $ 415,865.37 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 10/18/2016 | M&T ALM CASH WITHDRAWAL ON 10/17 1525 RUSSELL-21525 RUSSELL STREEBALTMORE MD | $ (1,005.99) | | | Horseshoe Casino - Baltimore MD | | | $ 414,859.38 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 10/18/2016 | CHECK NUMBER 0055 | $ (3.00) | | | | | | $ 414,856.38 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 10/28/2016 | CHECK NUMBER 0055 | $ (10,000.00) | | 3007618767 3007618785 | Ventricle Advisory Consultants | Jay Benjamin - Ventricle Advisory Consultants (Cashier's Check from M&T Bank *6629) | #6216 - St Johns Lane MD 145301-1 | $ 399,856.38 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 10/28/2016 | CHECK NUMBER 0055 | $ (5,000.00) | | 3007618776 | Ventricle Advisory Consultants | Jay Benjamin - Ventricle Advisory Consultants (Cashier's Check from M&T Bank *6629) | MD-163829-3 | $ 399,856.38 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 10/28/2016 | CHECK NUMBER 0055 | $ (3,800.00) | | 55 CASH | | Jay Benjamin - Ventricle Advisory Consultants (M&T Bank *6629) | | $ 396,056.38 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/7/2016 | CHECK NUMBER 0055 WITHDRAWAL ON 11/05 INGLESIDE/5842 BALT NATL PK, CATONSVILLE, MD | $ (1,000.00) | | | | | | $ 395,056.38 |

6/10

| Bank | Account Number | Account Name | Posted Date | Description | Debits/ Withdrawals | Credits/ Deposits | Check # | Check Written To/ Wire Paid To | Check Signed By/ Wire From | Check Memo Line/ Wire Description | Account Balance (Calculated) |
|------|------|------|------|------|------|------|------|------|------|------|------|
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/7/2016 | MCDONALD S F20971 CATONSVILLE | $ (9.32) | | | | | | $ 395,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | CHECK NUMBER 0055 | $ (20,000.00) | | 300761904-6 | Ventricle Advisory Consultants | Jay Benjamin – Ventricle Advisory Consultants (Cashier's Check - M&T Bank *6629) | #6216 - St Johns Lane | $ 332,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | CHECK NUMBER 0055 | $ (10,000.00) | | 300761907-3 | Ventricle Advisory Consultants | Jay Benjamin – Ventricle Advisory Consultants (Cashier's Check - M&T Bank *6629) | #6216 - St Johns Lane | $ 332,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | CHECK NUMBER 0055 | $ (10,000.00) | | 300761905-5 | Ventricle Advisory Consultants | Jay Benjamin – Ventricle Advisory Consultants (Cashier's Check - M&T Bank *6629) | #6216 - St Johns Lane | $ 332,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | CHECK NUMBER 0055 | $ (10,000.00) | | 300761906-4 | Ventricle Advisory Consultants | Jay Benjamin – Ventricle Advisory Consultants (Cashier's Check - M&T Bank *6629) | #6216 - St Johns Lane | $ 332,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | CHECK NUMBER 0055 | $ (5,000.00) | | 300761908-2 | Ventricle Advisory Consultants | Jay Benjamin – Ventricle Advisory Consultants (Cashier's Check - M&T Bank *6629) | #6216 - St Johns Lane MD 187431-1 | $ 332,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | CHECK NUMBER 0055 | $ (3,500.00) | | 300761912-7 | Ventricle Advisory Consultants | Jay Benjamin – Ventricle Advisory Consultants (Cashier's Check - M&T Bank *6629) | #6216 - St Johns Lane MD | $ 332,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | CHECK NUMBER 0055 | $ (1,500.00) | | 300761909-1 | Ventricle Advisory Consultants | Jay Benjamin – Ventricle Advisory Consultants (Cashier's Check - M&T Bank *6629) | #6216 - St Johns Lane MD | $ 332,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | CHECK NUMBER 0055 | $ (1,500.00) | | 300761910-0 | Ventricle Advisory Consultants | Jay Benjamin – Ventricle Advisory Consultants (Cashier's Check - M&T Bank *6629) | #6216 - St Johns Lane MD 187431-1 | $ 332,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | CHECK NUMBER 0055 | $ (1,500.00) | | 300761911-8 | Ventricle Advisory Consultants | Jay Benjamin – Ventricle Advisory Consultants (Cashier's Check - M&T Bank *6629) | #6216 - St Johns Lane MD | $ 332,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | In Branch Transfer/Withdrawal | $ (10,000.00) | | | | | | $ 322,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | CHECK NUMBER 0055 | $ (5,000.00) | | 55 CASH | CASH | Jay Benjamin – Ventricle Advisory Consultants (M&T Bank *6629) | | $ 317,047.06 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | DISH NETWORK-ONE TIME 800-894-9131 | $ (203.98) | | | | | | $ 316,843.08 |
| M&T Bank | 629 | Ventricle Advisory Consultants | 11/8/2016 | IRIE CAFE VI LANHAM | $ (70.00) | | | | | | $ 316,773.08 |

| Bank | Account Number | Account Name | Posted Date | Description | Debit/Withdrawal | Credit/Deposits | Check# | Check Written To/Wire Paid To | Check/Spend By/Wire From | Check Memo Line/Wire Description | Account Balance (Calculated) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/8/2016 | FIN WAWA 380 BRANDYWINE ON 11/09 | $ (45.42) | | | | | | $ 316,727.66 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/9/2016 | X661 ATM CASH WITHDRAWAL LAUREL/201 BOWIE RD, LAUREL, LAUREL, MD | $ (1,000.00) | | | | | | $ 315,727.66 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/14/2016 | ATM CASH WITHDRAWAL ON 11/10 Dbronics 7002 ARUNDEL MILLS HANOVER MD | $ (1,004.99) | | | Maryland Live Casino ATM Withdrawal | | | $ 314,722.67 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/14/2016 | CARIBBEAN SEA TAKOMA PARK | $ (101.69) | | | | | | $ 314,620.98 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/14/2016 | MORTY S HANOVER NON-X661 ATM FEE UN 11/10 | $ (21.18) | | | | | | $ 314,599.80 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/14/2016 | Dbronics 7002 ARUNDEL MILLS HANOVER MD | $ (3.00) | | | | | | $ 314,596.80 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/14/2016 | COLONIAL PARKING 828 CHEVY CHASE | $ (1.00) | | | | | | $ 314,595.80 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/22/2016 | CHECK NUMBER 0055 | $ (4,500.00) | | 55 | CASH | Jay Benjamin – Ventricle Advisory Consultants (M&T Bank *6629) | | $ 310,095.80 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/22/2016 | X662 ATM CASH WITHDRAWAL ON 11/22 INGLESIDE/5642 BALT NATL PK, CATONSVILLE, MO | $ (200.00) | | | | | | $ 309,895.80 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/28/2016 | ATM CASH WITHDRAWAL ON 11/26 1525 RUSSEL -21525 RUSSEL STREET BALTIMORE Ma | $ (1,005.99) | | | Horseshoe Casino - Baltimore MD | | | $ 308,889.81 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/28/2016 | FIN THE HOME DEPOT 25ELLICOTT CITY | $ (800.00) | | | | | | $ 308,089.81 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/28/2016 | NON-X662 ATM FEE ON 11/28 1525 RUSSEL -21525 RUSSEL STREET BALTIMORE MD | $ (3.00) | | | | | ' | $ 308,086.81 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/29/2016 | DEPOSIT | | $ 3,500.00 | 3007619127 | Ventricle Advisory Consultants | Jay Benjamin – Ventricle Advisory Consultants (Cashier's Check - M&T Bank *6629) | #6216 - St Johns Lane | $ 311,586.81 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/29/2016 | CHECK NUMBER 0055 ATM CASH WITHDRAWAL ON 11/28 | $ (3,500.00) | | 55 | James Benjamin | Jay Benjamin – Ventricle Advisory Consultants (M&T Bank *6629) | | $ 308,086.81 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/29/2016 | 1525 RUSSELL -21525 RUSSELL STREET BALTIMORE MD NON-X662 ATM FEE ON 11/28 | $ (1,005.99) | | | Horseshoe Casino - Baltimore MD | | | $ 307,080.82 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 11/29/2016 | 1525 RUSSELL -21525 RUSSELL STREET BALTIMORE MD | $ (3.00) | | | | | | $ 307,077.82 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 12/1/2016 | THE HOME DEPOT 2566 ELLICOTT CITY | $ (125.00) | | | | | | $ 306,952.82 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 12/1/2016 | Hanover Hanover | $ (67.70) | | | | | | $ 306,885.12 |
| M&T Bank | 6629 | Venticle Advisory Consultants | 12/1/2016 | THE HOME DEPOT 2566 ELLICOTT CITY | $ (18.34) | | | | | | $ 306,866.78 |

| Bank | Account Name | Account Number | Posted Date | Description | Debits/Withdrawals | Credits/Deposits | Check # | Check Written To/Wire Paid To | Check Spent By/Wire From | Check/Memo Line/Wire Description | Account Balance (Calculated) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&T Bank | Ventricle Advisory Consultants | 629 | 12/2/2016 | DEPOSIT | | $ 1,500.00 | 300761909-1 | Ventricle Advisory Consultants | Transfer *6629 Ventricle Advisory Consultants (M&T Bank *6629) | | $ 308,366.78 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 12/2/2016 | THE HOME DEPOT 2586 ELLICOTT CITY | | $ 14.80 | | | | | $ 308,381.58 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 12/2/2016 | CHECK NUMBER 0055 0062 - ATM CASH WITHDRAWAL ON 12/02 | $ (1,000.00) | | 300761905-8 | Ventricle Advisory Consultants | Ventricle Advisory Consultants (M&T Bank - Cashier's Check) | | $ 307,381.58 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 12/2/2016 | ST JOHNS LANE 1, BALT NTL PK, ELLICOTT CITY MD | $ (700.00) | | | | | #6216 - St Johns Lane | $ 306,681.58 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 12/2/2016 | MARYLANDGOVPAY ANNAPOLIS | $ (300.00) | | | | | | $ 306,381.58 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 12/2/2016 | MD GOV SERVICE FEE ANNAPOLIS | $ (9.00) | | | | | | $ 306,372.58 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 12/5/2016 | BALTIMORE GAS&ELECTRIC800- 685-0123 | $ (602.00) | | | | | | $ 305,770.58 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 12/5/2016 | ALOFT HANOVER | $ (100.86) | | | | | | $ 305,669.72 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 12/8/2016 | SERVICE CHARGE FOR ACCOUNT 000009864956629 | $ (1.00) | | | | | | $ 305,668.72 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 12/13/2016 | DISH NETWORK-ONE TIME 800- 333-3474 | $ (203.98) | | | | | | $ 305,454.74 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 12/14/2016 | 0062 - ATM CASH WITHDRAWAL ON 12/14 BETENY LN/0100 BALT NAT PK, ELLIOTT CITY, MD | $ (1,000.00) | | | | | | $ 304,454.74 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 1/9/2017 | DISH NETWORK-ONE TIME 800- 333-3474 | $ (203.98) | | | | | | $ 304,250.76 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 1/25/2017 | 0062 - ATM CASH WITHDRAWAL ON 01/25 BETENY LN/0100 BALT NAT PK, ELLIOTT CITY, MD | $ (1,000.00) | | | | | | $ 303,250.76 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 2/3/2017 | DISH NETWORK-ONE TIME 800- 333-3474 | $ (203.98) | | | | | | $ 303,056.78 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 2/14/2017 | 0062 - ATM CASH WITHDRAWAL ON 02/14 BETENY LN/0100 BALT NAT PK, ELLIOTT CITY, MD | $ (1,000.00) | | | | | | $ 302,056.78 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 2/15/2017 | CVS PHARMACY 02043 - Rt 40 & ConELLICOTT CITYMD | $ (24.35) | | | | | | $ 302,032.43 |
| M&T Bank | Ventricle Advisory Consultants | 629 | 3/3/2017 | MISCELLANEOUS DEBIT | $ (302,032.43) | | | | | | $ - |
| M&T Bank | Ventricle Advisory Consultants | 629 | 5/8/2017 | SERVICE CHARGE FOR ACCOUNT 000009864956629 | $ (10.00) | | | | | | $ (10.00) |
| M&T Bank | Ventricle Advisory Consultants | 629 | 6/8/2017 | SERVICE CHARGE FOR ACCOUNT 000009864956629 | $ (10.09) | | | | | | $ (20.09) |
| M&T Bank | Ventricle Advisory Consultants | 629 | 7/11/2017 | SERVICE CHARGE FOR ACCOUNT 000009864956629 | $ (10.22) | | | | | | $ (30.31) |
| M&T Bank | Ventricle Advisory Consultants | 629 | 8/8/2017 | SERVICE CHARGE FOR ACCOUNT 000009864956629 | $ (10.34) | | | | | | $ (40.65) |

| Bank | Account Number | Account Name | Posted Date | Description | Debit/ Withdrawal | Credit/ Deposit | Check # | Check Written To/ Wire Paid To | Check Signed By/ Wire From | Check Memo Line/ Wire Description | Account Balance (Calculated) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&T Bank | 6629 | Ventricle Advisory Consultants | 8/22/2017 | COLLECTION ACCOUNT FEE | | $ 40.65 | | | | | $ - |
| M&T Bank | 6629 | Ventricle Advisory Consultants | 8/22/2017 | COLLECTION ACCOUNT - CHARGE OFF CREDIT | | $ - | | | | | $ - |

# EXHIBIT 11



Ventricle Advisory Consu

Forward Thinking and F

Ventricle Advisory Consultants, LLC          17 January 2017

TO: Diana Leege: End of year status report.
      Diana Leege Ref Acct [REDACTED] 7001:

Commitment date 9/1/2016; Principle Contribution $ 500,000.00 usd.
Distribution received: 60,000.00 usd. via HG International PLLC
Anticpated return over the commitment term of 24 months will typically produce
25% annually. We have currently commited funds for banking securities / SBLCs of                    $
480,000.00 on behalf of the  the following companies:

Jasoral consulting------------------------------------------------------ $ 150,000.00
Gideon Enterprises--------------------------------------------------$ 100,000.00
Essential Laser Treatment------------------------------------------$ 75,000.00
Black wire LLC--------------------------------------------------------$ 75,000.00
Mathews Protective services----------------------------------------$ 55,000.00
SDS Networks--------------------------------------------------------$ 25,000.00
 TOTAL Committed Funds of -----------------------------------------$ 480,000.00

Depending on the Stage of the process each deal is in, the funds are transferred from Ventricle Advisory
Consultants Escrow Account at M@T Bank to Millhouse Trade Finance to HG International Holding
Accounts and then Back to Ventricle at Closing. All institutions utilize escrow holding accounts and the
funds are NEVER delivered to an individual borrower.
All unused or unissued funds are held in the escrow of Ventricle Advisory M@T Banking. Currently it is
requiring typically 6 months for the entire process to fund, these deals are all at various stages, but
Gideon Enterprises and Essential laser could fund by the end of February, and thus those funds would be
available to be reloaned in March 2017. This would give us an increase in annual yield if this occurs at
the anticipated timing.

                                                        Sincerely, Jay A. Benjamin.

# EXHIBIT 12



**RE: INCOME**
1 message

@aol.com <becllc1@aol.com>                    Sun, Nov 6, 2016 at 11:52
                                                                     AM
To:                @gmail.com

*Hello Diana,*

*As promised, I am providing the format for your Real Estate
Participation:*

*Our current portfolio of properties that underline the security of
this portfolio is 3,600,000.00*
*WE are rehabbing and reselling 85% of this portfolio, but there are
some long term income plays in this also. Since our objective is to
secure you a monthly income, this is what I have come up with:*

*Originally, we expected a 350k investment from your company;
even though we are reducing that investment to 225,000.00 we are
securing YOUR investment with the entire 3,600,000 and your
return will equate to 16%, annually broken into MONTHLY income
starting January 12th 2017*

*225,000.00 x 16% is 36,000.00 annually, which is 3,000.00 monthly
paid into your account. At the end of each year we will account for
Any capital gains for that annual period to be paid back to D
LEEGE CORP, at an amount Not to exceed a total of 22.5%. So
your Capital Gains at the most will be 6.5% annually, thus once
you combine your 16% income plus your 6.5% capital gains
maximum percentage, it totals 22.5% payout or 50,625 annually.*

*This will help you to manage your income exposure. WE will be securing your contributions with the entire portfolio to make sure you are SECURE with no worries. Additionally we will replace sold assets and update you with replaced assets so you can see we Never drop below a 3million security portfolio. Please call me with Any questions and we shall conclude this in the next couple of days.*

Ventricle Advisory Consultants



Forward Thinking and Doing

Ventricle Advisory Consultants, LLC                    24, January 2017

TO: Diana Leege: Confirmation report.

   D Leege Corporation Ref Acct ▮▮▮▮ 701D:

   DISTRIBUTION 2016------------------------------------------------$ 37,017.00

   Commitment date 1/1/2017; Principle Contribution $ 225,000.00 usd.

For the principle amount invested, D Leege Corporation and its legal representing authority Diana Leege, shall receive up to 17.5% per anun to be paid monthly as an interest payment distribution, and up to 5% annually as a capital gains distribution.

Distribution received:  1/17/2017.....................................................:...$ 3,280.00   An amount to be paid monthly by Ventricle Advisory Consultants LLC.

   Expected annual income total for 2017----------------------------$ 39,360.00

   This income derived from the underlying portfolio of real property pruchased, sold, developed, or owned by Ventricle Advisory Consultants and it's subsidiary realty holding companies.

                                        Sincerely, Jay A. Benjamin.

# EXHIBIT 13

| Bank | Account Number | Account Name | Posted Date | Description | Credit/Deposit | Debit/Withdrawal | Check # | Check Written To/Wire Paid To | Check Signed By/Wire From | Check/Memo Line/Wire Description | Account Balance (Calculated) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&T Bank | 852 | Ventride Advisory Consultants | 11/3/2016 | ATM CASH WITHDRAWAL ON 11/03 Dtreutes 7002 ARUNDEL MILLS HANOVER MD | | $ (1,004.99) | | Maryland Live Casino ATM Withdrawal | | | $ 3,072.09 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/3/2016 | NON-M&T ATM FEE ON 11/03 Otreutes 7002 ARUNDEL MILLS HANOVER MD | | $ (3.00) | | | | | $ 3,069.09 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/7/2016 | ATM CASH WITHDRAWAL ON 11/04 1525 RUSSELL-21525 RUSSELL STREEBALTIMORE MD | | $ (905.99) | | Horseshoe Casino - Baltimore MD | | | $ 2,163.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/7/2016 | SPRINT WIRELESS 800-639-6111 | | $ (475.00) | | | | | $ 1,688.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/7/2016 | CHECK NUMBER 551 | | $ (178.00) | 551 | | | | $ 1,510.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/8/2016 | In Branch Transfer/Deposit | $ 10,000.00 | | | | | | $ 11,510.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/8/2016 | SERVICE CHARGE FOR ACCOUNT 000009895421825 NON-M&T ATM FEE ON 11/04 | | $ (20.00) | | | | | $ 11,490.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/8/2016 | 1525 RUSSELL-21525 RUSSELL STREEBALTIMORE MD | | $ (3.00) | | | | | $ 11,487.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/9/2016 | INCOMING FEDWIRE FUNDS TRANSFER DLEECE COMPANY M&T ALM CASH WITHDRAWAL ON 11/13 | $ 225,000.00 | | | | Dleege Company (Wells Fargo 88239026625) | Investment | $ 236,487.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/14/2016 | RT 175 & DOBBIN RD, COLUMBIA, MD 21044 | | $ (1,000.00) | | | | | $ 235,487.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/14/2016 | CHECK NUMBER 542 | | $ (125.00) | 542 | | | | $ 235,362.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/15/2016 | CHECK NUMBER 0055 | | $ (5,000.00) | 300769194-0 | Ventride Advisory Consultants | Jay A Benjamin (Cashier's Check - M&T Bank *1852) | #6584 - Upper Marlboro | $ 230,362.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/17/2016 | CHECK NUMBER 0055 | | $ (2,500.00) | 55 | Cash | Jay A Benjamin - Ventride Advisory Consultants (M&T *1852) | | $ 227,862.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/17/2016 | PIN THE HOME DEPOT 2SELLICOTT CITY | | $ (1,000.00) | | | | | $ 226,862.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/21/2016 | CHECK NUMBER 554 ALM CASH WITHDRAWAL ON 11/19 | | $ (19,000.00) | 554 | Ilva V Benjamin | Jay Benjamin - Ventride Advisory Consultants (M&T Bank *1852) | Loan Repayment | $ 207,862.10 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/21/2016 | 1525 RUSSELL-21525 RUSSELL STREEBALTIMORE MD | | $ (1,005.99) | | Horseshoe Casino - Baltimore MD | | | $ 206,856.11 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/21/2016 | PIN THE HOME DEPOT 2SELLICOTT CITY | | $ (500.00) | | | | | $ 206,356.11 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/21/2016 | SPRINT WIRELESS 800-639-8111 | | $ (444.70) | | | | | $ 205,911.41 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/21/2016 | PIN THE HOME DEPOT 2SELLICOTT CITY | | $ (142.04) | | | | | $ 205,769.37 |
| M&T Bank | 852 | Ventride Advisory Consultants | 11/21/2016 | COLONIAL PARKING 628 CHEVY CHASE | | $ (3.00) | | | | | $ 205,766.37 |

| Bank | Account Number | Account Name | Posted Date | Description | Debits Withdrawals | Credits Deposits | Check # | Check Written To/ Wire Paid To | Check Signed By/ Wire From | Check Memo Line/ Wire Description | Account Balance (Calculated) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&T Bank | 852 | Venticle Advisory Consultants | 11/21/2016 | NON-M&T ATM FEE ON 11/19 1525 RUSSELL -21525 RUSSELL STREEBALTIMORE MD | $ (3.00) | | | | | | $ 205,762.37 |
| M&T Bank | 852 | Venticle Advisory Consultants | 11/22/2016 | CHECK NUMBER 0055 | $ (200.00) | | 55 | | | | $ 205,563.37 |
| M&T Bank | 852 | Venticle Advisory Consultants | 11/28/2016 | WALMART_COM 8009868546800-988-6546 | $ (356.41) | | | | | | $ 205,206.96 |
| M&T Bank | 852 | Venticle Advisory Consultants | 11/28/2016 | CHECK NUMBER 550 | $ (100.00) | | 550 | | | | $ 205,106.96 |
| M&T Bank | 852 | Venticle Advisory Consultants | 11/28/2016 | CHECK NUMBER 553 | $ (58.94) | | 553 | Brian Smith (Founders Federal Credit Union - 8500) | | | $ 205,048.02 |
| M&T Bank | 852 | Venticle Advisory Consultants | 11/30/2016 | OUTGOING FEDWIRE FUNDS TRANSFER BRIAN SMITH | $ (4,500.00) | | | | Venticil Advisory Consultants (M&T Bank *1852) | | $ 200,548.02 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/1/2016 | CHECK NUMBER 552 | $ (5.68) | | 552 | | | | $ 200,542.34 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/2/2016 | CHECK NUMBER 549 | $ (146.00) | | 549 | | | | $ 200,396.34 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/8/2016 | SERVICE CHARGE FOR ACCOUNT 0000085421852 | $ (45.00) | | | | | | $ 200,351.34 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/14/2016 | NON-M&T ATM CASH WITHDRAWAL ON 12/14 1525 RUSSEL -21525 RUSSELL STREETBALTIMORE MD | $ (1,005.99) | | | Horseshoe Casino - Baltimore MD | | | $ 199,345.35 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/14/2016 | NON-M&T ATM FEE ON 12/14 1525 RUSSEL -21525 RUSSELL STREETBALTIMORE MD | $ (3.00) | | | | | | $ 199,342.35 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/15/2016 | M&T ATM CASH WITHDRAWAL ON 12/15 INGLESIDE/5642 BALT NAIL PK CATONSVILLE, MD | $ (1,000.00) | | | | | | $ 198,342.35 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/15/2016 | STAPLES 00110510ELLICOTT CITY | $ (2.12) | | | | | | $ 198,340.23 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/16/2016 | TROPICAL SMOOTHIE CAPELLICOTT CITY | $ (10.89) | | | | | | $ 198,329.34 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/22/2016 | CHECK NUMBER 556 | $ (9,000.00) | | 556 | Edward Mathews/Mathews Protective Services | Jay Benjamin - Ventricle Advisory Consultants (M&T Bank *6669) | Loan to MPS (difficult to read) | $ 189,329.34 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/23/2016 | CHECK NUMBER 557 | $ (25,000.00) | | 557 | Green Family Trust | Jay Benjamin - Ventricle Advisory Consultants (M&T Bank *6669) | Repayment 4390 | $ 164,329.34 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/23/2016 | ATM CASH WITHDRAWAL ON 12/23 1525 RUSSELL -21525 RUSSELL STREETBALTIMORE MD | $ (1,005.99) | | | Horseshoe Casino - Baltimore MD | | | $ 163,323.35 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/23/2016 | NON-M&T ATM FEE ON 12/22 1525 RUSSELL -21525 RUSSELL STREETBALTIMORE MD | $ (3.00) | | | | | | $ 163,320.35 |
| M&T Bank | 852 | Venticle Advisory Consultants | 12/20/2016 | CHECK NUMBER 559 | $ (700.00) | | 559 | | | | $ 162,620.35 |
| M&T Bank | 852 | Venticle Advisory Consultants | 1/3/2017 | Global Cash Ax101 MGM NATIONAL A.OXON HILL MC ON 1230 M&T ATM CASH WITHDRAWAL ON 1230 ST JOHNS LANE 1, BALT NL PK, MD | $ (1,004.99) | | | Global Cash Access - MGM National, Oxon Hill | | | $ 161,615.36 |
| M&T Bank | 852 | Venticle Advisory Consultants | 1/3/2017 | ELLICOTT CITY, MD | $ (1,000.00) | | | | | | $ 160,615.36 |
| M&T Bank | 852 | Venticle Advisory Consultants | 1/3/2017 | CHECK NUMBER 546 | $ (310.00) | | 546 | | | | $ 160,305.36 |

| Bank | Account Number | Account Name | Posted Date | Description | Debit/Withdrawal | Credit/Deposits | Check# | Check Written To/Wire Paid To | Check Signed By/Wire From | Check Memo Line/Wire Description | Account Balance (Calculated) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/3/2017 | NON-M&T ATM FEE UN 01/02 Global Cash Ac101 MGM NATIONAL AOXON HILL, MD | $ (3.00) | | | | | | $ 160,302.36 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/4/2017 | CHECK NUMBER 0055 | $ (2,000.00) | | 55 | CASH | Jay Benjamin - Ventricle Advisory Consultants (M&T Bank *6629) | | $ 158,302.36 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/4/2017 | CHECK NUMBER 558 | $ (530.00) | | 558 | | | | $ 157,772.36 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/4/2017 | CHECK NUMBER 583 | $ (150.00) | | 583 | | | | $ 157,622.36 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/5/2017 | SPRINT WIRELESS 800-639-6111 866L ATM CASH WITHDRAWAL ON 01/09 | $ (928.19) | | | | | | $ 156,694.17 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/9/2017 | ST JOHNS LANE 1, BALT NTL PK, ELLICOTT CITY, MD | $ (1,000.00) | | | | | | $ 155,694.17 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/13/2017 | GLOBAL CASH ACCESS NASSAI | $ (1,954.25) | | | Global Cash Access - Nassau | | | $ 153,739.92 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/13/2017 | INTERNATIONAL FEE - GLOBAL CASH | $ (58.63) | | | | | | $ 153,681.29 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/18/2017 | DEPOSIT | | $ 1,000.00 | 300761965-8 | Ventricle Advisory Consultants | Ventricle Advisory Consultants (M&T Bank - Cashier's Check) | #6216 - St Johns Lane | $ 174,681.29 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/18/2017 | DEPOSIT | | $ 10,000.00 | 300761995-5 | Ventricle Advisory Consultants | Ventricle Advisory Consultants (M&T Bank - Cashier's Check) | #6216 - St Johns Lane | $ 174,681.29 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/18/2017 | DEPOSIT | | $ 10,000.00 | 300761995-6 | Ventricle Advisory Consultants | Ventricle Advisory Consultants (M&T Bank - Cashier's Check) | #6216 - St Johns Lane | $ 174,681.29 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/18/2017 | CHECK NUMBER 0055 | $ (1,250.00) | | 55 | CASH | Jay Benjamin - Ventricle Advisory Consultants (M&T Bank *6629) | | $ 173,431.29 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/18/2017 | PIN Global Cash Acce OXON HILL | $ (1,042.95) | | | Global Cash Access - Oxon Hill | | | $ 172,388.34 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/19/2017 | CHECK NUMBER 568 ATM CASH WITHDRAWAL ON 01/19 | $ (3,280.00) | | 568 | DJ.ezzo Corp | Jay Benjamin - Ventricle Advisory Consultants (M&T Bank *6629) | | $ 169,108.34 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/19/2017 | BANK OF AMERIC ARUNDEL MILLS HANOVER,MD | $ (803.00) | | | | | | $ 168,305.34 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/19/2017 | NON M&T ATM FEE ON 01/19 BANK OF AMERIC ARUNDEL MILLS HANOVER MD | $ (3.00) | | | | | | $ 168,302.34 |
| M&T Bank | 852 | Ventricle Advisory Consultants | 1/20/2017 | BALTIMORE GAS&ELECTRIC800-685-0123 | $ (602.00) | | | | | | $ 167,700.34 |
| M&T Bank | 1852 | Ventricle Advisory Consultants | 1/23/2017 | DEPOSIT | | $ 27,000.00 | 300809915-0 | James A Benjamin | James A Benjamin (M&T Bank - Cashier's Check) | #6216 - St Johns Lane | $ 214,700.34 |
| M&T Bank | 1852 | Ventricle Advisory Consultants | 1/23/2017 | DEPOSIT | | $ 20,000.00 | 300761904-6 | Ventricle Advisory Consultants | Ventricle Advisory Consultants (M&T Bank - Cashier's Check) | #6216 - St Johns Lane | $ 214,700.34 |
| M&T Bank | 1852 | Ventricle Advisory Consultants | 1/23/2017 | CHECK NUMBER 0055 | $ (27,000.00) | | 300809915-0 | James A Benjamin | James A Benjamin (M&T Bank - Cashier's Check) | #6216 - St Johns Lane | $ 171,700.34 |

| Bank | Account Number | Account Name | Posted Date | Description | Credits/Deposits | Debits/Withdrawals | Check # | Check Written To/Wire Paid To | Check Signed By/Wire From | Check/Memo Line/Wire Description | Account Balance (Calculated) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/23/2017 | CHECK NUMBER 0055 | | $ (16,000.00) | 300800915 | | Jay Benjamin – Ventnile Advisory Consultants (M&T Bank *6629) | | $ 171,700.34 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/23/2017 | CHECK NUMBER 0055 ATM CASH WITHDRAWAL ON 0123 | | $ (2,000.00) | 55 | Cash | | | $ 169,700.34 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/23/2017 | Global Cash Ac101 MGM NATIONAL A OXON HILL MC | | $ (1,004.99) | | Global Cash Access - MGM National Oxon Hill | | | $ 168,695.35 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/23/2017 | CHECK NUMBER 566 NONM&ET ATM FEE ON 0123 | | $ (190.00) | 566 | | | | $ 168,505.35 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/23/2017 | Global Cash Ac101 MGM NATIONAL A OXON HILL MD | | $ (3.00) | | | | | $ 168,502.35 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/24/2017 | CHECK NUMBER 565 | | $ -2,000.00) | 565 | Sarah L Melton | Jay Benjamin – Ventnile Advisory Consultants (M&T Bank *6629) | wk 2in 2017 | $ 166,502.35 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/24/2017 | PIN SAFEWAY STORE 12 ELLICOTT CITY | | $ (23.62) | | | | | $ 166,478.73 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/25/2017 | JETBLUE 27921683 21 SALT LAKE CITY | | $ (831.38) | | | | | $ 165,647.35 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/25/2017 | NE F&B - NAIL MARKET OXON HILL | | $ (12.72) | | | | | $ 165,634.63 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/26/2017 | ATM CASH WITHDRAWAL ON 0125 Global Cash Ac101 MGM NATIONAL A OXON HILL MC | | $ (1,004.99) | | Global Cash Access - MGM National Oxon Hill | | | $ 164,629.64 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/26/2017 | NONM&ET ATM FEE ON 0125 Global Cash Ac101 MGM NATIONAL A OXON HILL MD | | $ (3.00) | | | | | $ 164,626.64 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/27/2017 | CHECK NUMBER 570 | | $ (350.00) | 570 | | | | $ 164,276.64 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/27/2017 | NE F&B - NATL MARKET OXON APPLEBEES | | $ (16.96) | | | | | $ 164,259.68 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/27/2017 | 97610163320 SALTIMORE | | $ (14.30) | | | | | $ 164,245.38 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/30/2017 | 8684 7 ATM CASH WITHDRAWAL ON 0129 ST JOHNS LANE 2, BALT NTL PK, ELLICOTT CITY MD | | $ (1,000.00) | | | | | $ 163,245.38 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/30/2017 | APPLEBEES 97610163320 SBALTIMORE | | $ (38.75) | | | | | $ 163,206.63 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 1/30/2017 | NE F&B - NAT L MARKET OXON HILL | | $ (11.13) | | | | | $ 163,195.50 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 2/1/2017 | NE F&B - NAT L MARKET OXON HILL | | $ (24.38) | | | | | $ 163,171.12 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 2/1/2017 | NE F&B - NAT L MARKET OXON HILL | | $ (10.60) | | | | | $ 163,160.52 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 2/2/2017 | EXTENDED STAY 9661 410-691-2500 | | $ (90.39) | | | | | $ 163,070.13 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 2/2/2017 | PURCHASE ON 0201 Wal-Mart Super2412 WAL-SAMS ELLICOTT CITY MD | | $ (38.93) | | | | | $ 163,031.20 |
| M&T Bank | 852 | Ventnile Advisory Consultants | 2/6/2017 | CHECK NUMBER 571 | | $ (300.00) | 571 | | | | $ 162,731.20 |

| Bank | Account Number | Account Name | Posted Date | Description | Debits/ Withdrawals | Credits/ Deposits | Check # | Check Written To/ Wire Paid To | Check Signed By/ Wire From | Check Memo Line/ Wire Description | Account Balance (Calculated) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&T Bank | 852 | Ventside Advisory Consultants | 2/8/2017 | CHECK NUMBER 0055 | $ (7,000.00) | | 300800960-1 | Ventical Advisory Consultants | Jay Benjamin - Ventside Advisory Consultants (Cashier's Check) | #0216 - St. Johns Lane Endorsed" Jay A Benjamin For Deposit Only | $ 150,731.20 |
| M&T Bank | 852 | Ventside Advisory Consultants | 2/8/2017 | CHECK NUMBER 0055 | $ (5,000.00) | | 300800961-0 | Ventical Advisory Consultants | Jay Benjamin - Ventside Advisory Consultants (Cashier's Check) | #0216 - St. Johns Lane Endorsed" Jay A Benjamin Pay to Rosenbr | $ 150,731.20 |
| M&T Bank | 852 | Ventside Advisory Consultants | 2/8/2017 | CHECK NUMBER 572 | $ (500.00) | | 572 | | | | $ 150,431.20 |
| M&T Bank | 852 | Ventside Advisory Consultants | 2/8/2017 | DCA REAGAN WASHINGTON | $ (150.00) | | | | | | $ 150,281.20 |
| M&T Bank | 852 | Ventside Advisory Consultants | 2/22/2017 | CHECK NUMBER 575 | $ (3,380.00) | | 575 | D Lesge Corp | Jay A Benjamin - Ventside Advisory Consultants (M&T *1852) | 7013 Acc... | $ 147,001.20 |
| M&T Bank | 852 | Ventside Advisory Consultants | 3/3/2017 | MISCELLANEOUS DEBIT | $ (147,001.20) | | | | | | $ - |
| M&T Bank | 852 | Ventside Advisory Consultants | 4/10/2017 | SERVICE CHARGE FOR ACCOUNT 0000985942185 2 | $ (20.00) | | | | | | $ (20.00) |
| M&T Bank | 852 | Ventside Advisory Consultants | 5/8/2017 | SERVICE CHARGE FOR ACCOUNT 0000985942185 2 | $ (20.17) | | | | | | $ (40.17) |
| M&T Bank | 1852 | Ventside Advisory Consultants | 6/8/2017 | SERVICE CHARGE FOR ACCOUNT 0000985942185 2 | $ (20.45) | | | | | | $ (60.62) |
| M&T Bank | 1852 | Ventside Advisory Consultants | 7/11/2017 | SERVICE CHARGE FOR ACCOUNT 0000985942185 2 | $ (20.69) | | | | | | $ (81.31) |
| M&T Bank | 1852 | Ventside Advisory Consultants | 7/18/2017 | COLLECTION ACCOUNT FEE | | $ 81.31 | | | | | $ - |
| M&T Bank | 1852 | Ventside Advisory Consultants | 7/18/2017 | COLLECTION ACCOUNT - CHARGE OFF CREDIT | | $ - | | | | | $ - |

# EXHIBIT 14

Gmail - (no subject)

https://mail.google.com/mail/u/0/?ui=2&ik=7859139537&view=pt&q=..



**M** Gmail  Diana Leege <████████@gmail.com>

## (no subject)
1 message

████████@aol.com <████████@aol.com>  Tue, Oct 4, 2016 at 11:50 AM

To: ████████@gmail.com
Cc: ████████@millhousetradefinance.com

*Good morning Diana, attached are 2 applications, one is for the Attorneys and the other is for Millhouse Trade Finance due dudiligence.*

*1. Millhouse Trade Finance will purchase through its bank a SBLC, (Stand By Letter of Credit) in your company name D Leege Corp. a Florida corporation.*

*2. Upon the execution of the SBLC, they will forward this instrument to a receiving bank that will issue a loan to D Leege Corp in the amount of 2million, minus fees cost of instrument, financing etc.*

*3. In an effort to get this process going YOU must fill out the applications, and be prepared within 48 hours to send to Millhouse Trade, the amount of the requested invoice of $48,500.00 usd. ( 20,000.00, 1% of the face amount of the instrument and 3000.00 which is the account opening funds are fully refundable.) The balance of 25,000.00 is for professional services as well as Attorneys and broker fees. Please acknowledge this process may take 90-125 business days to completion.*

*4. The loan is secured by the addresses ████████ ████████, as well as ████████ Millhouse Trade Finance will be in first position on both properties, and will allow enough of an advanced loan at settlement to make the pay-off of the existing 125k, left on the Old*

*Course address. If you are in agreement with this as it is stated,*
*we will move on to a confirmation of Terms. If you have any*
*questions or comments please call me at* ▮▮▮▮▮▮ *. thank you*
*Jay A Benjamin.*

**2 attachments**

**Application For Trade Finance Facility edited copy.docx**
6K

**DD CLIENTE (ENGLISH).docx**
6K

# EXHIBIT 15



**MILLHOUSE TRADE FINANCE**

### Global Trade Finance – Letter of Credit Facilities

**Date: Sept 16, 2016**                              **Invoice# 09162016**

Client Name:   KEITH S BOUCHELION
Company:    LASER ESSENTIALS LLC
Address:
Email:                          LASSERESSENTIAL.COM
Rep:        JAMES

Total of all Guarantee for this worksheet only            USD 2,000.000 .00

**DESCRIPTION**                                      **AMOUNT**

Type: Standby Guarantee                              $ 2,000.000.00
Validity: Up to 360 days

| CHARGES | AMOUNT |
|---|---|
| Guarantee Charges... ..................... ......USD Standard LC Opening Fee: Document Negotiation Fee: | 96,000.00 |
| Total  Guarantee Charges... ...... .............USD | 96,000.00 |
| TOTAL DUE PRIOR TO OPENING (100% OF TOTAL) | 96,000.00 |
| Partial charges | |

Upon negotiations there may be a holdback of up to 0.25 percent of the payment to the beneficiary from the LC issuing bank. If additional fees are required they must be paid upon receipt of invoice. They may include any items that are shown in the letter of credit to be paid by the beneficiary and where the beneficiary refuses to pay. All letters of credit are governed by the Uniform Customs and Practices for Documentary Credits 1993 (UCP) Per UCP article no. 18cll it states. "Where a Credit stipulates that such changes are for the account of a party other than the instructing party and changes cannot collect, the instructing party remains ultimately liable for the payment thereof."

Please e-mail a copy of your wire transfer when paying this invoice:
                        @millhousetradefinance.com

**Bank Name:** Bank of America
**Account Name:** Millhouse Trade Finance Inc.
**Account Number:**          5989
**ABA (Wires):**
**Swift Code:**

*Thank you for your business*

# EXHIBIT 16



# Ventricle Advisory Consultants LLC.

Attn: Millhouse Trade Finance

RE: LASERESSENTIAL Acct # LE1622016

Invoice for services rendered regarding the above referred client

Please remit the amount outsatanding upon receit of client confirmations of funds to the transaction account of DPMG LLC c/o NFCU.

Amount Due.................................................................................................$ 30,000.00

SINCERELY, Jay A. Benjamin

# EXHIBIT 17

**Ahn, Demian (USADC)**

| | |
|---|---|
| **From:** | @millhousetradefinance.com |
| **Sent:** | Thursday, September 15, 2016 5:52 PM |
| **To:** | @aol.com |
| **Subject:** | Application for Laser Essentials LLC |

Upon review of your most recent application from your client, Las=r Essentials, LLC. , please see the following:

A.=SBLC = $2,000,000.00, validity 1 year, 10%.
B. Security fee (p=ior to issue of instrument),3% = $60,000.00
C. Attorneys fees,=etc.= $6,000.00
D. Intermediary Broker's fees= $11,500.00

Items B and C are refundable.

=/div>
Please, review the terms outlined above and reply at your conven=ence.

Best Regards,
Pete Kechagias, President.

Mil=house Trade Finance Inc.
www.Millhousetradefinance.com

*Thank you for considering the environmental impacts b=fore printing this e-mail.*

Confide=tiality Statement:
The information in this email transmission is privil=ged and confidential. If you are not the intended recipient, nor the emplo=ee or agent responsible for delivering it to the intended recipient, you a=e hereby notified that any dissemination or copying of this transmission (=ncluding
any attachments) is strictly prohibited. If you have received =his email in error, please notify the sender by email reply.
<=body>

# EXHIBIT 18

# EXHIBIT 19

**Ahn, Demian (USADC)**

| | |
|---|---|
| **From:** | @millhousetradefinance.com |
| **Sent:** | Wednesday, November 9, 2016 4:24 PM |
| **To:** | @comcast.net |
| **Cc:** | @outlook.com |
| **Subject:** | GGI LLC INVOICE |
| **Attachments:** | GGI LLC INVOICE.pdf |

Lawrence,
=div>We are in receipt of your most recent application.

Please see&=bsp; below.

Client ID: GGI1109
Amount Requested: $6,000,000.00
<=r>SBLC instrument: 10% annually
Bank International: 4.5-5.0= annually

Prior to issue of instrument: $120,000.00

*Attorney Fees for legalization of documents and opening accoun=, initial deposit,refundable.*

=br>Regards,
Pete Kechagias
President

Millhouse Trade F=nance Inc.
www.Millhou=etradefinance.com

*Thank you for considering the environ=ental impacts before printing this e-mail.*

Confidentiality Statement:
The information in this email transmiss=on is privileged and confidential. If you are not the intended recipient, =or the employee or agent responsible for delivering it to the intended rec=pient, you are hereby notified that any dissemination or copying of this t=ansmission (including any attachments) is strictly prohibited. If you have=received this email in error, please notify the sender by email reply.

1



**MILLHOUSE TRADE FINANCE**

### Global Trade Finance – Letter of Credit Facilities

**Date: Nov 09, 2016**                                      **Invoice# 11092016**

Client Name:    LAWRENCE Z GARRISON
Company:        GIDEON GLOBAL INVESTMENTS LLC
Address:
Email:                                    @OUTLOOK.COM
Rep:            JAMES BENJAMIN

Total of all Guarantee for this worksheet only                    USD 6,000,000 .00

**DESCRIPTION**                                            **AMOUNT**

Type: Standby Guarantee                                    $ 6,000,000.00
Validity: Up to 360 days

| CHARGES | AMOUNT |
|---|---|
| Guarantee Charges… …………………… ……USD<br>Standard LC Opening Fee:<br>Document Negotiation Fee:<br>Total  Guarantee Charges… …… …………USD | 120,000.00<br><br><br>120,000.00 |
| TOTAL DUE PRIOR TO OPENING (100% OF TOTAL) | 120,000.00 |
| **Partial charges** | |

Upon negotiations there may be a holdback of up to 0.25 percent of the payment to the beneficiary from the LC issuing bank. If additional fees are required they must be paid upon receipt of invoice. They may include any items that are shown in the letter of credit to be paid by the beneficiary and where the beneficiary refuses to pay. All letters of credit are governed by the Uniform Customs and Practices for Documentary Credits 1993 (UCP) Per UCP article no. 18cii it states, "Where a Credit stipulates that such changes are for the account of a party other than the instructing party and changes cannot collect, the instructing party remains ultimately liable for the payment thereof."

Please e-mail a copy of your wire transfer when paying this invoice:
@millhousetradefinance.com

Bank Name: Bank of America
Account Name: Millhouse Trade Finance Inc.
Account Number:              5989
ABA (Wires):
Swift Code:

*Thank you for your business*

# EXHIBIT 20



# Ventricle Advisory Consultants LLC.

Attn: Millhouse Trade Finance

RE: GGI LLC Acct # GGI1109

Invoice for services rendered regarding the above referred client

Please remit the amount outsatanding upon receit of client confirmations of funds to the transaction account of DPMG LLC c/o NFCU.

Amount Due.................................................................................$ 54,000.00

SINCERELY, Jay A. Benjamin

# EXHIBIT 21

29Q-WF-2127393 Serial 114

-1 of 5-

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD
Document participant/s have digitally signed.
All signatures have been verified by a
certified FBI information system.

Date of entry   02/23/2018

KEITH BOUCHELION (BOUCHELION),                                was
interviewed at the United States Attorney's Office for the District of
Columbia, 555 4th Street NW, Washington, D.C.  Also present for the
interview was BOUCHELION's legal counsel, C. Sukari, Hardnett and
Assistant United States Attorneys Demian Ahn and Thomas Swanton.  After
being advised of the identity of the interviewing Agent and the nature of
the interview, BOUCHELION provided the following information:

## BACKGROUND

BOUCHELION currently runs the business LASER ESSENTIALS (LASER) with
his business partner TERESE THOMAS (THOMAS).  LASER is a Maryland company
and was first established in February or March of 2014.  LASER is located
in College Park, Maryland.  LASER is a "medspa" company that provides
aesthetic laser hair removal and other skin treatment
services.  BOUCHELION handles the business aspect of the business and
THOMAS is a doctor who handles the medical/treatment aspect of the
business.

In 2016, BOUCHELION and THOMAS were interested in expanding LASER's
business.  BOUCHELION and THOMAS wanted to purchase a boat and to provide
"medspa" treatments during cruises on the Potomac River.  BOUCHELION and
THOMAS thought it was a good time to add a luxury service like this
because it was an election year, which would bring certain clientele to
the Washington, D.C. area.

BOUCHELION went through bankruptcy in 2008 after a divorce.  The
bankruptcy affected BOUCHELION's ability to obtain traditional credit and
financing for LASER.

LASER conducts its banking business at BANK OF AMERICA
(BOA).  BOUCHELION conducts his own personal banking business at SUNTRUST
BANK (SUNTRUST).  ARNOLD POINTS (POINTS), a branch manager at SUNTRUST
tried to convince BOUCHELION to bring LASER's business to
SUNTRUST.  BOUCHELION explored financing options for LASER, but because of

---

Investigation on  02/16/2018  at  Washington, District Of Columbia, United States (In Person)

File #  29Q-WF-2127393                                                    02/23/2018

by  SA Tristan S. Hall

This document contains neither recommendations nor conclusions of the FBI                    y; it and its contents are not
to be distributed outside your agency.

29Q-WF-2127393 Serial 114

FD-302a (Rev. 05-08-10)

29Q-WF-2127393

Continuation of FD-302 of (U) Interview of Keith Bouchelion _____, On 02/16/2018 , Page 2 of 5

BOUCHELION's poor credit, SUNTRUST required a down payment of 20 percent
on the $1 million loan for the boat LASER was interested in.  LASER could
not afford a $200,000 down payment.

POINTS was the manager at the SUNTRUST branch located at 5600 Greenbelt
Road, College Park, Maryland.  POINTS and BOUCHELION also knew each other
socially through being Masons.

## JAMES "JAY" BENJAMIN

BOUCHELION was first introduced to JAMES "JAY" BENJAMIN (BENJAMIN) by
POINTS.  POINTS knew that BOUCHELION was looking for financing options in
order to expand LASER's business.  POINTS advised BENJAMIN could assist
BOUCHELION with obtaining financing through private lenders.  POINTS
vouched for BENJAMIN and advised he had referred other clients to BENJAMIN.

POINTS put BOUCHELION in touch with BENJAMIN.  BOUCHELION never met
BENJAMIN in-person.  BOUCHELION and BENJAMIN communicated over the phone,
through email, and through text message.

BENJAMIN presented BOUCHELION with a Stand By Letter of Credit (SBLC)
bank "instrument" financing option.  BENJAMIN was a "broker" who helped
clients obtain bank "instruments" through a company called MILLHOUSE TRADE
FINANCE (MILLHOUSE), which was run by a man named PETE LNU
(PETE).  BENJAMIN explained the financing came through private
international banks that worked with MILLHOUSE.  BOUCHELION recalls
BENJAMIN referencing banks in Singapore, Colombia, China, and Hong Kong.

BOUCHELION was interested in obtaining financing for $1.5 million, but
BENJAMIN pushed for $3 million.  BENJAMIN told BOUCHELION that BOUCHELION
could always return any unused portion of the money without
penalty.  Ultimately, BOUCHELION applied for $2 million.  BOUCHELION was
told that if he provided $96,000 up-front, he would receive $2 million
within approximately 60 days.

The financing terms were attractive to BOUCHELION.  BOUCHELION
discussed the option with THOMAS and they decided to move
forward.  BOUCHELION filled out some paperwork and provided all of
LASER's business information to BENJAMIN, including information on the
assets and equipment owned by LASER.  BOUCHELION does not recall if
BENJAMIN requested financial statements.  BOUCHELION does not recall if he
disclosed his prior bankruptcy to BENJAMIN and PETE.  BOUCHELION never
signed a release to allow MILLHOUSE to run a credit check on BOUCHELION.

BENJAMIN told BOUCHELION that BOUCHELION had to communicate through
BENJAMIN and to not communicate directly with PETE.  In September 2016,

FD-302a (Rev. 05-08-10)

29Q-WF-2127393

Continuation of FD-302 of <u>(U) Interview of Keith Bouchelion</u> , On <u>02/16/2018</u> , Page <u>3 of 5</u>

LASER paid approximately $98,000 to MILLHOUSE for the "instrument." Although, only $96,000 was required, an additional $2,000 was sent by mistake.

BOUCHELION is not sure what the $98,000 was actually for. BOUCHELION does not know if the $98,000 was supposed to be applied as a down payment toward the boat or if it was just a fee. BOUCHELION just knows that the money was required in order to "secure" the financing. BOUCHELION believed he would receive the $2 million within 60 days of making the payment to MILLHOUSE. BOUCHELION understood the full amount to be refundable in the event the financing did not go through.

It was BOUCHELION's understanding at the time the money was paid that LASER had been approved for the financing and the payment from LASER was the last step to finalize the loan. It was BOUCHELION's understanding that following the payment by LASER, the SBLC/instrument would be "created" and then the $2 million would be sent to LASER's bank account for LASER to use the money to purchase the boat.

LASER took other steps to prepare for the boat purchase, including leasing space at a marina and paying slip fees. BOUCHELION's plan was to have the boat on-site at the marina by November 1, 2016.

Everything seemed fine until 60 days passed without obtaining the financing. BENJAMIN provided a myriad of excuses for the delay, including a lawyer who was supposedly involved getting sick. Time continued to pass without any success in actually obtaining the financing. BOUCHELION started to lose confidence in BENJAMIN and the financing.

BOUCHELION was trying to honor BENJAMIN's request to not communicate directly with PETE, but at some point, THOMAS reached out to PETE directly about the financing. PETE advised that he had not been able to get in touch with BENJAMIN. When BOUCHELION confronted BENJAMIN about this, BENJAMIN claimed he was still in touch with PETE and that the financing was still "a go." Both BENJAMIN and PETE made reference to one final document that was needed for the financing, but neither one would ever give specifics on what document was needed.

THOMAS and BOUCHELION agreed to request a refund and cancel the financing application. BOUCHELION requested a refund in a telephone call with PETE. PETE referred BOUCHELION to his attorney. LASER hired an attorney as well to assist them with trying to get a refund. PETE's attorney requested a signed release form in order to refund $68,000. PETE advised the other $30,000 was sent to BENJAMIN as a broker fee. PETE advised that the fee was part of the agreement between LASER and BENJAMIN and that LASER would have to talk to BENJAMIN about the rest of the money.

FD-302a (Rev. 05-08-10)

29Q-WF-2127393 Serial 114

29Q-WF-2127393

Continuation of FD-302 of (U) Interview of Keith Bouchelion _____, On 02/16/2018 , Page 4 of 5

 

This was the first time BOUCHELION was aware of BENJAMIN receiving any money. BOUCHELION's understanding was that BENJAMIN would receive a broker fee that would come out of the money LASER paid, but that the fee would be paid after closing on the loan. THOMAS and BOUCHELION ultimately agreed to sign the release in order to get the $68,000.

BOUCHELION tried to call BENJAMIN, but BENJAMIN did not answer. When BOUCHELION finally got in touch with BENJAMIN, BENJAMIN claimed that someone had broken into his car and stolen his cell phone and laptop computer. This was in or about February/March 2017. When BOUCHELION confronted BENJAMIN about the $30,000, BENJAMIN blamed PETE for the failed financing. BENJAMIN advised the $30,000 was his commission, that the money would not be refunded and that there was nothing BOUCHELION could do about it. BOUCHELION believes that BENJAMIN and PETE made up a pretend "document" that was missing in order to be able to blame BOUCHELION for the financing not going through.

**DOCUMENT REVIEW**

BOUCHELION was shown an email dated August 31, 2016, from BENJAMIN to BOUCHELION, titled "applications." BOUCHELION's attention was directed to the terms outlined in the email. BOUCHELION advised he understood the terms regarding "indemnify[ing]" the loan with assets to mean that LASER was "legitimate," had assets, and that PETE could come after LASER's assets if LASER defaulted. LASER's assets are valued at between $300,000 and $400,000. BOUCHELION was never told he needed to have collateral to back up 100 percent of the value of the SBLC/instrument.

BOUCHELION was shown an email dated September 24, 2016, from BOUCHELION to BENJAMIN, titled "Fw: Your Scanned Documents." BOUCHELION advised the document attached to the email is a copy of the mailing label for a package that was sent to MILLHOUSE. BOUCHELION advised that BOUCHELION and THOMAS were at an event at the W HOTEL in Washington, D.C. that day. BOUCHELION sent the email to BENJAMIN using his cell phone while BOUCHELION was in Washington, D.C. The package contained "a check or something" related to the payment made to MILLHOUSE in order to secure the loan.

BOUCHELION was shown a document titled "Application for Trade Finance Facility." BOUCHELION advised he recalled filling out the document.

BOUCHELION was shown a document titled "Master Facility Agreement." BOUCHELION advised he recalled signing the

29Q-WF-2127393 Serial 114

FD-302a (Rev. 05-08-10)

29Q-WF-2127393

Continuation of FD-302 of (U) Interview of Keith Bouchelion ____, On 02/16/2018 , Page 5 of 5

document.  BOUCHELION did not understand the information in the document, but thought that it looked official and was told it was required in order to secure the financing.

BOUCHELION was shown an invoice from MILLHOUSE for the amount of $96,000.  BOUCHELION advised he recognized the invoice.

BOUCHELION was shown a document titled "Swift Input: FIN 760 Guarantee /Stdby Letter of Credit."  BOUCHELION advised he recognized the document and that when he received this document from BENJAMIN, it made BOUCHELION worried that MILLHOUSE had done something in LASER's name.  BENJAMIN told BOUCHELION that the document was an example of an SBLC.

## MISCELLANEOUS

PETE claimed to have five brokers like BENJAMIN across the nation.

LASER has not been able to get out of its lease at the marina.  LASER has spent a total of $55,000 for the lease at the marina and approximately $4500 for slip fees.  LASER is still in the lease and will have to continue to pay.

BOUCHELION lived in Greenbelt, Maryland for part of 2016, but by September 1, 2016, BOUCHELION was living in Washington, D.C.

BOUCHELION previously served in the United States Army in the area of military intelligence.

## ARNOLD POINTS

POINTS was fired from SUNTRUST for scamming people at the bank.  The last BOUCHELION heard, POINTS was in New Orleans.  At some point, POINTS filed a motion for a protective order against BOUCHELION because POINTS violated a rite of masonry.  BOUCHELION went to the hearing, but POINTS never showed up, so the motion was dismissed.

MICHELE HUGHES is a teller at SUNTRUST who may have information about POINTS defrauding customers at SUNTRUST.

# EXHIBIT 22

29Q-WF-2127393 Serial 132

-1 of 3-

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    04/03/2018

LAWRENCE GARRISON (GARRISON), previously identified, was interviewed at the United States Attorney's Office for the District of Columbia, 555 4th Street NW, Washington, D.C. Also present for the interview was Assistant United States Attorney Demian Ahn. After being advised of the identity of the interviewing Agent and the nature of the interview, GARRISON provided the following information:

GARRISON is the assistant pastor for the CHURCH OF THE RAPTURE (RAPTURE). In or about the fall of 2016, RAPTURE was presented with an opportunity to purchase the church building it had been leasing located at ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ RAPTURE was interested in purchasing the building, but was unsuccessful with obtaining traditional bank financing. RAPTURE did not have enough cash and credit to get a loan. One of RAPTURE's partners was going to put up the money for the purchase, but it did not work out.

A member of the congregation, EDWARD MATTHEWS (MATTHEWS), referred RAPTURE to JAMES BENJAMIN (BENJAMIN). MATTHEWS thought BENJAMIN could assist RAPTURE with obtaining financing to purchase the church building.

BENJAMIN came to the church building to meet with GARRISON, GLORIA SWEETNEY (SWEETNEY), and the church board. BENJAMIN claimed to have a contact who could provide financing. BENJAMIN explained that the loan was different than a traditional bank loan and that money would have to be paid up front as a fee. For an upfront fee, RAPTURE could obtain a loan for $6 million. The process took about 60 days. The loan would have to be paid back according to the agreement. BENJAMIN did not explain how the church would be able to qualify for the loan when the church was not able to qualify for other traditional bank loans. GARRISON made sure BENJAMIN was aware that RAPTURE was not able to get approved for traditional financing. RAPTURE was told that if the loan was not issued, RAPTURE would be refunded the upfront fee.

BENJAMIN asked RAPTURE to complete some paperwork. GARRISON provided corporation documents associated with his company GIDEON GLOBAL INVESTMENTS (GIDEON). GIDEON is a company GARRISON already had set up that he allowed RAPTURE to use for the transaction. GIDEON is a

---

Investigation on  03/28/2018  at  Washingt▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒States (In Person)

File #  29Q-WF-2127393                                    ▒te drafted  04/02/2018

by  SA Tristan S. Hall

This document contains neither recommendations nor conclusi▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒r agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

29Q-WF-2127393 Serial 132

29Q-WF-2127393

Continuation of FD-302 of (U) Interview of Lawrence Garrison _____, On 03/28/2018 , Page 2 of 3

government contracting company that GARRISON used to provide social
service type assistance through contracts with the city of Washington, D.
C.  RAPTURE had to use GIDEON rather than its own business entity because
BENJAMIN said that the company used for the transaction could not be a non-
profit.

RAPTURE agreed to move forward with the loan.  BENJAMIN advised the
upfront fee would be $120,000.  RAPTURE wired a total of $120,000 to
MILLHOUSE TRADE FINANCE (MILLHOUSE), an entity involved in securing the
loan.  GARRISON was not aware of any of that money going to
BENJAMIN.  GARRISON and RAPTURE did not give permission for any of that
money to be sent to BENJAMIN.  GARRISON did not deal directly with PETE
KECHAGIAS (KECHAGIAS) from MILLHOUSE.  GARRISON dealt with BENJAMIN and
BENJAMIN dealt with KECHAGIAS.

After RAPTURE sent the $120,000, RAPTURE was just waiting for the loan
to go through.

GARRISON was shown a document titled Application for Trade Finance
Facility, dated November 7, 2016. GARRISON confirmed this was one of the
forms he filled out on behalf of RAPTURE related to the loan.

GARRISON was shown a document titled Master Facility Agreement, dated
December 14, 2016. GARRISON confirmed this was one of the forms he filled
out on behalf of RAPTURE related to the loan.

GARRISON was shown an email chain dated November 15, 2016, with the
subject line: "Re: GGI LLC INVOICE – Gideon Global Bank Transfer
Slip.  GARRISON advised he recognized the email.  GARRISON pointed out a
portion of the email chain that was from KECHAGIAS to SWEETNEY about the
fee being refundable.  BENJAMIN spoke with both GARRISON and SWEETNEY
about the transaction.

GARRISON was shown an invoice from MILLHOUSE, dated November 9, 2016
for the amount of $120,000.  GARRISON advised he recognized the
document.  Based on the explanation BENJAMIN gave to RAPTURE's board, the
board was aware that the $120,000 was an upfront fee related to the
financing.

GARRISON was shown a document titled: "FIN 760 Guarantee/Stdby Letter
Credit."  GARRISON advised he recognized the document.  BENJAMIN sent the
document.  GARRISON thought that it was a letter advising the loan was
going through.  The signature on the second page of the document is
GARRISON's.  BENJAMIN asked GARRISON to sign and return the document after
GARRISON had pressed BENJAMIN for an update on the loan.

29Q-WF-2127393 Serial 132

FD-302a (Rev. 05-08-10)

29Q-WF-2127393

Continuation of FD-302 of (U) Interview of Lawrence Garrison _____ , On 03/28/2018 , Page 3 of 3

 

BENJAMIN never explained anything about needing cash collateral for 100 percent of the loan. RAPTURE did not have cash for collateral for the loan. At the time RAPTURE was looking for financing, RAPTURE had about $150,000 in its accounts. RAPTURE assumed that the building being purchased with the $6 million loan would be used as collateral for the loan, just like a traditional mortgage. BENJAMIN never said anything about getting a separate loan to get $6 million in cash to use as collateral to get the loan.

At some point, GARRISON lost contact with BENJAMIN. MATTHEWS also tried to get in touch with BENJAMIN and was not successful. RAPTURE started to worry about the loan. After GARRISON was unsuccessful in reaching BENJAMIN, he eventually contacted KECHAGIAS directly to try to get RAPTURE's money back. KECHAGIAS explained that a portion of the $120,000 had been subsequently wired to BENJAMIN as an upfront fee. GARRISON was surprised by this and thought it was wrong for a fee to be taken before the service was fully provided.

GARRISON was shown an invoice from VENTRICLE ADVISORY CONSULTANTS for the amount of $54,000. GARRISON did not recognize the document. GARRISON was never aware of an upfront fee going to BENJAMIN.

KECHAGIAS referred GARRISON to his attorney. GARRISON worked with KECHAGIAS's attorney to get a refund of about $60,000.

At some point after contacting KECHAGIAS, GARRISON had a phone call with BENJAMIN. BENJAMIN claimed he would try to help GARRISON get a refund, but he never actually did.

GARRISON never spoke to anyone else at MILLHOUSE. GARRISON never talked to MATTHEWS about the issue after being in touch with the FBI. GARRISON is aware MATTHEWS had also done business with MILLHOUSE, but that MATTHEWS was refunded all of his money.

The RAPTURE congregation is upset about the loss of money and the church has had to relocate due to not getting the promised loan. The church building was sold to another buyer.

Prior to things going bad with BENJAMIN, GARRISON provided information to BENJAMIN about other property owned by RAPTURE. BENJAMIN expressed interest in helping RAPTURE sell a property worth about $30 million. BENJAMIN took some people out to see the property, but never closed a deal.

# Exhibit 23

29Q-WF-2127393 Serial 43

-1 of 3-

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/03/2017

EDWARD MATTHEWS (MATTHEWS), date of birth ▮▮▮▮▮▮▮▮, home
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
interviewed at his place of employment, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮. After being advised of the identities of the interviewing
Agents and the nature of the interview, MATTHEWS provided the following
information:

### BACKGROUND

MATTHEWS met JAMES BENJAMIN (BENJAMIN) while in college at the
UNIVERSITY OF THE DISTRICT OF COLUMBIA (UDC). They met through DARIYN
GREEN, an accounting professor at UDC, who owned a nightclub with
BENJAMIN. MATTHEWS wanted to work in the entertainment business and he
knew that BENJAMIN owned the nightclubs, BALTIMORE TUNNEL, in Baltimore,
Maryland and DIESEL, in Ocean, City, Maryland. MATTHEWS and BENJAMIN
worked together until BENJAMIN closed DIESEL due to a shooting. MATTHEWS
stayed in contact with BENJAMIN, confided in him, and viewed BENJAMIN as a
mentor.

MATTHEWS owns the business, MATTHEWS PROTECTIVE SERVICES (MPS), which
provides armed security, unarmed security and retail security. MPS has
approximately 28 employees. BENJAMIN is not involved in MPS and has never
invested in MPS.

### FINANCIAL DEALINGS WITH BENJAMIN

BENJAMIN loaned MATTHEWS $9,000 around Christmastime 2016 to help with
MPS payroll. MATTHEWS paid BENJAMIN back in full and did not view this
loan as an investment into MPS.

MATTHEWS received an additional check from BENJAMIN to help cover the
cost of the play, "Man of Her Dreams," that MATTHEWS produced. BENJAMIN
"bailed" MATTHEWS out and wrote him a check to help MATTHEWS pay for costs
associated with the play. MATTHEWS and BENJAMIN had agreed that since
BENJAMIN helped MATTHEWS out, BENJAMIN would receive a percentage of
profits made from the play. MATTHEWS ended up losing money from producing

---

Investigation on  03/27      at  Suitland, Maryland, United States (In Person)
                   72017
File # 29Q-WF-2127393

by  STECHSCHULTE RACHEL ELIZABETH, SA Tristan S. Hal▮▮▮▮▮▮▮▮

This document contains neither recommendations nor conclusions of the FBI. It is the property
to be distributed outside your agency.

29Q-WF-2127393 Serial 43

FD-302a (Rev. 05-08-10)

29Q-WF-2127393

Continuation of FD-302 of (U) Interview of EDWARD MATTHEWS , On 03/27/2017 , Page 2 of 3

the play.  MATTHEWS paid BENJAMIN back in full, but did not pay BENJAMIN any extra since the play had not made any money.  This was not an investment into MPS and was unrelated to MPS.

MATTHEWS was shown an image of a check from October 2016 for the amount of $7,500 from VENTRICLE ADVISORY CONSULTANTS (VENTRICLE) made payable to MPS.  MATTHEWS noted the memo line included "man of my dream" and advised this was the money BENJAMIN loaned to MATTHEWS pertaining to the play.

MATTHEWS was shown an image of a check from December 2016 for the amount of $9,000 from VENTRICLE to MPS.  MATTHEWS noted the memo line included "loan to MPS" and advised this was the money BENJAMIN loaned to MATTHEWS during Christmastime for payroll.

MATTHEWS was shown a document with a VENTRICLE letterhead that appears to purport $55,000 had been allocated to MPS in some way related to "banking securities/SBLCs."  MATTHEWS advised he had never seen the document before.  MPS never received $55,000 from VENTRICLE.  MPS never received anything from VENTRICLE related to banking securities or SBLCs.  MATTHEWS is not familiar with any of the other entities listed on the document, aside from "Gideon Enterprises."  MATTHEWS believes Gideon Enterprises may be related to the church MATTHEWS attends.

**BUSINESS DEALINGS WITH JAMES BENJAMIN AND PETE LAST NAME UNKNOWN**

BENJAMIN was involved in some real estate projects and was teaching MATTHEWS how to bid on foreclosed property at real estate auctions.  MATTHEWS never gave BENJAMIN any money to invest in real estate.

BENJAMIN referred MATTHEWS to PETE LAST NAME UNKNOWN (LNU) (PETE) for a small business loan.  In April 2016, MATTHEWS applied for a one million dollar business loan and wired $15,500 to PETE at MILLHOUSE FINANCE.  PETE met with MATTHEWS after MATTHEWS sent the wire.  MATTHEWS was supposed to receive the loan within 30 days of transferring the money to MILLHOUSE FINANCE, but he never received the loan.

On Wednesday, March 22, 2017, MATTHEWS received a refund from PETE for the full amount paid to MILLHOUSE FINANCE.  MATTHEWS did not request the refund, but PETE called MATTHEWS and told him that because of some issues with BENJAMIN, the loan was being canceled and MATTHEWS would receive a refund.

**VENTRICLE ADVISORY CONSULTANTS**

MATTHEWS was aware of the name, VENTRICLE ADVISORY CONSULTANTS (VENTRICLE), and believed BENJAMIN used the company for real estate

FD-302a (Rev. 05-08-10)

29Q-WF-2127393

| | | 03/27 | | |
|---|---|---|---|---|
| Continuation of FD-302 of | (U) Interview of EDWARD MATTHEWS | , On | /2017 | , Page 3 of 3 |

investments.  MATTHEWS was not involved in VENTRICLE at all.  MATTHEWS was not aware of being on any paperwork associated with VENTRICLE.  BENJAMIN never asked MATTHEWS' permission to use MATTHEWS' name on any paperwork related to VENTRICLE.

MATTHEWS was shown a document that appeared to be the Articles of Organization for VENTRICLE.  MATTHEWS was not familiar with the document.  MATTHEWS advised the signature on the document that appeared to be MATTHEWS' signature was not MATTHEWS' true signature.  MATTHEWS showed the interviewing Agents an example of his signature on one of his payroll checks for MPS.  MATTHEWS also provided an example of his signature to the interviewing Agents.

## DPMG

MATTHEWS was aware of the company DPMG and believed that BENJAMIN used DPMG in the nightclub business.  MATTHEWS was not part of the company, not aware of being on any paperwork, and never gave BENJAMIN permission to use MATTHEWS' name for anything related to DPMG.  MATTHEWS was not aware that he was listed as the President of DPMG in company records.

## MISCELLANEOUS

MATTHEWS believed that the church he attends, CHURCH OF THE RAPTURE (CR), located in Suitland, Maryland was also working through BENJAMIN to try to obtain some sort of loan from MILLHOUSE FINANCE.  CR wanted to buy property and needed a loan to purchase the property.  MATTHEWS believed that CR's assistant pastor, LAWRENCE GARRISON (GARRISON), gave PETE between $50,000 and $70,000 around the holidays in 2016.

In the past, PETE has hired MATTHEWS to drive him to meetings and to visit real estate properties when PETE has been in the area.  In the summer of 2016, MATTHEWS attended a meeting between PETE, BENJAMIN and a lawyer (FIRST NAME UNKNOWN (FNU) LNU) at THE PALM in Tyson's Corner, Virginia.

MATTHEWS also drove LEE LNU, cell phone number [redacted], and PETE to look at an apartment complex in Dillon, South Carolina.  MATTHEWS believed that LEE LNU had a loan through BENJAMIN as well.

MATTHEWS agreed to provide the interviewing Agents with emails and documents related to his dealings with BENJAMIN and PETE.

# Exhibit 24

- 1 of 1 -

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     09/23/2019

    JOHN GREEN (GREEN), previously identified, was interviewed via telephone.  Also present for the telephone interview was Assistant United States Attorney Demian Ahn.  After being advised of the identity of the interviewing Agent and the nature of the interview, GREEN provided the following information:

    In 2015, when GREEN first sent $250,000 to JAMES BENJAMIN (BENJAMIN), GREEN believed the full amount would be used for the SBLC investment.  At the time, GREEN understood that BENJAMIN would eventually retain a fee or commission for his work on the investment, but GREEN did not believe that BENJAMIN was entitled to "burn" $50,000 before the investment had performed.

    At some point after GREEN sent the $250,000 to BENJAMIN, GREEN learned that only $200,000 had been further transmitted to TD BANK and "blocked" for the supposed SBLC investment.  GREEN is not sure what GREEN's understanding of what happened with the remaining $50,000 was in 2015 or what explanations BENJAMIN provided in 2015.

    GREEN does not recall the specific conversation between BENJAMIN, GREEN, and FBI agents during the initial 2016 interview where BENJAMIN advised the $50,000 was for "joint business ventures" between BENJAMIN and GREEN.  GREEN does not recall why GREEN did not object to that statement during that initial meeting.  GREEN pointed out the interview happened approximately three years ago.

    GREEN was not involved in any alleged "joint ventures" and GREEN never received anything from the $50,000.

Investigation on   09/23/2019   at   Manassas, Virginia, United States (Phone)

File #   29Q-WF-2127393          Date drafted   09/23/2019

by   SA Tristan S. Hall

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.